IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

PAUL LEWIS SIMS,                              )
                                             )
                    *Petitioner,*             )
                                             )
*v.*                                          )        Case No. : CIV-23-533-D
                                             )
DAVID BUSS, Warden,                          )
R. B. Dick Conner Correctional               )
Center, Hominy, OK                           )
                                             )
                    *Respondent.*             )


**BRIEF IN SUPPORT OF
PETITION FOR A WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY PURSUANT 28 U.S.C. § 2254**


Robert S. Jackson, OBA #22189
1300 NW 10th ST.
Oklahoma City, OK 73106
phone: (405) 602-8614
fax:     (405) 400-2167
email: bob@bobjacksonlaw.com

COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

ATTACHMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

BRIEF IN SUPPORT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.    <u>STATEMENT OF THE CASE</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    <u>JURISDICTION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    III.    <u>STATEMENT OF THE FACTS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    IV.    <u>LEGAL CLAIMS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ground One  Mr. Sims's Constitutional rights to Due Process and a fair trial were violated by the trial court's erroneous admission of evidence of misconduct allegedly committed by Mr. Sims in the country of Morocco. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        i.    The admission of evidence in violation of state rules of evidence, served to violate Mr. Sims Fourteenth Amendment right to Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        ii.    The admission of evidence of events allegedly occurring in Morocco was so prejudicial as to result in a Due Process violation and rendered Mr. Sims's trial fundamentally unfair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ground Two  The trial court's failure to instruct the jury as to the limited purpose for which it could consider evidence of crimes and sexual abuse occurring in Morocco violated Mr. Sims's Constitutional rights to Due Process and a fair trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.      The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ground Three        Mr. Sims was denied the effective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution . . . . . . . . . 29

A.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.      The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        i.      The two record-based instances of ineffective assistance . . 32

            1.      Counsel's failure to object or perhaps even be aware of the law governing the admission of evidence concerning events allegedly occurring in Morocco . . . . . . . . . . . 32

            2.      Counsel's failure to request an appropriate limiting instruction to prevent the jury from erroneously convicting Mr. Sims for crimes allegedly committed in Morocco. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        ii.      Outside-the-trial-record instances of ineffective assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

            1.      Failure to consult and communicate with Mr. Sims prior to trial to such degree that a total breakdown in communication occurred . . . . . . . . . . . . . . . . . . . . . . . 39

            2.      Failure to investigate, obtain, and utilize evidence to refute DMS's allegations of other crimes/ sexual abuse occurring in Morocco . . . . . . . . . . . . . . . . . . . . . . . . 43

                a.      Failure to interview and/or obtain the testimony of witnesses in Morocco . . . . . . . . . . . . . . . . . . . 44

                b.      Failure to obtain and utilize photographs from the Morocco trips to support Mr. Sims's testimony and challenge the testimony of DMS . . . . . . . 47

c.     Failure to obtain and utilize Mr. Sims's United States Passport as a defense exhibit . . . . . . . . 49

d.     Failure to investigate and interview DMS's sibling who denied that DMS was abused by Mr. Sims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

3.     Failure to utilize available evidence, contained in the state's discovery, to impeach and cross-examine DMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

a.     Failure to cross-examine DMS as to multiple denials made following return from second Morocco trip . . . . . . . . . . . . . . . . . . . . . . . . 53

b.     Failure to cross-examine DMS regarding different allegations of abuse contained in her multiple statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Ground Four     The accumulation of errors acted to deprive Mr. Sims of his Constitutional rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

# TABLE OF AUTHORITIES

## *Cases*

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Anderson v. State*, 130 P.3d 273 (Okla. Crim. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . 1

*Aycox v. Lytle*, 196 F.3d 1174 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Ballard v. Estelle*, 937 F.2d 453 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bramlett v. State*, 422 P.3d 788 (Okla. Crim. App. 2018) . . . . . . . . . . . . . . . . . . 17, 19, 26

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29

*Brewer v. State*,  450 P.3d 969 (Okla. Crim. App. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Burks v. State*, 594 P.2d 771 (Okla. Crim. App. 1979). . . . . . . . . . . . . . . . . . . . . . . . 18, 33

*Byrd v. Workman*, 645 F.3d 1159 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 16, 25, 57

*Crawford v. Washington*, 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Estelle v. McGuire*, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 27, 28, 34

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 45

*Harris v. Dinwiddie*, 642 F.3d 902 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Henderson v. Kibbe*, 431 U.S. 145 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hicks v. Oklahoma*, 447 U.S. 343 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

*Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Horn v. State*, 204 P.3d 777 (Okla. Crim. App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

*James v. Martin*, 567 Fed. Appx. 594 (10th Cir. 2014) (unpub.) . . . . . . . . . . . . . . . 28, 34

*Kotteakos v. United States*, 328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Locke v. Saffle*, 237 F.3d 1269 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Miller v. State*, 313 P.3d 934 (Okla. Crim. App. 2013) . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Nguyen v. Reynolds*, 131 F.3d 1340 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Ochoa v. Workman*, 669 F.3d 1130 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O'Neal v. McAninch*, 513 U.S. 432  (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Payne  v. Tennessee*, 501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Romano v. Oklahoma,* 512 U.S. 1 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Romero v. Furlong*, 215 F.3d 1107 (10th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Sears v. Upton*, 561 U.S. 945 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Sims v. State*, No. F-2020-56 (Okla. Crim. App. March 17, 2022) (unpub.) .  3, 13, 24, 29, 56

*Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 23, 27, 28

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . 32, 34, 37, 38, 42, 43, 49, 52, 53

*Turrentine v. Mullin*, 390 F.3d 1181 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*United States v. Cronic*, 466 U.S. 648 (1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Garcia*, 52 F.3d 338 (10th Cir. 1995) (Table, unpub.) . . . . . . . . . . . . . 35

*United States v. Lott*, 310 F.3d 1231 (10th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*United States v. Soto Hernandez*, 849 F.2d 1325 (10th Cir. 1988) . . . . . . . . . . . . . . . . . 42

*United States v. Toles*, 297 F.3d 959 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Valdez v. Bravo*, 244 Fed. Appx. 864 (10th Cir. 2007) (unpub.) . . . . . . . . . . . . . . . . . . 27

*Vitek v. Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Welch v. State*, 2 P.3d 356 (Okla. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*White v. Woodall*, 572 U.S. 415 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 45

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 38

*Williamson v. Parker*, 705 Fed. Appx. 677 (10th Cir. 2017) (unpub.). . . . . . . . . . . . . . 23

*Willingham v. Mullin*, 296 F.3d 917 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

### *Statutes*

28 U.S.C. § 2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 2244. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . 4, 12, 15, 16, 19, 20, 22, 25, 31, 32, 38

Fed. R. Evid. 413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Evid. 414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. of Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Okla Stat. tit. 12, § 2403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 33

Okla. Stat. tit. 12, § 2404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Okla. Stat. tit. 12, § 2413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 33

Okla. Stat. tit. 12, § 2414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 33

Okla. Stat. tit. 21, § 13.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Okla. Stat. tit. 21, § 843.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Other Authorities*

*Criminal Justice Standards, Defense Function*, American Bar Assoc. (4th ed. 2017). . . 41

OUJI-CR 9-10A, Evidence - Evidence of a Defendant's Prior Sex Crimes. . . . 24, 26, 34, 35

OUJI-CR 9-9, Proof of Other Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 34, 35

Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. . . 36

*Tenth Circuit Pattern Criminal Jury Instruction*, 1.30, Similar Acts . . . . . . . . . . . . . . . 24

**ATTACHMENTS**

*Sims v. State*, No. F-2020-56 (Okla. Crim. App. March 17, 2022) (unpub.) . . . . . . . Att. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

PAUL LEWIS SIMS,       )
                                     )
          *Petitioner,*    )
                                     )
*v.*                               )     Case No. : CIV-23-533-D
                                   )
DAVID BUSS, Warden,     )
R. B. Dick Conner Correctional   )
Center, Hominy, OK       )
                                   )
         *Respondent.*   )

**BRIEF IN SUPPORT OF
PETITION FOR A WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY PURSUANT 28 U.S.C. § 2254**

Petitioner, Paul Lewis Sims, Oklahoma DOC# 851789, is presently incarcerated at the R. B. Dick Conner Correctional Center at Hominy, Oklahoma.  Mr. Sims is incarcerated as result of being convicted of five counts of Child Sexual Abuse (Okla. Stat. tit. 21, § 843.5(E)) in the District Court of Canadian County, Oklahoma, for which he is serving five consecutive terms of life imprisonment.[1]  These convictions were obtained through state judicial process in violation of the Constitution of the United States of America, and consequently, Mr. Sims remains incarcerated in violation of his Constitutional rights.  This

---

[1] Child Sexual Abuse is a crime that falls under Oklahoma's 85% Sentencing Rule.  Okla. Stat. tit. 21, § 13.1(14).  For parole eligibility purposes, a life sentence is calculated as a 45-year sentence. *Anderson v. State*, 130 P.3d 273, 282 (Okla. Crim. App. 2006).  This means that Mr. Sims must serve 38.25 years of the first life sentence before becoming eligible for parole and then, if granted, beginning service of the next of the remaining life sentences.

1

is Mr. Sims's first petition for a writ of habeas corpus.

References to the transcripts and state court record will be designated as follows: The three volume jury trial transcript, occurring from December 2 through 4, 2019, will be referred to as "Tr." followed by the volume and page number; the January 14, 2020 sentencing hearing will be designated as "Sent. Tr." followed by the page number; other hearings will be designated as "hearing date, Tr." followed by the page number; the two volume, consecutively paginated, original record will be designated as "O.R." followed by the page number; and attachments to this habeas petition will be designated as "Att." followed by attachment number.

## I.   <u>STATEMENT OF THE CASE</u>

On April 15, 2019, Mr. Sims was charged in the District Court of Canadian County via a felony information with six counts of Child Sexual Abuse.  O.R. 1-2.  The Information alleged that Mr. Sims had abused his step-daughter DMS on numerous occasions.  Count 1 alleged abuse occurring between September 1, 2016, and September 1, 2017.  Counts 2-6 alleged abuse occurring between September 1, 2016, and December 1, 2018.

An Amended Information was filed on October 25, 2019.  O.R. 67-68.  The Amended Information also charged six counts of Child Sexual Abuse.  The date ranges for the counts remained the same as the original felony information; however, some allegations as to what conduct formed the basis for the charges had changed.

And finally, the charges for which Mr. Sims proceeded to trial were filed via a Second Amended Information on November 27, 2019.  O.R. 109-10.  The Second Amended

Information charged five counts of Child Sexual Abuse.  All counts were alleged to have occurred between September 1, 2016 and June 11, 2017.   Count 1 alleged Mr. Sims had committed lewd acts against DMS by the touching of her breasts and private parts.  Count 2 alleged vaginal rape.  Count 3 alleged anal rape.  Count 4 alleged rape by digital vaginal penetration.  And, Count 5 alleged rape by digital anal penetration.

Despite the vagueness with which the Information was pleaded and the large date ranges at issue, no preliminary hearing was conducted.  On July 29, 2019, Mr. Sims waived his right to a preliminary Hearing.  O.R. 20.

Mr. Sims's jury trial was conducted from December 2nd through 4th, 2019, before the honorable Paul Hesse, District Court Judge.  The state presented four witnesses and admitted no exhibits.  Mr. Sims testified on his own behalf and presented one witness.  The defense admitted one exhibit into evidence.  The jury convicted Mr. Sims of all five counts and recommended life sentences as to all counts.  O.R. 155-56.

Mr. Sims was sentenced on January 14, 2020.  Judge Hesse followed the jury's recommendation and sentenced Mr. Sims to five terms of life imprisonment, with all terms to run consecutively.  O.R. 206-34.

Mr. Sims appealed his convictions and sentences to the OCCA in direct appeal Case No. F-2020-56.  The OCCA, in an unpublished opinion denied Mr. Sims's appeal on March 17, 2022.  *See Sims v. State*, No. F-2020-56 (Okla. Crim. App. March 17, 2022), attached hereto as Att. 1.   Mr. Sims did not seek review of the state court decision in the United States Supreme Court.

## II.    JURISDICTION

This Court has jurisdiction pursuant 28 U.S.C. §§ 2241, 2254.  Mr. Sims has complied with the one year limitations period provided at 28 U.S.C. § 2244(d)(1).  His convictions became final upon the expiration of time for seeking certiorari in the United States Supreme Court, which was ninety (90) days from the date the OCCA issued its opinion denying the direct appeal (March 17, 2022).  *See id*. at (d)(1)(A).  The ninety (90) days expired on June 15, 2022.  Thus, the one year limitations period began the next day, June 16, 2022, and Mr. Sims has one year from that date, or until June 16, 2023 to file a petition for a writ of habeas corpus.  *See Locke v. Saffle*, 237 F.3d 1269, 1273 (10th Cir. 2001); *Harris v. Dinwiddie*, 642 F.3d 902, 906 n.6 (10th Cir. 2011).  Therefore, Mr. Sims's Petition is timely filed and this Court has jurisdiction to decide the merits herein.

## III.    STATEMENT OF THE FACTS

The complaining witness, DMS, was born in September of 2001.  Tr. I, 174.  DMS accused her stepfather[2], Paul Sims, of multiple instances of sexual abuse.  Mr. Sims is from Rabat, Morocco.  *Id*. at 177.   DMS alleged that sexual abuse had occurred both in Yukon, Oklahoma and Morocco.  While the State of Oklahoma has no jurisdiction to prosecute crimes allegedly occurring in a foreign country, much of DMS's testimony was spent discussing events occurring in Morocco.

DMS testified that she had twice traveled to Morocco with Mr. Sims.  Mr. Sims is

---

[2] Paul Sims was married to Tammy Sims who was foster mother to DMS.  Tammy is the biological grandmother of DMS's three younger siblings.  Tr. I, 176-77.

Muslim and DMS was the same at the time of her trips to Morocco.  Tr. II, 8.  The first trip to Morocco was in 2016, and according to DMS, the trip lasted three months.  Tr. I, 178; Tr. II, 5.  DMS claimed the trip was a disciplinary measure by Mr. Sims to show her what life was like in other parts of the world and to make her grateful for all the things she had in Oklahoma.  Tr. I, 178-79.  Mr. Sims and DMS stayed at Mr. Sims's mother's farm outside of the town of Rabat. *Id*. at 179.  In addition to Mr. Sims's mother, two of his sisters, one of their husbands and three children, one of his brothers, and a niece lived in the single concrete house on the farm.  *Id*. at 180-81.  The house had two rooms and a living room.  *Id*. at 182.  According to DMS, most of the family slept in the living room and depending on the night an aunt or uncle would sleep in one of the other rooms.  *Id*.  DMS testified her and Mr. Sims stayed in the other room by themselves.  *Id*. at 182-83.

DMS alleged she was first raped a few days into the trip, at night in the room, while all the others were sleeping in the house.  *Id*. at 183; Tr. II, 20.  Allegedly, Mr. Sims had used DMS's nightgown to clean up ejaculate, but DMS wore the soiled nightgown the next day around Mr. Sims's family.  *Id*. at 188; Tr. II, 20.  DMS claimed Mr. Sims then exposed himself to her the next day during a trip to the beach and on other occasions at the beach.  Tr. I, 189.  But whenever Mr. Sims brother was around during beach trips, the abuse did not occur.  *Id*.  DMS next claimed she was raped "every night" during this first trip to Morocco. *Id*. at 190.

Also, during this first trip to Morocco, DMS became engaged to a boy named Zouhar. Tr. II, 9.  The two planned on getting married when DMS turned 18.  *Id*.  DMS's foster

mother, Tammy, was aware of the arrangement and provided her an engagement ring. *Id*. It was apparently an arranged relationship, but DMS had a "crush" on Zouhar. *Id*. at 10, 54. DMS and Mr. Sims returned from Morocco on September 1, 2016. *Id*. at 193. DMS did not tell her foster mother, Tammy Sims, about the abuse. *Id*. at 194.

The events that were alleged to occur in Yukon, Oklahoma, and forming the basis for the charges herein occurred during the less than a year period between the first and second trip to Morocco. *See* Tr. II, 32 (DMS testified she returned from the second trip in August of 2017). DMS alleged that Mr. Sims would enter her room in the night and touch her inappropriately. Tr. I, 198. DMS claimed Mr. Sims would stand on the bottom-bunk where her little sister HS was sleeping so that he could reach DMS who slept on the top bunk. *Id*. DMS pretended to be asleep while this abuse occurred. *Id*. at 199. HS apparently does not believe DMS was abused and has told DMS to never speak to her again for putting their "dad" (Mr. Sims) "behind bars." *Id*. at 233; Tr. II, 31. In addition to the touching, DMS also alleged that Mr. Sims had raped her in her bedroom in the Yukon home. Tr. I, 199. DMS alleged that a rape had occurred in her bedroom but stopped when Tammy unexpectedly arrived home, alleged that Mr. Sims had attempted to anally rape her one time in the living room but Tammy intervened; and alleged another anal rape in the living room. *Id*. at 200, 204-05. DMS claimed the abuse was not limited to these incidents but happened so many times that she couldn't remember. *Id*. at 208. However, DMS did not allege with any specificity on what dates the alleged sexual abuse occurred. Also, Tammy Sims testified that there was no indication Mr. Sims had been abusing DMS. Tr. II, 108.

To further put the allegations in context, Mr. Sims was often gone from the household in Yukon. Tr. II, 15.  He was often attending school in Lubbock, Texas and elsewhere.  DMS believed Mr. Sims had six master's degrees and had been working on getting a Ph.D.  *Id*. DMS seemed irritated that Mr. Sims had spent "three years" gone from home pursuing these degrees.  *Id*.   Tammy did not believe Mr. Sims had an opportunity to sexually abuse DMS in the period between the Morocco trips, because he was back and forth to Texas attending school; Tammy was present in the house; Mr. Sims would only be home for 3 days at a time; and when home, Mr. Sims was working as an Uber and Lyft driver.  *Id*. at 109-10.

DMS and Mr. Sims went to Morocco a second time within a year of the return from the first trip; DMS knew this time frame because she was still 15 years old at the time of the second trip.  Tr. I, 197-98.  DMS testified Mr. Sims didn't give a reason for the second trip, but only stated that his family wanted to see DMS again because they loved her.  *Id*. at 209-10.  DMS testified that Mr. Sims continued to abuse her during the second trip to Morocco. *Id*. at 210.  The only difference in the abuse was that Mr. Sims allegedly began using condoms during the alleged rapes.  *Id*.  A "couple of nights" into the second trip, Mr. Sims received a call from Tammy.  *Id*. at 211.  The police had come to Tammy's house in Yukon and relayed allegations that DMS had been raped and was pregnant.  *Id*.  DMS claimed Mr. Sims made her call the investigating officer the next day.  *Id*. at 214.  DMS told the officer that she had not been raped and was not pregnant.  *Id*. at 214.

DMS claimed Mr. Sims told her that she would have to "protect" him, and they went into Rabat to see a doctor that was "supposed to create cherries."  *Id*. at 213-14.  The trip to

7

see the doctor was a few days after DMS called the investigating officer and denied being raped. *Id*. at 216.   DMS testified the doctor, who only spoke French and Arabic,  had to communicate through Mr. Sims. *Id*. at 216.  A surgical procedure was performed on DMS's vagina. *Id*. at 216-217.   DMS testified she did not want the surgery.  *Id*. at 217.  DMS did not tell her mother about the surgery.  *Id*. at 218.  DMS had complications following the procedure so she asked Mr. Sims to take her back to the doctor.  *Id*. at 219.  The doctor performed the same procedure again, but there were more complications including an infection for which DMS received a medical cream.  *Id*.  Also, during the second trip to Morocco, DMS continued her relationship with her fiancé Zouhar.  Tr. II, 10.

When DMS returned to Yukon, she met with a woman named Vicki at the CART (Child Abuse Response Team) house in El Reno. Tr. I, 220.  DMS spoke with Vicki due to the rape allegations that were made while she was in Morocco.  DMS denied that Mr. Sims had ever abused her and instead told Vicki that Mr. Sims "didn't do anything, that he was a good dad, that he loved us."  *Id*. at 221.  DMS did not testify that any abuse occurred after her return from the second trip to Morocco.

Some time after visiting with Vicki, DMS told her foster mother Tammy that she had been abused by Mr. Sims.  *Id*. at 223.  Apparently DMS told Tammy as retaliation against Mr. Sims, because DMS believed Mr. Sims was going to tell Tammy about a love letter from DMS's boyfriend which Mr. Sims had found.  *Id*.  There was a house rule prohibiting dating and boyfriends, which was a constant source of conflict between DMS and her parents.  *Id*.; *see also* Tr. II, 12-13.   Tammy did not believe DMS's allegations against Mr. Sims and

called DMS a "liar."  Tr. I, 225.  DMS's disclosure to Tammy was sometime in or around October of 2018.  *Id*. at 226.  Tammy didn't report DMS's allegations to the Police.  *Id*. According to Tammy, DMS's allegations were made in November of 2018  – over a year after DMS's return from the second Morocco trip.  Tr. II, 114.

The relationship between DMS and Tammy deteriorated, and in April of 2019 there was an argument during which Tammy told DMS to move out.  Tr. I, 228.  Tammy changed her mind about asking DMS to leave, but DMS took this opportunity to "run."  *Id*.  DMS went to stay with her friend's family.  *Id*. at 229.  DMS disclosed the alleged abuse to her friend's mother, and then the friend's parents reported the alleged abuse to authorities and took DMS to the police station to be interviewed.  *Id*. at 230, 231.  DMS eventually had a second interview with Vicki at the CART house where DMS alleged Mr. Sims had abused her.  *Id*. at 231-32.   In addition to speaking with Vicki, a nurse conducted a physical examination of DMS.  *Id*. at 232.

The state called Vicki Boan, who twice conducted forensic interviews of DMS at the CART House.  Tr. II, 69-70.  Ms. Boan did not testify as to the content of her interviews with DMS, instead she testified in general about Child Sexual Abuse Accommodation Syndrome. *Id*. at 75-78.   The Syndrome theorizes why children might recant and then reaffirm allegations of child sexual abuse.  *Id*.  Ms. Boan did not opine as to whether DMS exhibited this Syndrome; instead, Ms. Boan agreed that one must look to the facts of each case to see if the Syndrome applies. Ms. Boan agreed that "children do lie."  *Id*. at 79.

Sarah Brown was the nurse who conducted the physical examination of DMS at the

CART house.  Ms. Brown is a labor and delivery nurse who also performs sexual assault

exams at the CART House.  Tr. II, 57.  Ms. Brown conducted the physical examination on

April 8, 2019.  Tr. II, 61.  DMS told Ms. Brown that she had surgery on her vagina twice to

"get her virginity back."  *Id.* at 62.  Ms. Brown did not know how to describe the appearance

of DMS's vagina, so she submitted a video of the examination to a doctor.  *Id*.  Ms. Brown

did not take DNA swabs due to the length of time that had passed between the alleged abuse

and the exam.  *Id*. at 63.  Ms. Brown through her exam did not make a positive finding of

sexual abuse, and she agreed that she had never examined someone who had received a

procedure in Morocco such as the one DMS had received.  *Id*. at 64.

   Dr. Ryan Brown reviewed photo documentation of DMS's physical exam at the

CART house, another doctor's report regarding that examination, and the intake interview

conducted by Vicki Boan.  *Id*. at 84.  Dr. Brown opined that DMS had a very mature

appearing vagina.  *Id*.  Dr. Brown noted that scar tissue and a "hymenal notch" were present

that could have been caused by the surgical procedure in Morocco.  *Id*. at 86-87.  The

medical procedure HMS underwent is called a "hymenoplasty."  *Id*. at 87.  Dr. Brown

explained that the procedure was designed to give a woman back her virginity and was

performed all over the world including in the United States.  *Id*. at 88-89.  Dr. Brown could

not rule in or rule out sexual abuse, which was the same finding as the other doctor who

reviewed the examination materials.  *Id*. at 89-90.  Dr. Brown agreed that he had no evidence

that Mr. Sims had sexually abused DMS.  *Id*. at 92.

   Mr. Sims testified in his defense.   He denied ever sexually abusing DMS.  Tr. II,

174,191.  He explained that DMS had a history of making false accusations against both him and his wife, Tammy.  *Id*. at 161-62.  DMS had accused Tammy of physical abuse and then years later apologized to Tammy for making the allegations.  *Id*. at 162.  As for the trips to Morocco, Mr. Sims explained that his son Paul, Jr., was originally supposed to accompany him on the trip, but at the suggestion of Tammy, DMS went instead.  *Id*. at 160.  DMS had been doing poorly in school and Tammy wanted DMS to see what life was like in different countries, so that DMS would be encouraged to do better in her studies.  *Id*.  Contrary to DMS's testimony, Mr. Sims explained that the first trip to Morocco lasted only 3 weeks and not 3 months.  *Id*. at 165, 172.  Mr. Sims provided details about Muslim culture and explained how men and women were generally separated for sleeping arrangements. *Id*. at 164.  He unequivocally denied sharing a room in private with DMS at any point in time.  *Id*.  As for DMS's engagement to Zouhar, Mr. Sims explained that the arrangement was at the request of DMS and Zouhar and then condoned by their parents.  *Id*. at 181.  This arrangement was not out of the ordinary in Morocco.  *Id*.

The second trip to Morocco lasted two months.  *Id*. at 186.  Mr. Sims explained that DMS continued to have a crush on Zouhar and requested to spend time with him during this trip.  *Id*.  Mr. Sims even drove DMS over a hundred miles to Casablanca on one occasion so she could spend time with Zouhar.  *Id*. Mr. Sims shed light on the surgical procedures DMS received in Rabat.  *Id*. at 187-90.  He explained that in Moroccan culture one was not supposed to have any sexual relationship until married and that women may have to demonstrate their chastity through "blood."  *Id*. at 187-88. As inartfully stated by Mr. Sims,

"you have to have a cherry" to get married in Morocco.  *Id*. at 188.  The purpose of the operation was so that DMS could pass as a virgin to satisfy Moroccan custom and carry through with her engagement to Zouhar.  *See* Tr. I, 221 (DMS testified she had sex with her boyfriend when she was 14).  DMS pushed very hard to have the procedure, and Mr. Sims agreed to take her to the doctor.  Tr. II, 189.  Mr. Sims was present but not in the same room when the procedures were performed; he could hear DMS and did not hear any screaming or severe distress.  *Id*. at 189, 211-12.  Mr. Sims was also aware during the second Morocco trip that a sexual abuse allegation had been made back in Oklahoma; even despite those allegations he returned to Oklahoma.  *Id*. at 191.  He could have simply chosen to stay in Morocco to avoid the charges herein, had he believed there was merit to the charges.  *Id*.

Additional facts will be presented as they relate to Mr. Sims's individual claims of Constitutional error.

## IV.  LEGAL CLAIMS

### Standard of Review

This Court conducts its review pursuant the Antiterrorism and Effective Death Penalty Act (hereinafter AEDPA).  Under the AEDPA, this Court may not grant the Writ unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254 (d)(1)-(2).

With respect to subsection (d)(1), a state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on

a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court adjudication constitutes "an unreasonable application" of Supreme Court precedent under Section 2254(d)(1) if the state court identifies the correct governing legal rule from the Supreme Court's cases, but unreasonably applies it to the facts of the particular state prisoner's case. *Id*. at 407; *see also White v. Woodall*, 572 U.S. 415, 426-27 (2014) (clarifying *Williams's* interpretation of unreasonable application language of 2254(d)(1)).

| | |
|---|---|
| <u>**Ground One**</u> | **Mr. Sims's Constitutional rights to Due Process and a fair trial were violated by the trial court's erroneous admission of evidence of misconduct allegedly committed by Mr. Sims in the country of Morocco.** |

Mr. Sims raised this claim as Proposition One of his Direct Appeal to the OCCA. Appellant's Brf., pp. 11-19 (Jan. 15, 2021). The OCCA declined to grant relief. *Sims v. State*, No. F-2020-56 at pp. 2-6 (Okla. Crim. App. March 17, 2022) (attached hereto as Att. 1). Thus, this claim is exhausted and ripe for this Court's review.

### A.    Background.

Much of the state's evidence revolved around allegations of sexual abuse occurring in the foreign country of Morocco. As discussed in the Statement of Facts, DMS testified that she was repeatedly abused by Mr. Sims during the two trips to Morocco in 2016 and 2017. In fact, the majority of DMS's direct examination testimony focused on abuse she alleged to have occurred during the Moroccan trips. Of her 60 transcript pages of direct

examination testimony (Tr. I, 174-234), only 11 pages were specifically focused on the abuse occurring in Yukon, Oklahoma, which forms the basis for the charges herein. *See* Tr. I, 198-208. The state even began its closing argument by emphasizing what DMS had alleged to have occurred in Morocco:

> 15 years old, thousands of miles from home, with a doctor that doesn't speak English, who you can't communicate with, with your arms tied one by one, your legs tied one by one 15 years old, not able to talk to your mother about it, told not to talk to her. 15 years old, and the numbing wears off and you feel the stitches and you scream in pain.
>
> That's [DMS's] story.

Tr. III, 6.

The state chose to make DMS's allegations of abuse occurring in Morocco the centerpiece of the trial; however, this evidence was erroneously admitted, because the defense was not given notice of the state's intention to utilize the same as other crimes/sexual propensity evidence; DMS's allegations about what occurred in Morocco were not proven by clear and convincing evidence prior to her testimony; and the evidence of what transpired in Morocco was more prejudicial than probative of the charges against Mr. Sims.[3] This erroneous admission of evidence as to what transpired in Morocco served to violate Mr. Sims rights to Due Process and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

### B.      The state court decision.

---

[3] In addition, as will be discussed in Ground Two, the trial court failed to give the jury a limiting instruction directing that the evidence of events occurring in Morocco could only be used for limited purposes and could not on its own establish guilt for the charged offenses.

The OCCA conducted plain error review because trial counsel failed to object to the evidence concerning misconduct allegedly occurring in Morocco. Att. 1 at 2. The state court held the evidence was properly admitted even though the state failed to follow applicable statutory procedures. With respect to lack of notice of the sexual abuse evidence alleged to have occurred in Morocco, the OCCA held: "Because there is no evidence of unfair surprise, the absence of a more formal pre-trial notice concerning this evidence does not require relief." *Id*. at 3. With respect of the allegations of misconduct in Morocco not being proven by clear and convincing evidence, the OCCA held: "We find the complaining witness's testimony of other bad acts, as well as specific acts of rape and molestation in Morocco, was clear and convincing, as it was corroborated both by physical evidence and other testimony indicating Appellant's propensity to commit sexual abuse." *Id*. at 5. And, lastly, the state court rejected Mr. Sims's argument that the evidence of events occurring in Morocco was more prejudicial than probative and as such could not be admitted: "Strict, convincing proof of [DMS's] shocking allegations was entirely necessary to obtain convictions on these charges. The victim's descriptions of abuse were clear and convincing, highly probative of disputed facts, corroborated by other evidence, and no less prejudicial testimony was available." *Id*. And, ultimately with respect to its plain error analysis, the OCCA held: "Because this evidence was admissible under sections 2403, 2404, 2413, and 2414, the trial court committed no plain or obvious error." *Id*. at 5-6. Mr. Sims contends that the state court's decisions violated § 2254(d) – the decisions were contrary to or involved an unreasonable application of federal law and/or were otherwise based upon an unreasonable

determination of the facts.

Finally, the OCCA's application of plain error has the potential to complicate this Court's review in the habeas context. A state court can deny relief on a federal claim via plain error review, because it found the claim lacked merit under federal law, or it may deny relief for a federal error because the defendant failed to satisfy some independent state law predicate. *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003). Here, the OCCA took the former approach; the state court conducted merits review, via multiple holdings. However, those decisions were contrary to clearly established federal law and/or were unreasonable as to the state court's application of the law or determination of the facts. 28 U.S.C. § 2254(d).

>   i.   **The admission of evidence in violation of state rules of evidence, served to violate Mr. Sims Fourteenth Amendment right to Due Process.**

Mr. Sims is aware that habeas relief is not generally unavailable to correct errors of state evidentiary rules. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). However, Mr. Sims was entitled to have a trial proceeding in which the Rules of Evidence were properly applied. The trial court's failure to afford Mr. Sims the protections of the evidence code violated his Fourteenth Amendment right to Due Process. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Vitek v. Jones*, 445 U.S. 480, 488 (1980) ("state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment"); *see also Ballard v. Estelle*, 937 F.2d 453, 456 (9th Cir. 1991) (holding misapplications of state law that lead to deprivations of liberty interests may be

reviewed on federal habeas).

Mr. Sims alleged on direct appeal that the evidence of misconduct occurring in Morocco could only be admitted at trial if statutory notice procedures and the requirement that such evidence be proven by clear and convincing evidence prior to admission. *See* Appellant's Brief, pp. 13-16 ( Jan 15, 2021).   The Oklahoma Rules of Evidence track the Federal Rules of Evidence with respect to allowing the admission of propensity evidence in sex crimes cases.  Okla. Stat. tit. 12, §§ 2413 and 2414 mirror the language of Fed. R. Evid. 413 and 414.  Sections 2413 and 2414 deal with sexual assault offenses and child molestation offenses, respectively, just as do Federal Rules 413 and 414.  Here, the state failed to comply with statutory notice requirements and the further prerequisite that such propensity evidence be proven by clear and convincing evidence prior to admission at trial. *See, e.g.*, *Bramlett v. State*, 422 P.3d 788, 795 (Okla. Crim. App. 2018) (citing *Miller v. State*, 313 P.3d 934, 966 (Okla. Crim. App. 2013)).

With respect to lack of notice, the state filed a pre-trial notice of other bad acts evidence, but wholly failed to include any notice whatsoever that it intended to admit at trial evidence of sexual abuse allegedly occurring in the foreign country of Morocco.  On October 21, 2019, the state filed its "Notice of Intent to Use Evidence of Other Bad Acts/Crimes or Res Gestae Evidence and/or In the Alternative Notice of Title 12 Section 2413/2414 Evidence."  O.R. 43-44.  The Notice provided that the state intended to introduce "Section 2413/2414 Evidence &/or *BURKS* Evidence" and then specifically identified only the following as the evidence it sought to admit:

1. The Defendant raped, verbally, and physically abused T.S. on numerous occasions.  More specifics are detailed in the written discovery which was provided to the  defense on May 2, 2019.

*Id*.  T.S. is Tammy Sims and was married to Mr. Sims.  Tammy testified during Mr. Sims's case-in-chief, and during cross-examination the state explored whether Mr. Sims had abused Tammy.  *See, e.g.,* Tr. II, 126, 140-41.  Per its Notice, the state requested the "identified" evidence as to T.S. be admitted pursuant to Okla. Stat. tit. 12, §§ 2404(B), 2413, and 2414. O.R. 44.  The state did not include any reference in its pleading whatsoever to the other crimes/ sexual misconduct alleged to have occurred in Morocco.  Due to this lack of notice, it was error under state law for DMS's allegations about the events occurring in Morocco to be admitted at trial.

Whether treated as other crimes evidence pursuant to Okla. Stat. tit. 12, § 2404(B) or sexual propensity evidence pursuant to Okla. Stat. tit. 12, §§  2413, 2414, Mr. Sims was entitled to notice and an opportunity to challenge same prior to its admission at trial.  A defendant is entitled to notice 10 days prior to trial of the state's intention to use other crimes evidence, and the state must describe with "particularity" the other crimes it intends to utilize. *Burks v. State*, 594 P.2d 771, 773 (Okla. Crim. App. 1979).  As for sexual propensity evidence, Sections 2413 and 2414 both require notice 15 days prior to trial, including "statements of witnesses or a summary of the substance of any testimony that is expected to be offered."  Okla. Stat. tit. 12, §§ 2413(B), 2414(B).

Despite the clear notice requirements provided by statute and case law, the state failed to inform Mr. Sims' that it intended to present evidence of alleged crimes/ sexual abuse of

18

DMS that occurred in Morocco.  Without such notice, the majority of DMS's testimony improperly focused on the abuse she claimed occurred during her two trips to Morocco with Mr. Sims.  The OCCA ostensibly conceded the state's violation of statutory notice requirements.  However, the state court found "there is no evidence of unfair surprise."  Att. 1 at 3.  That rules at issue unequivocally require notice, yet none was provided of the state's intention to admit evidence of misconduct occurring in Morocco.  The state court concedes the lack of notice, yet inexplicably concludes there was no "unfair surprise."  *Id*.  Such analysis appears a non-sequitur and is based upon an unreasonable determination of fact.  28 U.S.C. § 2254 (d)(2).

And, due to the lack of notice, the state was not required to prove up the allegations of misconduct occurring in Morocco by clear and convincing evidence prior to being admitted at trial.  Whether treated as other crimes evidence under Okla. Stat. tit. 12, § 2404(B) or treated as sexual propensity evidence under Okla. Stat. tit. 12, §§ 2413 or 2414, such evidence must be proven by clear and convincing evidence prior to admission at trial.  *See Bramlett* 422 P.3d at 795 (citing *Miller v. State*, 313 P.3d at 966); *Brewer v. State*,  450 P.3d 969, 671 (Okla. Crim. App. 2019) (citing *Horn v. State*, 204 P.3d 777, 786 (Okla. Crim. App. 2009)).  The state's burden to prove up other crimes is generally triggered by a defendant's objection to such evidence prior to trial.  *See Horn*, 204 P.3d at 786 ("If the defense raises an objection to the admission of the propensity evidence, the trial court should hold a hearing . . .").  However, as stated above, Mr. Sims was not provided pre-trial notice that the state specifically intended to admit evidence of crimes and/or sexual abuse occurring

19

in Morocco such that he was unable to request a pretrial determination.  Further, the state's

trial evidence did not come close to establishing by clear and convincing evidence that Mr.

Sims had committed the acts allegedly occurring in Morocco.

The evidence of misconduct occurring in Morocco consisted solely of DMS's

testimony.  The state offered no evidence to corroborate DMS's allegations that she had been

raped "every night" or otherwise abused by Mr. Sims during the first trip to Morocco or any

corroboration that the abuse continued during the second trip.  Tr. I, 190.  No witnesses,

physical evidence, forensic evidence, exhibits, or other witnesses were presented to establish

DMS's allegations actually occurred.  With respect to what happened in Morocco, the trial

evidence was truly conflicting – DMS alleged she was repeatedly abused during the trips and

Mr. Sims denied the same.  The state should have been required to demonstrate by clear and

convincing evidence that the sexual abuse occurred in Morocco before exposing Mr. Sims's

jury to the prejudicial and inflammatory allegations.

The OCCA held that "[t]he victim's descriptions of abuse were clear and convincing,

highly probative of disputed facts, corroborated by other evidence, and no less prejudicial

testimony was available."  Att. 1 at 5.  Yet, the OCCA fails to identify what "other evidence"

corroborated DMS's allegations.  Mr. Sims respectfully contends there was no corroboration

in the trial record of the misconduct alleged to have occurred in Morocco.  As such the state

court's finding was based on an unreasonable determination of fact.  28 U.S.C. § 2254(d)(2).

Also, tellingly, in its analysis, the OCCA concedes the extreme prejudice attendant the

allegations of abuse occurring in Morocco by acknowledging that "convincing proof of her

20

shocking allegations was entirely necessary to obtain convictions on these charges."  Att. 1 at 5.  In any event, DMS's claimed abuse occurring during the trips to Morocco was not established by clear and convincing evidence, and therefore was not properly admitted at trial.

Mr. Sims's Fourteenth Amendment due process rights were violated through the admission of the sexual propensity evidence allegedly occurring in Morocco in objective violation of state evidentiary rules.  *See Hicks*, 447 U.S. at 346.  The Writ should issue.

### ii.    The admission of evidence of events allegedly occurring in Morocco was so prejudicial as to result in a Due Process violation and rendered Mr. Sims's trial fundamentally unfair.

On direct appeal, Mr. Sims raised the additional argument that the evidence was so prejudicial that it should not have been admitted in accordance with Okla Stat. tit. 12, § 2403, which provides the prejudice versus probative value balancing test similar to Fed. R. of Evid. 403.  Appellant's Brief, pp. 17-18 (Jan. 15, 2021).  The Supreme Court has recognized that the admission of evidence may rise to the level of a due process violation if the evidence acts to infect the proceeding with unfairness.  *Romano v. Oklahoma,* 512 U.S. 1, 12-13 (1994).  While, as noted above, habeas relief does not extend to state law evidentiary errors, an exception applies where the state court admits evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair."  *Ochoa v. Workman*, 669 F.3d 1130, 1144 (10th Cir. 2012) (quoting *Payne  v. Tennessee*, 501 U.S. 808, 825 (1991)).  Nothing occurring in the foreign country of Morocco could form the basis for the jury's verdict of guilt for the crimes charged against Mr. Sims in Canadian County, Oklahoma.  The prejudice inherent in DMS's

allegations was that, if believed, her testimony of what occurred in Morocco established Mr.

Sims had perpetrated numerous crimes, the same as those charged, but in a foreign

jurisdiction.

DMS alleged that she was repeatedly sexually abused in Morocco, including being

raped, inappropriately touched, exposed to Mr. Sims's genitalia, and forced to have a surgical

procedure.  DMS's allegations are truly disturbing, and rightfully so.  She painted an image

of an American girl being taken to a foreign country to be repeatedly abused by Mr. Sims,

a Muslim man of Moroccan descent.  The allegations of crimes, identical to the ones charged,

but occurring in a foreign jurisdiction, could easily confuse and mislead a jury, especially

without a limiting instruction.[4]  All of the acts alleged to occur in Morocco, if believed, could

well have influenced Mr. Sims's jury to convict him as opposed to the jury basing its verdict

on conduct actually occurring in Oklahoma.   In this circumstance, DMS's allegations of

sexual abuse occurring in Morocco were so unduly prejudicial as to render the trial

"fundamentally unfair" under the Due Process clause of the Fourteenth Amendment. *Payne*,

501 U.S. at 825.

The OCCA found the evidence of events occurring in Morocco to not be so prejudicial

to outweigh its probative value.  Att. 1 at 5 (discussing § 2403 balancing test).   The state

court's finding was objectively unreasonable.   The tenth circuit has explained how the

OCCA's finding that evidence's probative value exceeded its prejudice can violate § 2254(d)

---

[4] As will be discussed in Ground Two, Mr. Sims's jury was not instructed of the limited
purpose for which it could consider DMS's testimony about abuse allegedly occurring in Morocco.

and facilitate habeas relief:

> This highly inflammatory evidence fatally infected the sentencing and deprived [the defendants] of their constitutional rights to a fundamentally fair sentencing proceeding. The [state court's] decision that the photographs' relevance exceeded their prejudice was objectively unreasonable, *see* 28 U.S.C. §2254(d); and we conclude that the District Court correctly decided that the photographs rendered the second stage of trial fundamentally unfair. To the extent that the [state court] implicitly determined that the admission of the photographs did not render the second stage fundamentally unfair, we conclude that this was an unreasonable application of clearly established Supreme Court precedent.

*Spears v. Mullin*, 343 F.3d 1215, 1229 (10th Cir. 2003).  Just as in *Spears*, the OCCA made an objectively unreasonable determination that the trial was not rendered fundamentally unfair by DMS's testimony of alleged abuse occurring in Morocco.  The Writ should issue.

As discussed above, this testimony about events in Morocco was the centerpiece of the state's case against Mr. Sims and consumed the majority of DMS's testimony.  The events alleged to have occurred in Morocco were crimes in and of themselves and could have improperly formed the basis for the guilty verdicts herein.  The admission of this evidence had a "substantial and injurious" effect on the jury's verdict to the extent Mr. Sims must demonstrate same in order to garner this Court's grant of relief.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Spears*, 343 F.3d at 1229 n. 9 (explaining that fundamental fairness inquiry in context of erroneously admitted evidence subsumes harmless-error review, and that once a "showing of fundamental unfairness is made, a petitioner is entitled to habeas relief" without further harmlessness analysis."); *but see Williamson v. Parker*, 705 Fed. Appx. 677, 681 (10th Cir.

2017) (unpub.) (assuming evidence was erroneously admitted and applying *Brecht* analysis to find error was harmless).

**Ground Two**     **The trial court's failure to instruct the jury as to the limited purpose for which it could consider evidence of crimes and sexual abuse occurring in Morocco violated Mr. Sims's Constitutional rights to Due Process and a fair trial.**

Mr. Sims raised this claim as Proposition Two of his Direct Appeal to the OCCA. Appellant's Brf., pp. 19-24 (Jan. 15, 2021).  The OCCA declined to grant relief.  *Sims v. State*, No. F-2020-56 at p. 6 (Okla. Crim. App. March 17, 2022) (attached hereto as Att. 1). Thus, this claim is exhausted and ripe for this Court's review.

**A.     Background.**

As discussed in Ground One, Mr. Sims Constitutional rights were violated by the admission of evidence of other crimes and/or sexual abuse alleged to have been committed in Morocco.  The majority of DMS's testimony focused on sexual abuse occurring during the two trips to Morocco; however, Mr. Sims jury was not instructed it could not utilize evidence that he sexually abused DMS in Morocco as proof of guilt for the charged offenses.  *See* OUJI-CR 9-9, Proof of Other Crimes; OUJI-CR 9-10A, Evidence - Evidence of a Defendant's Prior Sex Crimes; *see also Tenth Circuit Pattern Criminal Jury Instruction*, 1.30, Similar Acts ("Of course, the fact that the defendant may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case").  The trial court's failure to give an appropriate limiting instruction deprived Mr. Sims of his rights to Due Process and a fair trial in violation

24

the Sixth and Fourteenth Amendments of the United States Constitution.

### B.     The state court decision.

The OCCA, conducted plain error review, due to trial counsel's failure to request a

limiting instruction, and held:

> The underlying evidence was properly admitted. Its prejudicial impact was considerable, but absent any indication that it was misused, there is no plain or obvious error.

Att. 1 at 6.   The OCCA application of plain error review could complicate this Court's

review, but in this instance it appears to have addressed the merits of the underlying claim.

*See Cargle*, 317 F.3d at 1206 (discussing impact of state court's application of plain error

review upon habeas review).   Here, the OCCA conducted merits review of the underlying

claim and declined to find any "plain or obvious error."   However, that decision was contrary

to clearly established federal law and/or was unreasonable as to the state court's application

of the law or determination of the facts.   28 U.S.C. § 2254(d).

As discussed in the Statement of Facts and in Ground One, extensive other crimes/

sexual propensity evidence was admitted against Mr. Sims at trial.   This evidence consisted

of DMS's testimony that she had been repeatedly raped and sexually abused during two trips

to Morocco.   Mr. Sims's jury was not instructed of the limitation on which it could consider

evidence of what allegedly transpired in Morocco.   *See* O.R. 120-152, *Instructions Given to

the Jury After Evidence*.

Oklahoma Uniform Jury Instructions 9-9 and 9-10A serve to inform a jury of how it

may consider other crimes and sexual propensity evidence, respectively.   Instruction 9-9

provides:

> Evidence has been received that the defendant has allegedly committed misconduct/offenses/(an offense) other than that charged in the information. ***You may not consider this evidence as proof of the guilt or innocence of the defendant of the specific offense charged in the information/indictment.*** This evidence has been received solely on the issue of the defendant's alleged motive/opportunity/intent/ preparation/(common scheme or plan)/knowledge/identity/(absence of mistake or accident). ***This evidence is to be considered by you only for the limited purpose for which it was received***.

OUJI-CR 9-9 (emphasis added).  And, OUJI 9-10A likewise limits a jury's consideration of

sexual propensity evidence:

> You have heard evidence that the defendant may have committed another/other offenses(s) of (sexual assault)/(child molestation) in addition to the offense(s) for which he/she is now on trial. You may consider this evidence for its bearing on any matter to which it is relevant along with all of the other evidence and give this evidence the weight, if any, you deem appropriate in reaching your verdict. ***You may not, however, convict the defendant solely because you believe he/she committed this/these other offense(s) or solely because you believe he/she has a tendency to engage in acts of (sexual assault)/(child molestation).  The prosecution's burden of proof to establish the defendant's guilt beyond a reasonable doubt remains as to each and every element of each/the offense charged.***

OUJI-CR 9-10A (emphasis added).  One or both of the above limiting instructions should

have been given at Mr. Sims's trial.  However, neither instruction was given, nor did the trial

court contemporaneously instruct the jury of limited purpose for which it may consider the

other crimes/ sexual misconduct evidence at the time such evidence was received.  The

OCCA has previously held "the trial court must issue contemporaneous and final limiting

instructions" when other crimes evidence is admitted.  *Bramlett v. State*, 422 P.3d 788, 795

(Okla. Crim. App. 2018) (citing *Welch v. State*, 2 P.3d 356, 365 (Okla. Crim. App. 2000)).

And, the OCCA has cautioned likewise with respect to sexual abuse propensity evidence.

26

*Horn v. State*, 204 P.3d at 787 n.4 (recognizing that trial court mitigated prejudice of sexual propensity evidence by giving limiting instruction and requesting the OUJI-CR Committee draft a jury instruction specific to Okla. Stat. tit. 12, §§ 2413 and 2414). Yet, despite its emphasis in prior cases on the importance of a limiting instruction where other crimes and sexual abuse propensity evidence is admitted, the OCCA found no "plain or obvious error" in Mr. Sims's case, despite acknowledging that the "prejudicial impact was considerable." Att. 1 at 6. The state court's determination was objectively unreasonable.

That a jury instruction was erroneous under state law will not suffice for federal habeas relief. *Estelle*, 502 U.S. at 71-72. Habeas relief may be granted in the context of improper jury instructions when those instructions are fundamentally unfair and act to deny a petitioner of a fair trial and Due Process of law. *See, e.g., Valdez v. Bravo*, 244 Fed. Appx. 864, 868 (10th Cir. 2007); *see also Spears*, 343 F.3d at 1244 ("On federal habeas review, we review the alleged error in failing to instruct on voluntary intoxication in the context of the entire trial, only for the denial of fundamental fairness and due process."); *Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997). This Court must conduct its review in the "context of the instructions as a whole and the trial record." *Valdez*, 244 Fed.Appx. at 868 (citing *Estelle*, 502 U.S. at 72). And, should the Court find Constitutional error in the omitted instructions, relief may be granted if the error had "a substantial and injurious effect or influence in determining the jury's verdict. *Id*. (citing *Turrentine v. Mullin*, 390 F.3d 1181, 1191 (10th Cir. 2004)).

Here, in the context of the instructions as a whole and the trial, the omission of an

appropriate limiting instruction acted as a denial of Due Process and rendered the trial fundamentally unfair. *See Spears*, 343 F.3d at 1244 (citing *Henderson v. Kibbe*, 431 U.S. 145, 156-57 (1977)). When viewed in the context of the entire proceedings, Mr. Sims's jury was never informed of the limited purpose for which it could consider DMS's testimony about alleged abuse occurring in Morocco. The jury was left without any guidance as to the limited purpose for which it could consider the evidence of other crimes and/or sexual abuse occurring in Morocco. This is especially problematic considering that the abuse alleged to have occurred in Morocco was of the same type as the charged offenses. The Tenth Circuit and the Supreme Court have both acknowledged the significance of an appropriate limiting instruction when considering claims of improper admission of prior bad acts/ prior sexual abuse evidence. *See James v. Martin*, 567 Fed. Appx. 594, 597 (10th Cir. 2014) (unpub.) ("On federal habeas review, the district court determined Mr. James was not denied due process or a fair trial because in his second trial, unlike in his first trial, ***the court instructed the jury not to use the [§ 2414] evidence as proof of guilt***.") (emphasis added); *Estelle*, 502 U.S. at 75 (finding limiting instruction prevented misuse or prior injury evidence). There is also indication in the trial record that Mr. Sims jury may have misused the other crimes evidence. *See* Att. 1 at 6 (finding no "indication" that the other crimes/ sexual abuse evidence of events in Morocco was "misused"). The jury sent out a note requesting to view a copy of the Information, which was denied by the trial court. O.R. 153; Tr. III, 61. The record is silent as to why this request was made; however, ostensibly one or more jurors could have been curious whether the allegations of abuse occurring in Morocco were

28

included within the charged offenses.

Given that the other crimes/ sexual abuse evidence was extensive and prejudicial coupled with the jury not being instructed that it could not consider the same as substantive proof of guilt of the charged offenses, the absence of a limiting instruction rendered the trial fundamentally unfair and deprived Mr. Sims of Due Process.  Further, assuming some form of harmlessness analysis applies to this Constitutional violation, this error must be considered in conjunction with the other Constitutional errors incurred by Mr. Sims. *Brecht v. Abrahamson*, 507 U.S. at 638 (reviewing Constitutional error "in light of the record as a whole" to determine whether error had a substantial and injurious effect on the verdict); *see also Turrentine*, 390 F.3d 1181, 1191.  Given the strong and extensive emphasis at trial on events alleged to have occurred in Morocco, the omission of an appropriate limiting instruction had a substantial and injurious effect in determining the jury's verdict.    The Writ should issue.

**Ground Three**          **Mr. Sims was denied the effective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.**

Mr. Sims raised this claim as Proposition Three of his Direct Appeal to the OCCA. Appellant's Brf., pp. 24-49 (Jan. 15, 2021).  Also, pursuant Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Mr. Sims presented outside-the-trial-record materials in support of his claims of ineffective assistance.  *See* Rule 3.11 App., OCCA No. 56 (Jan. 15, 2021). The OCCA declined to grant relief.  *Sims v. State*, No. F-2020-56 at pp. 6-8 (Okla. Crim. App. March 17, 2022) (attached hereto as Att. 1).  Thus, this claim is exhausted and ripe for

this Court's review.

### A.    Background.

Mr. Sims was arrested on April 7, 2019 in relation to the charges herein, and he has remained in continuous custody since that time.  Retained Counsel Michael Rogalin entered his appearance on April 19, 2019.  The case was tried to a jury from December 2 through 4, 2019.  In the approximate eight months that the case was pending, Counsel Rogalin visited Mr. Sims at the jail on only *one* occasion.  Despite that Mr. Sims was charged with five counts of child sexual abuse with each count carrying up to life in prison, defense counsel only consulted with his client at the jail just one time.  Mr. Sims was quite literally on trial for his life, yet defense counsel did not consult with his client regularly at the jail.

Not only did defense counsel fail to adequately communicate with Mr. Sims prior to trial, but counsel failed to mount a reasonable investigation into the state's allegations, and otherwise failed to utilize available evidence to counter those allegations.  Counsel failed to contact witnesses in Morocco, who could have demonstrated the falsity of DMS's claims of sexual abuse occurring in that country.  Counsel could have presented photographs taken in Morocco which call into question the veracity of DMS's allegations.  Counsel could have presented Mr. Sims's passport to, *inter alia*, show that DMS was incorrect in her recall of what transpired in Morocco and for how long she was in that country.  And apart from conducting a reasonable investigation, counsel even failed to utilize evidence contained in the state's discovery to cross examine and impeach DMS.

And as apparent from Ground's One and Two, above, counsel's conduct at trial was

woefully deficient. The majority of DMS's testimony concerned allegations of other crimes/ sexual abuse occurring in the Country of Morocco. The State of Oklahoma lacks any jurisdiction to prosecute Mr. Sims for conduct occurring in a foreign country, yet defense counsel stood idly by as DMS testified, *inter alia*, that she was raped "every night" during the first trip to Morocco, which she erroneously characterized as lasting three months. Tr. I, 178, 190. And to further harm his client, defense counsel neither requested a limiting instruction informing the jury that it could not convict Mr. Sims on the basis of conduct occurring in Morocco, nor did counsel object to the lack of the same.

### B.    The state court decision.

The OCCA denied Mr. Sims's numerous allegations of ineffective assistance *en masse* by holding:

> We have carefully considered Appellant's record-based challenges to counsel's representation, as well as his request for an evidentiary hearing to develop additional facts supporting his claims. The Court finds that he has not shown clear and convincing evidence of a strong possibility that trial counsel was ineffective. He does not show that counsel's presumptively reasonable strategic decisions about how to conduct the defense involved errors so serious as to deserve the name deficient performance. Nor has he shown that counsel's representation was so deficient that, but for unprofessional errors, there is a reasonable probability of a different outcome. Proposition Three, and the related request for an evidentiary hearing, are denied.

Att. 1 at 7. The state court's decision was contrary to clearly established federal law and/or was unreasonable as to the state court's application of the law or determination of the facts. 28 U.S.C. § 2254(d). This Court may properly grant relief as to any or all of the alleged instances of ineffective trial counsel. Mr. Sims will address each allegation of

ineffectiveness separately.

### i.    The two record-based instances of ineffective assistance.

The OCCA classed counsel's complete and utter failure to raise appropriate objections to the other crimes/ sexual propensity evidence and counsel's failure to ensure an appropriate limiting instruction be given to the jury as "presumptively reasonable strategic decisions." Att. 1 at 7.  The state court's finding of strategy was an objectively unreasonable determination of fact.  28 U.S.C. § 2254(d)(2).  It is true that counsel is generally afforded wide latitude in making tactical decisions, and there is a presumption that such tactical decisions be considered sound trial strategy.  *Strickland v. Washington*, 466 U.S. 668, 689-90 (1984).  However, there is no evidence in the record to support that defense counsel engaged in any decision-making whatsoever as to evidence of misconduct occurring in Morocco and the admission of the same at trial without a limiting instruction.  Counsel's sheer inadvertence or ineptitude seems the best explanation for his silence.  The state court's further findings of no prejudice were likewise unreasonable and/or contrary to law.  *See Att.* 1 at 7.

### 1.    Counsel's failure to object or perhaps even be aware of the law governing the admission of evidence concerning events allegedly occurring in Morocco.

As discussed in Grounds One and Two, above, it was Constitutional error for the trial court to admit evidence of other crimes/ sexual abuse allegedly occurring in Morocco, where the state failed to comply with statutory notice requirements; such other crimes/ sexual abuse were not proven by clear and convincing evidence prior to admission; and such evidence was

so prejudicial as to render Mr. Sims's trial fundamentally unfair.  Defense Counsel failed to object to admission of this evidence and stood idly by as DMS testified for transcript page after transcript page of her two trips to Morocco.  *See* Tr. I, 174-234 (DMS's direct examination testimony).

Due to defense counsel's complete and unexplainable silence regarding the other crimes/ sexual propensity evidence from the Morocco trips, the record does not reveal the reason, if any, for counsel's failure.  Either counsel failed to know the applicable Oklahoma law governing other crimes/ sexual propensity evidence (*Burks,* 594 P.2d 771, 773; and Okla. Stat. tit. 12, §§ 2413, 2414), or counsel was totally oblivious to the legal errors and principles involved in admission of DMS's allegations of crimes and abuse occurring in Morocco, for which Mr. Sims was not presently on trial.  In either event, the failure to object is a clear example of counsel's overall inattentiveness and certainly falls below any reasonable standard of professional competency.

Had counsel objected to DMS's testimony concerning her allegations of other crimes/ sexual abuse occurring in Morocco, the district court should have not allowed such testimony and/or instructed the jury to disregard same.  This is so given the state's failure to comply with statutory pre-trial notice requirements for evidence of alleged conduct occurring in Morocco, that the alleged conduct was not proven by clear and convincing evidence prior to admission, and that the evidence was so prejudicial that it could not satisfy the balancing test as Okla. Stat. tit. 12, § 2403.  Without DMS's testimony about how Mr. Sims allegedly abused her in Morocco, there exists a reasonable probability that Mr. Sims would not have

been convicted.   *See Strickland*, 466 U.S. at 694.

> **2.     Counsel's failure to request an appropriate limiting instruction to prevent the jury from erroneously convicting Mr. Sims for crimes allegedly committed in Morocco.**

As discussed in Ground Two, above, Mr. Sims's jury was not given a limiting instruction regarding the other crimes/ sexual propensity evidence of DMS's allegations of what occurred during the trips to Morocco.   *See* O.R. 120-52 (Instructions Given to Jury After Evidence).   It was necessary for Mr. Sims's jury to be instructed that it could not consider what allegedly occurred in Morocco as "proof of the guilt or innocence of the defendant of the specific offense charged in the information," or instructed that it "may not [] convict the defendant solely because you believe he committed these other offenses." OUJI-CR 9-9, 9-10A, respectively.    The Tenth Circuit and Supreme Court have acknowledged that an appropriate limiting instruction must be given where other crimes/ sexual propensity evidence is admitted. *See, e.g.*, *James*, 567 Fed. Appx. at 597 ("On federal habeas review, the district court determined Mr. James was not denied due process or a fair trial because in his second trial, unlike in his first trial, ***the court instructed the jury not to use the [§ 2414] evidence as proof of guilt***.") (emphasis added); *Estelle*, 502 U.S. at 75 (finding limiting instruction prevented misuse or prior injury evidence).

Here, the record reveals that the state and Mr. Sims submitted, but apparently did not file, proposed jury instructions.  Tr. III, 3.  The district court then prepared its own packet of instructions based on the trial evidence and "with the aid" of the parties' proposed instructions.  *Id*.  Defense counsel was specifically asked if there were any instructions that

were requested but not included in the court's packet. *Id.* at 4. Counsel stated there was one, but it had to do with "corroboration based upon case law"; counsel did not mention a limiting instruction regarding the evidence of abuse allegedly occurring in Morocco. *Id.* Counsel offered no other objections to the Court's proposed instructions. *Id.* at 5. Counsel's statements establish as fact that (1) he failed to request an appropriate limiting instruction in his proposed instructions, as evidenced by not requesting one when asked by the trial court if its instruction packet failed to contain any instructions which had been submitted; and (2) he failed to object to omission of an appropriate limiting instruction from the trial court's instruction packet. Either way counsel was severely deficient. *See United States v. Garcia*, 52 F.3d 338, *2 (10th Cir. 1995) (Table, unpub.) ("It is undisputed that Garcia's trial counsel did not request a limiting instruction concerning the evidence of his prior drug-related conduct. The government concedes that this error was outside reasonable professional bounds in dealing with prior acts evidence.").

Had defense counsel asked for an appropriate limiting instruction, such as one or both of OUJI-CR 9-9 or 9-10A, there is no reason the trial court would not have granted the request. Given the emphasis in DMS's testimony on the repeated sexual abuse and other misconduct she alleged to have been committed by Mr. Sims in Morocco, not to mention the state's emphasis on the same during closing argument (*see* Tr. III, 6), there exists a reasonable probability Mr. Sims would not have been convicted had an appropriate limiting instruction been given.

### ii.     Outside-the-trial-record instances of ineffective assistance.

In accordance with the OCCA's rules, Mr. Sims contemporaneously filed an Application for Evidentiary Hearing on Sixth Amendment Claims along with his Brief of Appellant on January 15, 2021.  *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App.   Included with the Rule 3.11 Application were numerous exhibits, including an affidavit from Mr. Sims, an affidavit from Legal Assistant Hanson regarding an open records request submitted to Canadian County, an affidavit from Direct Appeal Counsel Douglas Parr regarding items present in trial counsel's discovery file, the affidavits of three of Mr. Sims's adult siblings from Morocco, an affidavit from Mr. Sims's friend of 27 years Seddik Halabi, a second affidavit from Appeal Counsel Parr regarding Mr. Sims's passport and photographs taken during the Morocco trips, and a second affidavit of Legal Assistant Hanson regarding specific documents contained in trial counsel's discovery file.  *See* Rule 3.11 App., Exhs. 1-9, respectively.  As was demonstrated in his Appeal Brief and by the Rule 3.11Application materials, Mr. Sims received ineffective assistance of counsel in numerous ways.  Appellant's Brf., pp. 29-48.  *Inter alia*, counsel failed to communicate with Mr. Sims, which could have informed defense strategies and pre-trial investigation; counsel failed to conduct any sort of reasonable investigation into DMS's allegations; counsel failed to utilize available discovery materials to impeach DMS.  But for counsel's failures, essentially to function as competent defense counsel, there exists a reasonable probability that Mr. Sims would not have been convicted.

The OCCA denied these outside-the-trial-record claims of ineffective assistance.  Att. 1 at 8.  The state court's decision was objectively unreasonable.  First, the OCCA found that

defense counsel engaged in "presumptively reasonable strategic decisions," so as to preclude a finding of deficient performance. Att. 1 at 8. Defense counsel failed to adequately consult with his client, investigate the state's case, and utilize available discovery materials to defend Mr. Sims. Counsel's conduct resulted from inattention not any sort of reasoned strategy. And, even if this Court could possibly class counsel's conduct as strategy, such strategy could have been by no means a reasonable exercise of professional judgment. *See Wilson v. Sirmons*, 536 F.3d 1064, 1132 (10th Cir. 2008) (citing *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) (holding strategic judgments are not reasonable unless backed by a reasonable investigation); *accord Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir. 2002).

The Supreme Court has explained that a strategic decision must be the result of deliberation, investigation, a reasoned choice between alternatives, and the like. Here, the state court record, including Rule 3.11 materials, demonstrates that counsel's failures resulted from "inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 526 (2003). The OCCA's rationale of invoking "presumptively reasonable strategic decisions" to insulate counsel's deficiency "resembles more a post hoc rationalization of counsel's conduct than an accurate description of" counsel's deliberations prior to trial. *Id*. at 526-27. Strategic choices must be backed by a reasonable investigation. *Strickland*, 466 U.S. at 690-91 ("...strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Anderson v. Sirmons*, 476 F.3d 1131, 1145-46 (10th Cir.

2007) (collecting cases); *see also Sears v. Upton*, 561 U.S. 945, 953 (2010) (finding "that a theory might be reasonable in the abstract does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced" the defendant).  There is no indication that Mr. Sims's counsel conducted any investigation into the DMS's allegations against him, including her claims of abuse occurring in Morocco. It is unclear that defense counsel even read discovery materials, given his failure to utilize the same for cross-examination and impeachment.  Counsel's failures cannot be classified as strategy or otherwise a reasonable exercise of professional judgement.  The OCCA's casting of counsel's inaction as strategy is contrary to and/or an unreasonable application of *Strickland* and its progeny, as well as being an unreasonable determination of fact. 28 U.S.C. § 2254(d).

Second, the OCCA's finding of no "reasonable probability of a different outcome" was likewise unreasonable and/or contrary to clearly established federal law.  Att. 1 at 8. Prejudice is shown by demonstrating that absent counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different.  *Strickland* at 694.  The reasonable probability standard is not a difficult test to meet – if confidence in the conviction is undermined, prejudice is established.  *Id.* at 694-95; *see also Williams*, 529 U.S. 362, 405-06 (finding a reasonable probability is something less than a preponderance of the evidence).   Here, counsel failed to conduct a reasonable investigation which, as will be shown below, would have yielded strong evidence refuting DMS's allegations.  The materials submitted with Mr. Sims's Rule 3.11 Application, dramatically weaken the state's

case and create a reasonable probability that the outcome of trial would have been different but for counsel's deficiencies.

> **1.    Failure to consult and communicate with Mr. Sims prior to trial to such degree that a total breakdown in communication occurred.**

In the approximate eight months prior to trial, defense counsel only visited with Mr. Sims on *one* occasion at the Canadian County Jail.  Mr. Sims provided an affidavit in support of his Rule 3.11 Application, which details the extent of his communications with his lawyer. *See* Rule 3.11 App., Exh. 1 (Sims Affidavit).   The Affidavit provides in part:

> Shortly after I was arrested, and before formal charges were filed against me in Canadian County District Court case number CF-19-188, friends hired Mr. Michael Rogalin, an attorney in Oklahoma City, to represent me in any criminal charges filed against me.

> Around April 8, 2019, after I had been arrested, and before official charges were filed against me in Canadian County District court case CF-19-188, Mr. Rogalin visited me in the Canadian County jail for approximately twenty (20) to thirty (30) minutes.  This was the first time I ever met Mr. Rogalin and the first time I ever spoke to him.

> ***That one time on April 8, 2019, before charges were officially filed against me on April 15, 2019, was the only time after I was arrested that Mr. Rogalin came to talk with me at the jail.***

> After my one visit with Mr. Rogalin in the Canadian County jail on April 8, 2019, and before the trial in my case started on December 4, 2019, the only other times that I saw and talked with Mr. Rogalin were on the two or three times that I was brought to court for court appearances in my case.
>                                     * * *
> At no time after while I was in jail, did Mr. Rogalin and I have any telephone conversations.  I tried to call him many times but was never able to be connected with him.

*Id*. at ¶¶ 4-7, 11 (emphasis added).   Despite the severity of the charges herein, defense

counsel only met with Mr. Sims at the jail once for 20 or 30 minutes, which was prior to the Information being formally filed and prior to discovery materials being provided to the defense. *Id*. The only other times prior to trial that Mr. Sims communicated with defense counsel were when he was brought over to the courthouse for routine appearances. *Id*. at ¶¶ 7-9. And, those communications with defense counsel in court were very brief. *Id*. Review of the district court docket sheet and the Canadian County Sheriff's Office's Response to an Open Records Request confirm pre-trial communications between Mr. Sims and defense counsel were limited to one visit at the jail and the few brief times Mr. Sims appeared in court. O.R. 236-258 (docket sheet); Rule 3.11 App., Exh. 2 (Hanson Affidavit).

Absent communications with his attorney, Mr. Sims was unable to participate in his defense. For example, defense counsel did not discuss discovery materials with Mr. Sims or otherwise inform Mr. Sims of the evidence and precise allegations that would be made against him at trial. Rule 3.11 App., Exh. 1, ¶¶ 12-13 (Sims Affidavit). Nor did defense counsel inform Mr. Sims that DMS had alleged sexual abuse occurred during the trips to Morocco. *Id*. at ¶ 15. Defense counsel never asked Mr. Sims if there were witnesses or evidence that could help disprove the state's allegations or which could impeach the testimony of DMS. *Id*. at ¶¶ 14-15. Also, with respect to the trial, defense counsel did not have a pre-trial discussion about or otherwise prepare Mr. Sims to testify in his defense. *Id*. at ¶ 17. Instead, that critical decision was made on the fly, following the state resting its case, without Mr. Sims being prepared to testify or being informed by defense counsel of what would likely be asked by the state on cross examination. *Id*. Perhaps most critically,

counsel did not ask Mr. Sims questions about his personal anatomy. *Id*. at ¶ 15. It is understood that unique characteristics of Mr. Sims's anatomy are unknown to DMS, and questioning DMS about these characteristics could have revealed DMS's allegations were untrue. *Id*.

Counsel's performance was objectively deficient and unreasonable in failing to consult and communicate with Mr. Sims. *See Criminal Justice Standards, Defense Function*, American Bar Assoc. (4th ed. 2017) (available https://www.americanbar.org /groups/criminal_justice/standards/DefenseFunctionFourthEdition/). Among other things, defense counsel must develop and maintain a relationship of "trust and confidence" with criminal clients. *Id*. at Standard 4-3.1(a). This responsibility is not diminished due to a client's in-custody status: "Defense counsel should actively work to maintain an effective and regular relationship with all clients. The obligation to maintain an effective client relationship is not diminished by the fact that the client is in custody." *Id*. at Standard 4-3.1(f). As part of the relationship, defense counsel must keep the client informed and advised about the representation, "including developments in pretrial investigation, discovery, disposition negotiations, and preparing a defense." *Id*. at Standard 4-3.9(a).

Had counsel communicated appropriately with Mr. Sims, Mr. Sims could have, *inter alia*, provided counsel with reasonable lines of investigation, including witnesses to interview and available evidence to obtain. Rule 3.11 App., Exh. 1, ¶¶ 14-15 (Sims Affidavit). Also had appropriate communications occurred, Mr. Sims would have been in a position to participate in his case, including making informed decisions concerning his trial

and whether to testify.  If such communications had occurred, Mr. Sims trial would have no doubt taken on a different light; for example, defense witnesses and exhibits could have been presented to discredit DMS's allegations, and Mr. Sims's testimony could have been more coherent, or he may have chosen not to testify at all.   Had defense counsel developed and maintained appropriate communications with Mr. Sims, there exists a reasonable probability that the outcome of trial would have been different.  *See Strickland*, 466 U.S. at 694.

Alternatively, Mr. Sims submits that counsel's conduct was so deficient in relation to the near complete failure to communicate with his client that prejudice should be presumed and the Writ issued.  *See United States v. Cronic*, 466 U.S. 648, 658-59 (1984) (discussing circumstances in which prejudice is presumed, such as the complete denial of counsel). Here, defense counsel did not function as counsel as guaranteed by the Sixth Amendment. While Mr. Sims and his counsel did not suffer an acrimonious relationship such that they could no longer communicate, the lack of communication is equivalent to a "complete breakdown in communication" in which prejudice would be presumed.  *See United States v. Soto Hernandez*, 849 F.2d 1325, 1327-28 (10th Cir. 1988) (discussing *Cronic* in context of an alleged breakdown in communication).   "To prove a total  breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney ***or evidence that he had such minimal contact with the attorney that meaningful communication was not possible*.**" *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir.2002) (emphasis added).  A reviewing court may consider a number of factors when assessing whether a breakdown in communication occurred, including "1) whether the

defendant's motion for new counsel was timely; 2) whether the trial court adequately inquired into defendant's reasons for making the motion; 3) whether the defendant-attorney conflict was so great that it led to a total lack of communication precluding an adequate defense; and 4) whether the defendant substantially and unreasonably contributed to the communication breakdown." *Id*. at 1250 (citing *Romero v. Furlong*, 215 F.3d 1107, 1113 (10th Cir.2000)). Here, only the 3rd and 4th factors appear applicable.   As discussed above, had counsel communicated with Mr. Sims the defense could have been strengthened considerably, including identifying witnesses and circumstances to rebut DMS's allegations.  And, there is no indication whatsoever, that Mr. Sims is to blame for counsel's lack of pre-trial client conferences at the jail.  Respectfully, prejudice must be presumed in these circumstances.

The OCCA failed to address the *Cronic* aspect of this claim.  *See* Att. 1 at 8 (containing no discussion of *Cronic* or types of ineffective assistance in which prejudice is presumed); *see also* Applnt's Brief, p. 34 (Jan. 15, 2022) (asserting *Cronic* claim). Thus, there is no state court adjudication to which AEDPA deference is owed and this Court's review of this aspect of counsel's ineffectiveness is de novo.  *Byrd v. Workman*, 645 F.3d 1159, 1166–67 (10th Cir. 2011); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).  This Court may presume prejudice and relief may be properly granted.  *See Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice").

> **2.**     **Failure to investigate, obtain, and utilize evidence to refute DMS's allegations of other crimes/ sexual abuse occurring in Morocco.**

43

a.      **Failure to interview and/or obtain the testimony of witnesses in Morocco.**

Defense counsel failed to conduct any investigation into what transpired during the trips to Morocco.  Counsel should have interviewed Mr. Sims's family members who lived at his mother's farmhouse where he and DMS stayed.  Counsel should have been aware from the state's discovery materials that witnesses existed in Morocco who could provide information and insight into DMS's allegations.  *See* Rule 3.11 App., Exh. 3 (Parr Affidavit Regarding Contents of Trial Attorney's File).   Alternatively, if counsel had communicated with Mr. Sims, including apprising Mr. Sims of DMS's allegations as contained in police reports, DHS reports, etc., Mr. Sims could have identified family members in Morocco for defense counsel to interview who could discredit DMS's allegations.

Mr. Sims provided in his affidavit that defense counsel had not explained to him the details of DMS's accusations, and Mr. Sims did not learn the specifics of those allegations until she testified.  Rule 3.11 App., Exh. 1, ¶ 13 (Sims Affidavit).  Nor did counsel ask Mr. Sims prior to trial if there were any witnesses who could disprove DMS's allegations.  *Id*. at ¶ 14.  During direct examination, when asked about sexual abuse occurring in Morocco, Mr. Sims responded that his lawyer "can put people on the phone. My Sister, Laal, she speak very good English."  *See* Tr. II, 173.  Mr. Sims's testimony confirms that he was surprised by DMS's allegations about the Morocco trips and confirms that counsel had not sought to interview Mr. Sims's relatives in Morocco prior to trial.  In fact, Mr. Sims's relatives could have discredited much of DMS's testimony.  Counsel's failure to investigate and obtain the

testimony of available witnesses "resulted from inattention, not reasoned strategic judgment" and constituted deficient performance. *Wiggins*, 539 U.S. 510, 526; *see also Fisher*, 282 F.3d 1283, 1291 ("counsel has a duty to investigate all reasonable lines of defense").

On direct appeal, Mr. Sims obtained the affidavits of his two sisters, Hanane El Kamli and Khadija El Kamli, and his brother, Said El Kamli. Rule 3.11 App., Exhs. 4, 5, 6, respectively. These siblings were present during the two trips to Morocco. Contrary to DMS's testimony, Hanane and Khadija could have testified that the sleeping arrangements at the farmhouse were such that Mr. Sims and DMS did not sleep in the same room as result of religious beliefs. Rule 3.11 App, Exh. 4, ¶ 17 (Hanane Affidavit); Exh. 5, ¶ 14 (Khadija Affidavit). All three siblings would have also testified that the first trip to Morocco in 2016 only lasted three weeks, not three months as claimed by DMS. *Id*. at Exh. 4, ¶ 5 (Hanane Affidavit); Exh. 5, ¶ 5 (Khadija Affidavit); Exh. 6, ¶ 4 (Said Affidavit). The sisters could have discredited DMS's very specific allegation that Mr. Sims had ejaculated on her stomach and then wiped up his semen with DMS's nightgown. Tr. 1, 188; Tr. II, 20. The sisters explain that they were responsible for doing the laundry, that they inspected each piece of clothing for stains to "hand prepare for washing," that they did not notice any semen, and that if they would have noticed semen on DMS's clothing, it would have been discussed with the family. Rule 3.11 App, Exh. 4, ¶ 18 (Hanane Affidavit); Exh. 5, ¶ 15 (Khadija Affidavit). Mr. Sims's brother, Said, lived near the seashore, and could have disputed DMS's testimony about how Mr. Sims would expose himself and watch DMS undress while putting on swimsuits in the car. Tr. I, 189. Said explains that his house was not far from the beach and

45

that the few times DMS and Mr. Sims went to the beach, they changed into their swimsuits at Said's house and not in a car as claimed by DMS. Rule 3.11 App., Exh. 6, ¶ 14 (Said Affidavit). Hanane could have explained more articulately than Mr. Sims about the "traditional and conservative practice" of the "custom of virgin bride," which DMS witnessed at a niece's wedding in 2016. *Id*. at Exh. 4, ¶ 10 (Hanane Affidavit); *but see* Tr. II, 188 (Mr. Sims's testimony about needing a "cherry" to get married in Morocco). Hanane's testimony would have lent credibility to Mr. Sims testimony about why DMS wanted the medical procedure. And all the siblings confirmed that neither they, nor any other family member in Morocco, were ever contacted by Mr. Sims's defense counsel about what happened in Morocco during DMS's two trips there. Rule 3.11 App., Exh. 4, ¶ 19 (Hanane Affidavit); Exh. 5, ¶ 16 (Khadija Affidavit); Exh. 6, ¶ 15 (Said Affidavit).

The testimony of Mr. Sims's siblings creates a reasonable probability that the outcome of his trial would have been different. As shown by their affidavits, the siblings discredit DMS's testimony in many key respects, including that Mr. Sims did not rape DMS at night in Morocco because the two did not share the same room. Also, the sisters' affidavits corroborate and further explain, the circumstances of DMS's Hymenoplasty procedure against the backdrop of traditional Moroccan culture. Such testimony was needed to explain what must seem bizarre to westerners such as Mr. Sims's jurors, who, based on their verdicts, were understandably reluctant to accept the testimony of Mr. Sims's who stood accused of repeatedly sexually abusing his daughter. Had Mr. Sims's siblings caused a jury to question the veracity of DMS's allegations about events in Morocco, a jury would likely discredit

DMS's accusations of abuse occurring in Oklahoma.

>    **b.    Failure to obtain and utilize photographs from the Morocco trips to support Mr. Sims's testimony and challenge the testimony of DMS.**

Just as counsel failed to interview key witnesses in Morocco, he also failed to obtain and utilize photographs taken during the trips to Morocco. *See* Rule 3.11 App., Exh. 8, Atts. 2-13 (Parr Affidavit Regarding Passports and Photographs). These photographs depict a happy, carefree teenager, DMS, enjoying trips to a foreign country. *Id*. They are not the sort of images one would expect of a person who was being repeatedly sexually abused during those trips. If only counsel had asked him, Mr. Sims could have provided such photographs prior to trial. Rule 3.11 App., Exh. 1, ¶ 15 (Sims Affidavit). Even more troubling is that Seddik Halabi, Mr. Sims's friend of 27 years, collected these photographs, as well as Mr. Sims's passport prior to trial, and Mr. Halabi tried to give these items to defense counsel. Rule 3.11 App., Exh. 7, ¶ 7 (Halabi Affidavit). Oddly, defense counsel informed Mr. Halabi that he did not need or want to have either the photographs or passport. *Id*. at ¶ 8. These photographs would have supported Mr. Sims's testimony and explanation of the events occurring in Morocco. Rule 3.11 App., Exh. 1, ¶ 15 (Sims Affidavit). These photos would have likewise undermined the state's case. Also, the photographic evidence could have been used to support the testimony of Mr. Sims's siblings whom counsel should have interviewed and presented as witnesses. *See* Rule 3.11 App. Exhs, 4, 5, 6 (Affidavits of Mr. Sims's Siblings).

With respect to the photographs themselves, 12 were included with the Rule 3.11

materials before the OCCA.  *See* Exh. 8, Atts. 2-13.  Most of the photographs depict a happy teenager, DMS, enjoying a trip to a foreign country.  *Id*. at Atts. 2-5, 8-12.  For example, there are pictures of a side-trip DMS took with Mr. Sims and his family to Marrakesh soon after arriving in Morocco for the first trip in 2016.  *Id*. at Atts. 4-5.  And after returning from Marrakesh, there are photos of DMS attending Mr. Sims's nieces wedding.  *Id*. at Atts. 8-11.  Mr. Sims rented DMS a special dress to wear at the wedding.  *Id*. at Att. 8; *see also* Rule 3.11 App., Exh. 4, ¶ 9 (Hanane Affidavit).  Also these pictures of DMS at the wedding confirm Mr. Sims's testimony and his sister's affidavit regarding DMS seeing the custom of the virgin bride.  Rule 3.11 App., Exh. 4, ¶ 10 (Hanane Affidavit).   There are also photographs of Mr. Sims's mother's farmhouse.  Rule 3.11 App., Exh. 8, Atts. 6-7.  These pictures of the farmhouse would have supported Mr. Sims testimony about the design of the house and sleeping arrangements during the trip and would also have supported testimony from his siblings Hanane and Khadija that DMS and Mr. Sims did not share a room alone.  Rule 3.11 App., Exh. 4, ¶ 17 (Hanane Affidavit); Exh. 5, ¶ 14 (Khadija Affidavit).

Counsel's failure to investigate DMS's allegations of abuse occurring in Morocco extended beyond his failure to interview witnesses in that country.  At least as concerning, if not more so, was counsel's failure to collect photographs which would have undermined DMS's allegations.  Counsel could have easily obtained the photographs had he just asked his client for them, or had counsel accepted the photographs from Seddik Halabi when offered to him.  *See* Rule 3.11 App. Exh. 7, ¶¶ 7-8.  Counsel's performance was deficient in failing to obtain and utilize the photographs.  As is apparent from viewing the photographs,

DMS was not being truthful in her testimony about the events occurring in Morocco. Had the jury seen the photographs, it would have caused it to question the veracity of DMS. Therefore, there exists a reasonable probability that Mr. Sims would not have been convicted had counsel obtained and utilized the photographs. *See Strickland*, 466 U.S. at 694.

        **c.**    **Failure to obtain and utilize Mr. Sims's United States Passport as a defense exhibit.**

Counsel failed to obtain and utilize Mr. Sims's passport as a defense exhibit. The passport could have easily been obtained had counsel asked Mr. Sims for it. Rule 3.11 App. Exh. 1, ¶ 15 (Sims Affidavit). The passport was even offered to counsel by Mr. Sims's friend Seddik Halabi, but counsel didn't want it. Rule 3.11 App. Exh. 7, ¶ 8 (Halabi Affidavit). If presented at trial, the passport would have assisted the defense greatly. A copy of the relevant pages of Mr. Sims's passport was included with his Rule 3.11 Application. Exh. 8, Att. 1 (Parr Affidavit Regarding Passport and Photographs); *see also* Substitute Exhibit to Appellant's Application for Evidentiary Hearing Sixth Amendment Claims, OCCA No. F-2020-56 (June 7, 2021) (containing passport pages that were inadvertently omitted from Exh. 8 when initially filed with the Rule 3.11 Application). The passport could have been utilized (1) to demonstrate that Mr. Sims was a United States citizen, (2) to support Mr. Sims's testimony regarding the length of the trips to Morocco and contradict DMS's testimony regarding those trips, and (3) to impeach DMS's testimony regarding the timing of when a phone call was received from Oklahoma during the second trip to Morocco.

Mr. Sims's jury was given the impression, albeit incorrect, that he was a foreigner

who had been caught abusing an American child, DMS. Defense counsel failed to correct this impression. Mr. Sims was born in Morocco, but he has been a United States citizen since 2010. Rule 3.11 App., Exh. 1, ¶ 1 (Sims Affidavit). Mr. Sims's Moroccan origins were discussed extensively at trial; however, defense counsel failed to confirm either by asking Mr. Sims, or otherwise, that Mr. Sims was a United States citizen. Instead, the jury was left with the impression that "My client is from Morocco. He is a Muslim." Tr. III, 31 (defense closing argument). The passport would have established Mr. Sims was a citizen and dispelled the notion that he was a foreigner committing crimes in this country and crimes in his country against DMS, an American.

The passport could also have been used to rebut DMS's assertions about the timing of events in Morocco. First, DMS testified that the first trip to Morocco in 2016 lasted three months during which she was raped "every night." Tr. I, 178, 190; Tr. II, 5. The entry and exit stamps on Mr. Sims's passport reveal that the 2016 trip only lasted three weeks, with entry to Morocco on August 11 and exit on September 11. Substitute Exhibit (June 7, 2021), Exh. 8, Att. 1 (Passport). The passport accords with Mr. Sims's testimony as to the length of the first trip and could certainly have been used by defense counsel to impeach DMS's incorrect assertion that the trip lasted three months. *Compare* Tr. I, 178, 5 with Tr. II, 165. Three months is vastly different than three weeks, and had the passport been presented, DMS would have been impeached. In turn, such impeachment could reasonably have caused the jury to disbelieve DMS's other allegations, including that she was raped "every night" during the first trip. *See* Tr. I, 190.

Second, presentation of the passport could have also impeached DMS's testimony about when during the second Morocco trip that Tammy called to inform Mr. Sims and DMS that the Yukon Police were investigating allegations that DMS had been raped and was pregnant. *See* Tr. I, 21.  DMS testified the call from Tammy came a "couple of nights" into the trip. *Id*.  DMS's testimony was incorrect.  Mr. Sims's passport establishes that the second Morocco trip began on June 12, 2017, when he entered the country.  Rule 3.11 App., Exh.8, Att. 1 (Passport); *see also* Substitute Exhibit (June 7, 2021).  However, the DHS Reports in the state's discovery show that Tammy's call to Morocco would have occurred on July 8 or 9, 2017 as the Yukon Police Department began its investigation on July 7, 2017.  Rule 3.11 App., Exh. 9, Atts.  G, H (Hanson Affidavit Regarding Documents in Trial Counsel File ).  Presentation of the passport could have shown Tammy's call came almost a full month into the trip, not a couple of nights in as DMS testified.  This is not an inconsequential line of impeachment.  But considering the numerous ways DMS's testimony could have been disputed about the Morocco trips, whether by testimony of Mr. Sims's siblings, photographic evidence, her prior statements, or the passport, another matter on which DMS was incorrect could have served as the tipping point in causing the jury to wholesale reject her testimony.  Had counsel obtained and presented Mr. Sims's passport as a defense exhibit, there exists a reasonable probability that Mr. Sims would not have been convicted.

### d.   Failure to investigate and interview DMS's sibling who denied that DMS was abused by Mr. Sims.

DMS testified that Mr. Sims would repeatedly come into her bedroom at night and

touch her inappropriately on her private parts.  Tr. I, 198.  DMS shared the bedroom with her little sister HS.  DMS alleged Mr. Sims would stand on the bottom-bunk where HS was sleeping so that he could reach DMS who slept on the top bunk.  *Id*.  DMS pretended to be asleep while this abuse occurred.  *Id*. at 199.  If the abuse actually occurred as DMS testified, HS should have witnessed it.

Contained in the state's discovery, were two reports of interviews DHS investigators conducted with HS.  Rule 3.11, App., Exh. 9, Atts. E, F.  On August 28, 2017, HS was forensically interviewed and reported that Mr. Sims had never abused DMS or any of the Sims children.  *Id*. at Att. E.  HS further reported that no one has tried to touch her or asked HS to touch them.  *Id*.  HS was again interviewed in 2019, and HS again denied that she had ever witnessed Mr. Sims engaging in misconduct with DMS or any of the other children.  *Id*. at Att. F.  *Inter alia*, HS told investigators "DMS has not been raped and that DMS is a liar . . . HS denied ever seeing Mr. Sims wake DMS up at night . . . HS stated she thinks DMS is lying to get dad out of the home and so she can go out with her boyfriend."  *Id*.

Counsel should have conducted an investigation into the information contained in the reports of HS's interviews.  At minimum, counsel should have interviewed HS.  Yet counsel failed to conduct a reasonable investigation.  It is seemingly impossible to conceive of any reasonable strategy which would omit investigating HS's statements, which directly refute abuse that HS should have witnessed according to DMS.  *See Strickland*, 466 U.S. at 690-91 ("...strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

Counsel was severely deficient in failing to investigate HS's statements.  Had Mr. Sims's jury been informed of HS's denials of abuse, not to mention her characterizing DMS as a "liar," a reasonable probability exists that the outcome of trial would have been different. *See id.*, 466 U.S. at 694.

### 3. Failure to utilize available evidence, contained in the state's discovery, to impeach and cross-examine DMS.

Counsel was further ineffective in failing to utilize available evidence contained in the state's discovery during cross-examination of DMS.  Key discovery materials are attached to the Affidavit of Legal Assistant Lori Hanson, which is included as Exhibit 9 to Mr. Sims's Rule 3.11 Application.  These key materials consist of a Yukon Police Department Reports, DHS Reports, and a handwritten statement from DMS.  Rule 3.11, Exh. 9, Atts. A, B, C, D, G, H.  Had counsel utilized the content of these reports, he could have cross-examined DMS as to her multiple denials of sexual abuse following her return from the second Morocco trip and cross-examined her as to how her allegations of abuse had changed over time.  These reports were contained in the state's discovery disclosure, and it was deficient performance for counsel to fail to utilize the same during cross examination of DMS.  *See Rompilla v. Beard*, 545 U.S. 374, 383-390 (2005) (finding trial counsel rendered deficient performance by failing to review publically available materials prior to trial).

### a. Failure to cross-examine DMS as to multiple denials made following return from second Morocco trip.

The reports from the Oklahoma Department of Human Services contained in defense

counsel's file show that after police and DHS began an investigation into suspected sexual abuse of DMS by Mr. Sims around July 8, 2017, DMS on three separate occasions denied that any such abuse was occurring.  According to an undated report by a Captain Fairchild of the Yukon Police Department, sometime after July 8, 2017, but before August 11, 2017, DMS called him from Morocco and reported that, contrary to what he may have heard, she was not pregnant and was not being sexually abused by Mr. Sims, and that such allegations were probably made by her biological father because he did not like Mr. Sims.  Rule 3.11, App., Exh. 9, Att. A.  On August 11, 2017, the day DMS returned from the second trip to Morocco, DHS worker Monica Cervantes and DHS Child Welfare Investigator Brandi Buck conducted an extensive interview with DMS at her home in Yukon, Oklahoma, where DMS reported great enjoyment in her trips to Morocco, that she has a good relationship with Mr. Sims and her adopted mother, that there was no one that had done anything to her that she was not okay with, and that she feels safe at home with her adopted step parents.  *Id*. at Att. B.  Also contained within the same report in defense counsel's discovery file is the report of a forensic interview of DMS conducted by Ms. Cervantes and observed by Yukon Police Detective Vicki Brugh on August 28, 2017, at the CART house in El Reno, Oklahoma, in which DMS reports that she is aware that there were accusations that Mr. Sims had sexually abused her but that he has never touched her in any inappropriate way.  *Id*. at Att. B.

DMS denied to authorities that sexual abuse was occurring on at least three occasions; however, defense counsel failed to cross-examine her as to the specifics of each denial.  Any reasonable defense counsel would have walked DMS through each denial in detail, so as to

demonstrate to the jury that DMS had been inconsistent in her statements. These inconsistences are exactly what could cause a jury to disbelieve a witness, and in turn, create a reasonable probability that Mr. Sims would not have been convicted.

> **b.   Failure to cross-examine DMS regarding different allegations of abuse contained in her multiple statements.**

On March 27, 2019, DMS made her initial allegations to Yukon Police that Mr. Sims had sexually abused her. Rule 3.11 App., Exh. 9, Att. C. At that time, DMS provided a handwritten statement. *Id*. at Att. D. While the handwritten statement alleges that Mr. Sims raped DMS in Morocco; DMS did not claim Mr. Sims had raped her here in Oklahoma. *Id*. At the time of her handwritten statement, DMS's allegations against Mr. Sims for conduct occurring in Oklahoma were limited to:

> Every night that he was home he would come in and slip his hands into my panties. I pretended I was asleep. Everyday he was there when I was home-schooled, he would try to rape me every time my mom left the house.

*Id*. But, by the time of trial, DMS's allegations about what occurred in Oklahoma had become much more severe. At trial, DMS testified that after returning from the first Morocco trip, Mr. Sims digitally penetrated her vagina and anus and had committed vaginal and anal rapes. *See* Tr. I, 198-208. Counsel should have cross-examined DMS at length about the differences in her allegations of what occurred in Oklahoma between the time of her initial disclosure to police and trial.

Considering that the State of Oklahoma only had jurisdiction to charge and convict Mr. Sims for crimes occurring in Yukon, it was clear deficient performance for counsel to

not cross examine DMS as to the content of her handwritten statement. DMS's handwritten statement alleged sexual abuse no doubt, but the acts occurring in Yukon were limited to fondling and Mr. Sims "trying" to rape DMS. Rule 3.11 App., Exh. 9, Att. D. The jury needed to hear how DMS's allegations had changed drastically from when she first disclosed abuse. DMS's testimony should have been assessed for reliability in the "crucible of cross examination;" counsel was ineffective for failing to do so. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004). Had defense counsel cross-examined DMS as to her statements, there exists a reasonable probability that the outcome of trial would have been different.

In conclusion, the OCCA findings that defense counsel did not render Constitutionally ineffective assistance were objectively unreasonable. Defense counsel was severely deficient in multiple respects and but for counsel's unprofessional conduct there exists a reasonable probability of a different outcome at trial. Mr. Sims respectfully requests the Court issue the Writ.

**Ground Four**      **The accumulation of errors acted to deprive Mr. Sims of his Constitutional rights.**

Mr. Sims raised this claim as Proposition Four of his Direct Appeal to the OCCA. Appellant's Brf., pp. 49-50 (Jan. 15, 2021). The OCCA declined to grant relief. *Sims v. State*, No. F-2020-56 at p. 8 (Okla. Crim. App. March 17, 2022) (attached hereto as Att. 1). Thus, this claim is exhausted and ripe for this Court's review.

The OCCA declined to grant relief on this ground: "We have found no significant errors on review, and thus find no accumulation of prejudicial effects." Att. 1 at 8. As

argued in the preceding grounds for relief, the state court's determination of no error is contrary to and/or an unreasonable application of federal law, or is otherwise based upon an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  Further, the state courts mention of "accumulation of prejudicial effects" appears at odds with cumulative error jurisprudence.  Prejudicial errors result in judicial relief, not further cumulative error review.  *See Cargle*, 317 F.3d 1196, 1207.

It is well established that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."  *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990).  The cumulative error analysis, which itself is an extension of the harmless-error analysis, "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."  *Cargle*, 317 F.3d at 1206 (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)).  *See also Rivera*, 900 F.2d at 1470.

While non-errors are not part of the analysis, claim-specific prejudice need not be established for the individual errors.  "Indeed, to deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice 'would render the cumulative error inquiry meaningless, since it [would] ... be predicated only upon individual error already requiring reversal.'"  *Cargle*, 317 F.3d at 1207 (quoting *Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002)).  Further, Mr. Sims need not carry the burden of establishing prejudice.  *O'Neal v. McAninch*, 513 U.S. 432, 436

(1995).  Instead, "[u]nless an aggregate harmlessness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless." *Rivera*, 900 F.2d at 1470.

Mr. Sims respectfully argues each of the errors, identified above, is sufficient to warrant relief.  Yet, should the Court determine otherwise, it is necessary for the Court to also consider the aggregate impact of the errors.  And, when the prejudice from these errors is viewed cumulatively, there can be no doubt the errors deprived Mr. Sims of his Constitutional rights.  Mr. Sims respectfully requests this Court issue the Writ.

## CONCLUSION

For the foregoing reasons, Mr. Sims respectfully requests the Court issue the Writ of Habeas Corpus.  Further, Mr. Sims requests a full and fair evidentiary hearing as to any issues which involve facts disputed by the Respondent.  And, lastly Mr. Sims respectfully requests the Court grant any other relief it may deem appropriate to dispose of this matter as law and justice require.

Respectfully submitted,

/s *Robert S. Jackson*
Robert S. Jackson, OBA #22189
1300 NW 10th ST.
Oklahoma City, OK 73106
phone: (405) 602-8614
fax:    (405) 400-2167
email:   bob@bobjacksonlaw.com

COUNSEL FOR PETITIONER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date of filing, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing.  There is presently no attorney appearance on file on behalf of the Respondent.  Service of the foregoing document will be made on this date (June 15, 2023) via email and regular U.S. Mail, first-class postage pre-paid thereon, to:

THE ATTORNEY GENERAL OF THE STATE OF OKLAHOMA
313 NE 21st St.
Oklahoma City, OK 73105
e-mail: fhc.docket@oag.state.ok.us

s/ Robert S. Jackson
Robert S. Jackson