## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

PAUL LEWIS SIMS,           )
                          )
     Petitioner,         )
                          )
v.                       )        **Case No. CIV-23-533-D**
                          )
DAVID BUSS, Warden,      )
                          )
     Respondent.        )

## RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, Gentner F. Drummond, appearing on behalf of the above-named Respondent, in response to the Petition for Writ of Habeas Corpus on file herein shows the Court as follows:

1. Petitioner, Paul Lewis Sims,[1] an inmate in the custody of the Oklahoma Department of Corrections, appearing though counsel, has filed with this Court a petition seeking federal habeas corpus relief.

2. Petitioner is currently incarcerated pursuant to a judgment and sentence imposed in the District Court of Comanche County, Case No. CF-2019-188, wherein Petitioner was found guilty of the crimes of Child Sexual Abuse by Lewd Acts (Count 1), Child Sexual Abuse by Rape (Count 2), Child Sexual Abuse by Rape (Count 3), Child Sexual Abuse by Rape by Instrumentation (Count 4), and Child Sexual Abuse by Rape by Instrumentation (Count 5), all in violation of OKLA. STAT. tit. 21, § 843.5(E) (Supp. 2014). (Exhibit 1,

---

[1] Although Paul Lewis Sims is Petitioner's legal name, he is referred to throughout the record as both Paul Sr. and by his Moroccan name, Ibrahim Elkani, a.k.a., "Brahim."

Summary Opinion; Exhibit 2, Judgment & Sentence in Comanche County Case No. CF-2019-188). Petitioner was sentenced to five consecutive life sentences for Counts 1-5. (Exhibit 1 at 1; Exhibit 2 at 1). Petitioner was represented by attorneys Michael Rogalin and Douglas Parr, respectively, at trial and on appeal.

3. Petitioner filed a direct appeal of his convictions to the Oklahoma Court of Criminal Appeals (OCCA), in Case No. F-2020-0056, raising four propositions of error: (1) "[t]he trial court erred in admitting evidence of misconduct allegedly committed by [Petitioner] in Morocco"; (2) "[t]he trial court failed to correctly instruct [Petitioner's] jury as to the limited purpose for which it could consider evidence of crimes/sexual abuse occurring in Morocco"; (3) Petitioner "was denied the effective assistance of counsel in violation of his rights under" the United States and Oklahoma Constitutions; and (4) cumulative error. (Exhibit 3, Brief of Appellant in OCCA Case No. F-2020-56; Exhibit 4, Brief of Appellee in OCCA Case No. F-2020-56; Exhibit 5, Reply Brief of Appellant in OCCA Case No. F-2020-56; Exhibit 6, Application for Evidentiary Hearing under Rule 3.11). The OCCA affirmed Petitioner's convictions and sentences. (Exhibit 1 at 9).

4. It appears this Petition is timely filed.

5. It appears Petitioner has exhausted his state court remedies unless otherwise shown in the response to each individual ground. *See Fairchild v. Workman*, 579 F.3d 1134, 1152 (10th Cir. 2009) (holding petitioner did not exhaust his claims where he failed to present the specific allegations presented to the reviewing court first to the OCCA); *Sexton v. Beaudreaux*, __ U.S. __, 138 S.Ct. 2555, 2558 (2018) (appellate courts should not review arguments that petitioner failed to raise to the state court).

2

6. The following transcripts are available: Transcript Day One Jury Trial – December 2, 2019; Transcript Day Two Jury Trial – December 3, 2019; Transcript Day Three Jury Trial – December 4, 2019; Transcript Sentencing Hearing – February 13, 2020. Complete copies of these transcripts and the original record are being conventionally filed along with the Response. Relevant portions of the transcripts are attached to the Response as Exhibit 7. The relevant portions of the original record are attached to the Response as Exhibit 8.

7. Respondent is not aware of any proceedings that have been recorded but not transcribed.

8. Petitioner is not entitled to an evidentiary hearing. The Court's review of Petitioner's habeas petition is limited to the record that was before the OCCA when it adjudicated his claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Furthermore, as will be shown, Petitioner fails to show that the OCCA's adjudication of his claims resulted in unreasonable determinations of law or fact under 28 U.S.C. § 2254(d). Furthermore, Petitioner has not been diligent and cannot satisfy the strict standards of 28 U.S.C. § 2254(e)(2). *See Cannon v. Trammell*, 796 F.3d 1256, 1264 (10th Cir. 2015).

## STATEMENT OF THE FACTS

Tammy Sims, the biological grandmother of victim DMS's[2] three half-siblings, fostered and subsequently adopted DMS. (Exhibit 7, Tr. I 176-177).[3] At some point, Petitioner and Ms. Sims entered a relationship and, by the time the abuse of DMS began, referred to each other as "common law" spouses. (Exhibit 7, Tr. I 176-177). Petitioner took on the role of a "father figure" to DMS, and she called him "Dad" or "baba," although he never legally adopted her. (Exhibit 7, Tr. I 177; Tr. II 45). In the summer of 2016, when DMS was fourteen years old and living in Yukon, Oklahoma, Petitioner and Ms. Sims determined that, because DMS was not doing well in school, Petitioner should take her to his home country of Morocco to appreciate the life she had in the United States. (Exhibit 7, Tr. I 178-179). DMS was nervous to travel to Morocco as she had never been out of the country before but felt excited to visit another country and see another culture. (Exhibit 7, Tr. I 179). However, once Petitioner and DMS arrived in Morocco, Petitioner's sinister motives became apparent. (Exhibit 7, Tr. I 183).

On their first night in Morocco, while the rest of Petitioner's family was sleeping, Petitioner pulled DMS's sleeping mat towards him, whispered "I'm sorry, baby, but your

---

[2] Because the primary victim here is referred to throughout the record and by Petitioner by the initialism "DMS," Respondent will also use "DMS" to refer to her. Otherwise, Respondent will use the standard two-letter initialism to refer to other victims or minors.

[3] References to the testimony presented at the jury trial held on December 2-4, 2019, will be referred to by the volume number of the transcript and the relevant page number, (Exhibit 7, Tr. I __); (Exhibit 7, Tr. II __); etc. References to the original record will be delineated (Exhibit 8, O.R. __). The entire original record is filed conventionally along with this Response. References to the State's Exhibits admitted at trial will be referred to as (State's Exhibit __).

mom is not giving me any," and then began to touch her thighs and fondle her breasts. (Exhibit 7, Tr. I 185). Petitioner then slipped DMS's underwear off and forced his fingers into her vagina, first one, and then two, which DMS stated "stung." (Exhibit 7, Tr. I 185-186). DMS initially made a sound, but Petitioner covered her mouth with his hand and then forced his penis into her vagina. (Exhibit 7, Tr. I 186-187). DMS stared out the window, trapped and praying for the abuse to stop, until Petitioner pulled his penis out of her vagina and ejaculated on her stomach, wiping his semen off her with her nightgown. (Exhibit 7, Tr. I 187-188).

The sexual abuse continued throughout the 2016 trip to Morocco – at night, at the beach, whenever Petitioner and DMS were alone together. (Exhibit 7, Tr. I 188-192). DMS recalled several instances of sexual abuse: once where Petitioner exposed his erect penis to her in a beach changing room, several instances where he raped her with his fingers and penis, both in her vagina and anus, "almost every night." (Exhibit 7, Tr. I 188-192). Due to the constant sexual abuse, DMS's vagina became swollen and caused her burning pains. (Exhibit 7, Tr. I 193). DMS stated that Petitioner "didn't care" about her pain. (Exhibit 7, Tr. I 193).

Petitioner and DMS returned to Oklahoma in September of 2016, around DMS's fifteenth birthday. (Exhibit 7, Tr. I 193-194). Petitioner threatened DMS, telling her that if she went to the police, or spoke to Ms. Sims, that her family, including her three siblings, "wouldn't have any money and [they] would all suffer and [their] family would be destroyed." (Exhibit 7, Tr. I 195). Petitioner's abuse of DMS continued throughout 2016. It became a regular practice of Petitioner to enter DMS's room, which she shared with her

younger sister, H.S., at night, between midnight and 3:00 a.m., fondle her breasts and then insert his fingers into both her vagina and anus. (Exhibit 7, Tr. I 198-199). DMS would roll over onto her stomach and pretend to be asleep to deny him access to her vagina, but that did not deter Petitioner who would then insert his fingers into her anus, roll her over, and then insert his fingers into her vagina. (Exhibit 7, Tr. I 198-199).

When DMS's grades began to suffer, Ms. Sims and Petitioner decided to pull DMS out of public school to homeschool her. (Exhibit 7, Tr. I 203). Petitioner was DMS's primary math and science teacher and whenever Ms. Sims was out of the house running errands or picking up the other children, Petitioner would try to assault DMS. (Exhibit 7, Tr. I 200). On one occasion, DMS recalled being in her room taking out her earrings when Petitioner came up from behind her, grabbed her arms, penned her to the ground, and tried to force her to manually masturbate his erect penis. (Exhibit 7, Tr. I 200). When she refused, he pushed DMS's underwear to the side and forced his erect penis into her vagina – raping her until he was interrupted by the sound of Ms. Sims' car. (Exhibit 7, Tr. I 201). When H.S. came into her room, DMS attempted to tell her about Petitioner's abuse, but H.S. covered her ears and said that she did not want to hear about it. (Exhibit 7, Tr. I 201).

On another occasion, while Petitioner was homeschooling DMS, Petitioner attempted to insert his erect penis into DMS's anus. (Exhibit 7, Tr. I 204). DMS managed to resist the much larger Petitioner long enough that Ms. Sims came into the room and interrupted him. (Exhibit 7, Tr. I 204). Ms. Sims was alarmed, but DMS panicked, made up a lie about roughhousing and that she was saying "no" because she did not want to start the next subject until Ms. Sims was there. (Exhibit 7, Tr. I 204-205).

DMS was not always so lucky. On another occasion, when Ms. Sims was not home, Petitioner pulled down DMS's pants while she was studying and forced his erect penis into her anus – raping her until she managed to wrest herself away from him and escape. (Exhibit 7, Tr. I 206). DMS attempted to lock herself in the bathroom, but Petitioner burst in and tried to apologize stating that if he ever did anything to her again, if he ever had "sex" with her again, DMS could kill him. (Exhibit 7, Tr. I 206).

The abuse still did not stop. Petitioner continued to assault her any time they were alone together during homeschooling. (Exhibit 7, Tr. I 207). He would pull her breast out of her sports bra and bite her nipple. (Exhibit 7, Tr. I 207-208). When DMS would tell Petitioner no, Petitioner would slap her on the back of her head and her arms with such force that it would leave fingerprint shaped bruises. (Exhibit 7, Tr. I 207). When DMS attempted to thwart Petitioner by closing her legs, Petitioner would force them open and force his fingers into her vagina or put his mouth on and his tongue into her vagina. (Exhibit 7, Tr. I 207-208). Between September 2016 and June 2017, DMS testified that the abuse happened "so many times I can't remember." (Exhibit 7, Tr. I 209).

By the summer of 2017, Petitioner was discussing returning to Morocco and taking H.S. with him instead of DMS. (Exhibit 7, Tr. I 209). Hoping to spare her sister the same fate she suffered, DMS begged Petitioner to take her instead. (Exhibit 7, Tr. I 209). During this second Morocco trip, Petitioner brought condoms because he didn't want DMS to get pregnant. (Exhibit 7, Tr. I 210). While they were in Morocco, Petitioner received a call from Ms. Sims that the Yukon police department had been by to see her because they were investigating an allegation that Petitioner was raping DMS and that she was pregnant by

him. (Exhibit 7, Tr. I 211). Petitioner immediately began to panic and forced DMS to call the investigating officer and lie to the officer about the allegations. (Exhibit 7, Tr. I 214-215). DMS followed the script Petitioner gave her, but the only truthful statement was that she was not pregnant. (Exhibit 7, Tr. I 215).

Petitioner knew he had to cover his tracks, so he took DMS to a doctor in Morocco to undergo a hymenoplasty to "get [her] virginity back." (Exhibit 7, Tr. I 213, 216). This doctor only spoke French and Arabic and tied DMS's legs and arms to the bed and performed the procedure with only a local anesthetic. (Exhibit 7, Tr. I 216). DMS screamed in pain as she could feel the stitch being put in, but Petitioner did not seem to care. (Exhibit 7, Tr. I 216-217). Petitioner paid the doctor in cash and told DMS that she was "a virgin again and that [Petitioner] couldn't touch" her anymore. (Exhibit 7, Tr. I 217).

The first surgery did not work. DMS was in pain and could not go to the restroom without finding blood in her underwear after. (Exhibit 7, Tr. I 219). So, Petitioner decided to take DMS back to the doctor and the doctor performed the surgery again. (Exhibit 7, Tr. I 219). This time, DMS's skin was too soft, and the stitches ripped open leading to an infection. (Exhibit 7, Tr. I 219). Petitioner and DMS returned to the doctor a third time to get medication to treat the infection. (Exhibit 7, Tr. I 220).

When DMS and Petitioner returned to Oklahoma, in August of 2017, DMS met with Yukon police who interviewed her regarding the allegations against Petitioner. (Exhibit 7, Tr. I 220). Fearing for herself and her siblings, DMS lied and denied that Petitioner had hurt her in any way. (Exhibit 7, Tr. I 220-221).

When DMS finally came forward to Ms. Sims in October 2018, Ms. Sims refused to believe her, insisting she was a liar. (Exhibit 7, Tr. I 225-226). In the spring of 2019, DMS came forward to the family of one of her friends whom she trusted and with their support and assurance of her safety, DMS took her allegations to the police and reported Petitioner's behavior. (Exhibit 7, Tr. I 228-232).

Subsequent medical examination of DMS revealed significant trauma to DMS's vaginal area, but because of the multiple hymenoplasties, sexual abuse could not be definitively ruled in or ruled out as the cause. (Exhibit 7, Tr. II 87-91).

Petitioner testified and denied all the accusations DMS presented against him. (Exhibit 7, Tr. II 163-210). He claimed that DMS is a liar and that she was just upset about the disciplinary measures Ms. Sims and Petitioner had taken such as removing her from public school to homeschool her and not allowing her to date. (Exhibit 7, Tr. II 209-210).

Additional facts will be presented as necessary.

## **STANDARD OF REVIEW**

The standard of review is set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). According to the AEDPA, the Court must defer to the OCCA's rejection of Petitioner's claims unless the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. §§ 2254(d)(1) & (2).

"[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*." *House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008); *See also Simpson v. Carpenter*, 912 F.3d 542, 562-563 (10th Cir. 2018) (clearly established federal law refers to narrowly construed holdings of the Supreme Court as opposed to dicta). If a court determines there is no clearly established law, the inquiry under § 2254(d)(1) ends. *Goode v. Carpenter*, 922 F.3d 1136, 1148 (10th Cir. 2019) (the threshold issue for review is "whether there exists clearly established law on the issues raised by" the petitioner).

If there is a clearly established rule of federal law, the Court must then decide whether the state court's decision was contrary to, or an unreasonable application of, that clearly established rule of federal law. *House*, 527 F.3d at 1018. A state court decision is contrary to clearly established federal law as determined by the Supreme Court when it applies a rule that contradicts the governing law set forth in Supreme Court case law or decides a case differently than the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001). The reviewing court must apply a "level of deference to the determinations of state courts, provided those determinations did not conflict with federal law or apply federal law in an unreasonable way." *Williams*, 529 U.S. at 386. It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied, it must be "diametrically different" and "mutually opposed" to the Supreme Court decision itself. *Owens v. Trammell*, 792 F.3d 1234, 1242 (10th Cir. 2015), quoting *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). However,

that doesn't mean abject deference to the state court on the part of the reviewing court; but instead, it prohibits a reviewing court from substituting its own judgment for the judgment of the state court. *Milton v. Miller*, 744 F.3d 660, 668-669 (10th Cir. 2014).

A state court decision involves an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States when the state court identifies the proper governing legal principle but applies it in an unreasonable manner to the facts in a particular case. *Valdez v. Bravo*, 373 F.3d 1093, 1096 (10th Cir. 2004); *Gilbert v. Mullin*, 302 F.3d 1166, 1171 (10th Cir. 2002). The Supreme Court has explained as follows regarding the "unreasonable application" clause:

> In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 411.

Further, relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 899 (10th Cir. 2019). As the Tenth Circuit has explained, the fairminded jurist test is a way of measuring reasonableness:

> The Court's "fairminded jurists" test thus serves as a proxy for "unreasonable application." It is designed to help federal courts reviewing § 2254 habeas motions to determine whether a state court decision that would be incorrect under de novo review is also unreasonable. Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was

> unreasonable and the habeas corpus writ should be granted. If,
> however, some fairminded jurists could possibly agree with the
> state court decision, then it was not unreasonable and the writ
> should be denied.

*Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014). *Frost* further stated that federal courts

> may issue the writ only when the petitioner shows there is *no
> possibility* fairminded jurists could disagree that the state
> court's decision conflicts with the Supreme Court's
> precedents. Thus, even a strong case for relief does not mean
> that the state court's contrary conclusion was unreasonable. If
> the standard is difficult to meet—and it is—that is because it
> was meant to be. Indeed, AEDPA stops just short of imposing
> a complete bar on federal court relitigation of claims already
> rejected in state proceedings. Accordingly, we will not lightly
> conclude that a State's criminal justice system has experienced
> the extreme malfunction for which federal habeas relief is the
> remedy.

*Id.* at 1223 (quotation marks and citations omitted, alterations adopted, emphasis in

original).

As to § 2254(d)(2), "if the petitioner can show that 'the state courts plainly

misapprehend[ed] or misstate[d] the record in making their findings, and the

misapprehension goes to a material factual issue that is central to petitioner's claim, that

misapprehension can fatally undermine the fact-finding process, rendering the resulting

factual finding unreasonable.'" *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016)

(alterations in original) (quoting *Ryder ex. rel Ryder v. Warrior*, 810 F.3d 724, 739 (10th

Cir. 2016)). However, a state court's determination of facts is not deemed unreasonable

until a petitioner has shown by clear and convincing evidence that the state court's

determination was incorrect. *Compare Black v. Workman*, 682 F.3d 880, 896-897 (10th

Cir. 2012) (refusing to grant relief under § 2254(d)(2) where Petitioner failed to present

clear and convincing evidence to rebut a state court's factual finding), *with Wood v. Allen*, 558 U.S. 290, 300-301 (2010) (declining to decide the relationship between § 2254(d)(2) and § 2254(e)(1)); *Grant v. Trammell*, 727 F.3d 1006, 1024 n.6 (10th Cir. 2013) (same).

## ARGUMENT AND AUTHORITY

### GROUND ONE

**PEITIONER'S CLAIM THAT THE TRIAL COURT ERRONEOUSLY ADMITTED EVIDENCE OF MISCONDUCT COMITTED IN MOROCCO WAS NOT EXHAUSTED AS A FEDERAL CLAIM. EVEN ASSUMING, *ARGUENDO*, THAT THE CLAIM WAS PROPERLY EXHAUSTED, THE OCCA'S REJECTION OF THIS CLAIM WAS NEITHER CONTRARY TO, NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.**

In his first ground for relief, Petitioner challenges, as he did on direct appeal, the admission of evidence concerning sexual assaults of DMS in Morocco. (Doc. 5 at 21-32;[4] Exhibit 3 at 11-13). As shown below, Petitioner's claim was not fairly presented to the OCCA as a federal claim, and thus, any federal claim now advanced before this Court is unexhausted and anticipatorily barred. Regardless, even if this Court finds Petitioner's federal claim was exhausted properly before the OCCA, the OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor were the OCCA's determinations of fact unreasonable. Petitioner's first ground for habeas relief must be rejected accordingly.

---

[4] Respondent's citations to any documents filed by Petitioner in this Court will refer to the electronically stamped CM/ECF header pagination.

A.     **Background.**

In challenging the admission of the evidence of the sexual assaults committed by Petitioner against DMS in Morocco, Petitioner presents a claim based both on state and federal law. (Doc. 5 at 21-32; Exhibit 3). As for Supreme Court law, he specifically invokes *Hicks v. Oklahoma*, 447 U.S. 343 (1980), and *Romano v. Oklahoma*, 512 U.S. 1 (1994). (Doc. 5 at 24, 29). However, while Petitioner challenged the admission of this same evidence on direct appeal, his claim has fundamentally changed. (*Compare* Doc. 5 at 21-32, *with* Exhibit 3 at 11-18). Specifically, before the OCCA, Petitioner raised this claim entirely based on OCCA case law, save for a fleeting reference to the admission of the evidence of the events that occurred in Morocco violating his "rights to Due Process and a fair trial as guaranteed by … the Sixth and Fourteenth Amendments to the United States Constitution." (Doc. 5 at 30; Exhibit 3 at 12). The substance of Petitioner's argument – *i.e.*, everything save for this singular sentence – consisted entirely of state law, without a single citation to a Supreme Court (including *Hicks* or *Romano*) or other federal case or mention of "due process." (Doc. 5 at 21-32; Exhibit 3 at 11-18). As discussed more below, a side-by-side comparison of Petitioner's briefing now and on direct appeal demonstrates clearly that he did not fairly present to the OCCA the claim presently pressed. *Grant v. Royal*, 886 F.3d 874, 899 (10th Cir. 2018) ("The juxtaposition between [petitioner's brief to the OCCA] and [petitioner's] habeas petition strongly underscores the deficiencies of the former as an ostensible presentation of a procedural due process competency claim. The direct-appeal brief did not offer a *fair* presentation of such a claim.") (emphasis in original).

The OCCA rejected Petitioner's other crimes evidence claim as follows:

In Proposition One, Appellant argues the trial court erred in the admission of evidence of other crimes, wrongs, bad acts, and evidence of sexual propensity. He argues the State failed to give the pre-trial notice required by statute and case law; that the acts were not proven by clear and convincing evidence; and that the probative value of these acts was substantially outweighed by the danger of unfair prejudice and other countervailing factors.

Trial counsel did not object to the evidence on any of the grounds raised on appeal, waiving all but plain error. *Simpson v. State,* 1994 OK CR 40, ¶¶ 2, 23, 876 P.2d 690, 692-93, 698. Appellant must now show plain or obvious error affected the outcome. This Court will only correct plain error when it seriously affects the fairness, integrity or public reputation of the proceedings, or otherwise causes a miscarriage of justice. *See Brewer v. State,* 2019 OK CR 23, 450 P.3d 969 (reviewing evidence of other sexual assaults for plain error). The purpose of pre-trial notice of other crimes evidence is to prevent unfair surprise and ensure the defense is heard before the evidence is admitted. *See McClendon v. State,* 1989 OK CR 29, ¶ 16, 777 P.2d 948, 952. These procedures do not relieve defense counsel of the need to object, and "there is no need for the court to make a determination of admissibility unless the defendant raises an objection." *Burks v. State,* 1979 OK CR 10, ¶ 19, 594 P.2d 771, 775.

Indeed, under this Court's case law, a defendant who complains of a lack of pre-trial notice "must do more than simply object; he must withdraw his announcement of ready for trial and request a continuance." *Diaz v. State,* 1986 OK CR 167, ¶ 26, 728 P.2d 503, 513. Because there is no evidence of unfair surprise, the absence of a more formal pre-trial notice concerning this evidence does not require relief. *See Warner v. State,* 2006 OK CR 40, ¶¶ 65-66, 144 P.3d 838, 868; *Wisdom v. State,* 1996 OK CR 22, ¶ 33, 918 P.2d 384, 394.

Evidence of other crimes, wrongs, or bad acts is not admissible to prove action in conformity therewith on a particular occasion, but "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." 12 O.S.2011, § 2404(B). To be admissible under section 2404(B),

general other crimes evidence must be: (1) probative of a disputed issue; (2) visibly connected to the charged crime; (3) necessary to support the State's burden of proof; (4) clear and convincing; and (5) of sufficient probative value to outweigh its prejudice to the defendant. *Miller v. State,* 2013 OK CR 11, ¶ 89, 313 P.3d 934, 966.

In cases involving sexual assault or child molestation, evidence of a defendant's other sexual assaults or sexual molestation is relevant and admissible for "any proper purpose," if it is established by clear and convincing evidence and satisfies the general relevancy balancing requirements of 12 O.S.2011, section 2403. *See also,* 12 O.S.2011, §§ 2413, 2414; *Horn v. State,* 2009 OK CR 7, ¶¶ 25, 27, 37, 41, 204 P.3d 777, 784, 786.

Appellant argues that the other bad acts, sexual assaults, and child molestation in Morocco were not proved by clear and convincing evidence. We find the complaining witness's testimony of other bad acts, as well as specific acts of rape and molestation in Morocco, was clear and convincing, as it was corroborated both by physical evidence and other testimony indicating Appellant's propensity to commit sexual abuse. This argument is without merit.

Appellant also argues the evidence of other sex crimes failed to meet the balancing requirements of section 2403. We disagree. Appellant flatly denied sexually abusing the complainant. Strict, convincing proof of her shocking allegations was entirely necessary to obtain convictions on these charges. The victim's descriptions of abuse were clear and convincing, highly probative of disputed facts, corroborated by other evidence, and no less prejudicial testimony was available.

The crimes of Appellant in Morocco were very similar to those committed in Oklahoma against the same victim. This evidence therefore did not distract the jury from the principal issues on trial, but rather tended to show Appellant's sexual propensity, consciousness of guilt, his identity as an abuser, and his plan to escape detection. Because this evidence was admissible under sections 2403, 2404, 2413, and 2414, the trial

16

court committed no plain or obvious error. *See Brewer,* 2019
OK CR 23, ¶ 9, 450 P.3d at 972. Proposition One is denied.

(Exhibit 1 at 1-5).

**B.      Preliminary Statement Regarding Fair Presentation and Merits Adjudication.**

Before this Court, Petitioner argues the admission of evidence regarding the sexual

assaults of DMS that occurred in Morocco deprived him of his federal due process rights.

(Doc. 5 at 21-32). But this constitutional claim was never fairly presented to the OCCA

and is barred from consideration by this Court. Alternatively, assuming this Court

determines this claim was fairly presented to the OCCA, then it must also presume that the

OCCA adjudicated the claim on the merits.

A habeas petitioner who challenges an evidentiary ruling in state court is not

automatically entitled to then claim in habeas proceedings that his due process right to a

fair trial was violated by the admitted evidence:

> If state courts are to be given the opportunity to correct alleged
> violations of prisoners' federal rights, they must surely be
> alerted to the fact that the prisoners are asserting claims under
> the United States Constitution. If a habeas petitioner wishes to
> claim that an evidentiary ruling at a state court trial denied him
> the due process of law guaranteed by the Fourteenth
> Amendment, he must say so, not only in federal court, but in
> state court.

*Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam).

Moreover, if a petitioner does wish to exhaust a federal due process claim, the claim

must be "fairly presented to the state court, which means that the petitioner has raised the

substance of the federal claim in state court." *Grant*, 886 F.3d at 890 (quotation marks

omitted). To fairly present a federal due process challenge, "it is not enough to make a

general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." *Gray v. Netherland*, 518 U.S. 152, 163 (1996). Nor is it sufficient to bookend a state-law claim with conclusory references to the Constitution:

> A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights. Moreover, to hold that vague references to such expansive concepts as due process and fair trial fairly present, and therefore exhaust, federal claims is to eviscerate the exhaustion requirement.

*Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001); *see Duncan*, 513 U.S. at 364-366 (holding petitioner, who argued in state court that prior-crime evidence was erroneously admitted under state law and asked state court to find error was not harmless under state law, "did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment," and instructing that petitioner's argument that evidence was "irrelevant and inflammatory" and its admission resulted in a "miscarriage of justice" was not sufficient to signal federal claim); *Zuniga v. Falk*, 618 F. App'x 407, 411 (10th Cir. July 10, 2015) (unpublished) (concluding that a federal due process claim based on trial court's refusal to sever petitioner's trial from that of his codefendant was unexhausted because, "[a]lthough [the direct appeal] brief cited the Fifth, Sixth, and Fourteenth Amendments at the tail end of his state law argument," this "conclusory reference to a fair trial and the Constitution [was] insufficient to put the state court on notice that [petitioner] was raising a federal constitutional claim" (quotation marks omitted));

*Cole v. Zavaras*, 349 F. App'x 328, 331 (10th Cir. Oct. 16, 2009) (unpublished) (holding that some of petitioner's "claims were not presented to the state courts as *federal* constitutional claims" where state post-conviction motion in some instances "state[d] in a conclusory fashion that the alleged error violated [petitioner's] federal constitutional rights, but [the motion] cite[d] no federal case law to support those claims and [did] little to connect the claim with the rights [the motion] alleged were violated" (emphasis in original)); *see also Rivera v. Illinois*, 556 U.S. 148, 158, 160 (2009) ("[E]rrors of state law do not automatically become violations of due process" because "[t]he Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial" (quotation marks omitted)). Put more generally, "[t]o satisfy exhaustion, … the habeas petition's focus—as well as the alleged error that it identifies—cannot depart significantly from what the petitioner had presented to the state court." *Grant*, 886 F.3d at 891; *cf. Duncan*, 513 U.S. at 366 ("[M]ere similarity of claims is insufficient to exhaust.").

Here, Petitioner did not fairly present his federal due process claim to the OCCA. The substance of his proposition pertained entirely to showing the admission of the conduct that occurred in Morocco was an abuse of discretion under Oklahoma law, with only a single unadorned and undeveloped reference to "Due Process and a fair trial." (Exhibit 3 at 11-18). Pursuant to the above-cited case law, Petitioner did not fairly apprise the OCCA that he was raising a federal claim or give that court a fair opportunity to pass upon same; as such, the federal claim he now presents is unexhausted.

Not only is Petitioner's claim unexhausted, but it is subject to an anticipatory bar. Petitioner would face an independent and adequate state procedural bar if he were to return to state court and assert Ground One in an application for post-conviction relief. Specifically, if Petitioner were to present the claim in an application for post-conviction relief and appeal to the OCCA, the OCCA would bar the claim as waived because Petitioner could have raised it on direct appeal. *See* OKLA. STAT., tit. 22, § 1086 (2021). The Tenth Circuit has held § 1086 to be independent and adequate. *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008).

A federal court may not grant relief on a claim defaulted in state court based on an independent and adequate rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The "cause and prejudice" standard requires Petitioner to "show that some objective factor external to the defense impeded … efforts to comply with state procedural rules," such as the discovery of new evidence, a change in the law, or interference by state officials. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Here, Petitioner's counseled Petition does not acknowledge the default of this claim, let alone marshal any argument for cause and prejudice. Neither this Court nor Respondent is required to make that argument for him, even if he were *pro se*. *Childers v. Crow*, 1 F.4th 792, 798 (10th Cir. 2021) (stating that although a *pro se* petition is entitled to a liberal construction, the court "may not rewrite a petition to include claims that were never presented.") (quoting *Barnett v. Hargett*, 174

F.3d 1128, 1133 (10th Cir. 2019)). Further, in order to assert a "fundamental miscarriage of justice," Petitioner would be required to demonstrate that he is factually innocent of the crimes of which he was convicted. *Murray*, 477 U.S. at 488. At trial, Petitioner denied all allegations against him by DMS and attempted to explain away his conduct in Morocco as customary. (Exhibit 7, Tr. II 181-191). Further, Petitioner asserts that if the evidence of his conduct in Morocco was not admitted by the trial court, he would not have been convicted. (Doc. 5 at 28-29). However, even construing this as a claim of factual innocence, it does not rely on any new evidence not presented at trial. *Schlup v. Delo*, 513 U.S. 298 (1995) (claims of actual innocence require petitioner to support his claim with new, reliable, evidence that was not presented at trial). Petitioner does not acknowledge that the federal constitutional version of his claim is unexhausted and, further, fails to show cause and prejudice or a fundamental miscarriage of justice to overcome his default.

Alternatively, if this Court finds that Petitioner fairly presented his federal due process claim to the OCCA, then this Court must *presume* that the OCCA adjudicated that claim on the merits. *See Johnson v. Williams*, 568 U.S. 289, 298-301 (2013) (where a state court opinion expressly addresses some of a Petitioner's claims but "rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits"). Indeed, *Johnson* explained why a federal court may not separately discuss a federal claim when, as here, a Petitioner raises the claim in cursory fashion within a state-law-focused claim:

> [A] state court may not regard a fleeting reference to a
> provision of the Federal Constitution or federal precedent as
> sufficient to raise a separate federal claim. Federal courts of

21

> appeals refuse to take cognizance of arguments that are made
> in passing without proper development. State appellate courts
> are entitled to follow the same practice.

*Id.* at 299 (citations omitted).[5]

Here, too, assuming Petitioner fairly presented a federal due process claim, the OCCA unsurprisingly decided such a claim was nonetheless unworthy of discussion given Petitioner's cursory argument, consisting of only a passing reference to the claim. (Exhibit 3 at 12). Assuming Petitioner's constitutional claim was fairly presented, the OCCA adjudicated same on the merits. Indeed, the OCCA applied its plain error review test, which the Tenth Circuit has said is tantamount to the federal due process test. *Thornburg v. Mullin*, 422 F.3d 1113, 1124-25 (10th Cir. 2005) (holding that the Oklahoma plain error test is "rooted in due process" so the federal court should defer to the OCCA's ruling unless it unreasonably applied that test). Further, this Court must confine its review of this claim to those arguments presented to the OCCA – which, as explained above – were practically non-existent as to the constitutional aspect of the claim. *See Sexton*, __ U.S. __, 138 S.Ct. at 2558.

## C.    Argument and Authority.

The OCCA's rejection of Petitioner's claim as to the evidence regarding his conduct against DMS in Morocco did not run afoul of § 2254(d).

---

[5] It is unclear if *Johnson*'s statement that state courts need not "take cognizance" of "arguments" made "in passing" with only "fleeting reference" to the Constitution meant that such claims are not fairly presented and barred in federal court. Regardless, at the very least, *Johnson* establishes that, assuming this Court finds fair presentation, a merits presumption does apply in such a situation.

### i.   This claim is unsupported by clearly established Supreme Court law.

First, this claim fails for lack of clearly established Supreme Court law. Petitioner cites the following Supreme Court cases in this ground for relief: *Estelle v. McGuire*, 502 U.S. 62 (1991),[6] *Hicks*, 447 U.S. at 343; *Vitek v. Jones*, 445 U.S. 480 (1980), *Romano v. Oklahoma*, 512 U.S. 1 (1994), *Payne v. Tennessee*, 501 U.S. 808 (1991), and *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Taking these cases one by one, none provides clearly established law applicable to a claim that the admission of "other crimes" evidence rendered a petitioner's trial fundamentally unfair. *See Andrew v. White*, 62 F.4th 1299, 1314 (10th Cir. 2023) ("We begin, as we must, with Ms. Andrew's first required showing under § 2254(d)(1): evaluating whether she has cited clearly established federal law governing her claim. *Sanders v. Miller*, 555 F. App'x 750, 752 (10th Cir. 2014) (Gorsuch, J.) ('[The petitioner] bears the burden of identifying [the] clearly established Supreme Court law.')." (alterations by *Andrew*)).

In *Hicks*, the Supreme Court held that "[w]here . . . a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state

---

[6] Respondent notes that although *Estelle* is cited by Petitioner, it is not cited as clearly established law on the claim regarding the trial court's admission of Petitioner's conduct in Morocco. (Doc. 5 at 16). Instead, Petitioner cites *Estelle* to acknowledge that, generally, "habeas relief is generally not available to correct errors of state evidentiary rules." (Doc. 5 at 16). *Brecht* is also included not as clearly established law on Petitioner's substantive due process claim, but as to Petitioner's argument he can show prejudice assuming such a showing is necessary. (Doc. 5 at 23). Accordingly, Respondent focuses this section on *Hicks*, *Vitek*, *Romano*, and *Payne*.

procedural law," that the "defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury," and that this "liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." *Hicks*, 447 U.S. at 346. The reach of *Hicks* has been interpreted as quite narrow. *See Mitchell v. Sharp*, 798 F. App'x 183, 197-98 (10th Cir. 2019) (unpublished) ("*Hicks* thus decided that when a state law provides for a jury to impose a sentence, a defendant has a due process right for the jury to be instructed under a constitutional standard" and did not supply clearly established law for the petitioner's resentencing due process claim); *Cole v. Trammell*, 755 F.3d 1142, 1171 (10th Cir. 2014) ("*Hicks*, which involved a defendant who was effectively deprived of the right to have a jury exercise its discretion to impose a sentence on him, is not remotely on point" with the petitioner's claim that the OCCA applied an incorrect legal standard); *accord Carter v. Bowersox*, 265 F.3d 705, 714-15 (8th Cir. 2001) (*Hicks* holds that some state law guarantees *as to sentencing* are so fundamental that their disregard may violate due process). *Hicks* does not provide clearly established law as to a claim regarding the admission of other crimes evidence.

In *Vitek*, the Supreme Court held that a state's "reliance on the opinion of a designated physician or psychologist for determining whether the conditions warranting transfer [to a state run mental facility] exist neither removes the prisoner's interest from due process protection nor answers the question of what process is due under the Constitution." *Vitek*, 445 U.S. at 491. The Tenth Circuit has stated that, similarly to *Hicks*, *Vitek* does not apply to evidentiary claims. *See Wilson v. Sirmons*, 563 F.3d 1064, 1102-03

(10th Cir. 2008) (holding that petitioner failed to show that the Oklahoma Discovery Code created a protected liberty interest and therefore *Vitek* did not apply); *Thompson v. Allbaugh*, 750 F. App'x 736, 750-51 n. 7 (10th Cir. 2018) (unpublished) (holding that *Vitek* and *Hicks* stand "for the narrow proposition that when state statutes create liberty interests those interests are entitled to due process standards" and, in addition, petitioner made no argument that § 2403 of the Oklahoma statutes was contrary to federal law, therefore *Vitek* and *Hicks* were inapplicable); *Carter v. Gibson*, 27 F. App'x 934, 942 (10th Cir. 2001) (unpublished) (stating that although OCCA case law was inconsistent regarding the requirements for an information to provide the elements of the crime, because the OCCA had resolved those conflicts by the time of the appeal, there was no liberty interest created, *Vitek* was not applicable, and the Tenth Circuit will not "reexamine the state appellate court's determination of the state law questions" and instead only "whether Oklahoma violated [petitioner's] constitutional rights").

In *Romano*, the Supreme Court held that the admission in a second stage capital sentencing trial of the petitioner's prior conviction for murder—where that prior conviction was later overturned—did not render the sentencing trial fundamentally unfair. *Romano*, 512 U.S. at 3, 13. Not only did *Romano* not find constitutional error, but it was a capital case pertaining to a second stage sentencing proceeding that cannot provide clearly established law for purposes of the admission of other crimes evidence in a non-capital guilt/innocence trial. *Cf. White v. Woodall*, 572 U.S. 415, 421 (2014) (refusing to find rule applicable to first stage to be clearly established for second stage and noting that "it is not uncommon for a constitutional rule to apply somewhat differently at the penalty phase than

it does at the guilt phase"). *But see Johnson v. Martin*, 3 F.4th 1210, 1230 (10th Cir. 2023) (citing *Romano* and rejecting the State's argument for lack of clearly established law regarding a gruesome photographs claim and holding that petitioners are only entitled to relief on an evidentiary claim if an alleged state-law error was so "grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process") (citations omitted).

In *Payne*, the Supreme Court held that, in capital sentencing proceedings, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on the subject, the Eighth Amendment does not erect a *per se* bar." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). This holding is clearly not applicable to Petitioner's claim here. In fact, the Tenth Circuit very recently reiterated that the holding in *Payne*, 501 U.S. 808, was limited to the principle that the "Eighth Amendment did not erect a '*per se* bar' to the introduction of victim-impact statements in capital cases"; the Tenth Circuit further rejected the idea that *Payne*'s more broad pronouncement—that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief"— clearly established "the applicable legal framework from wrongfully-admitted trial evidence." *Andrew*, 62 F.4th at 1314 (quotation marks omitted). *See also Wyatt v. Crow*, 812 F. App'x 764, 767 (10th Cir. 2020) (unpublished) (relying on *Holland v. Allbaugh*, 824 F.3d 1222, 1228 (10th Cir. 2016) to hold that no "Supreme Court decision clearly establish[es] a standard for wrongfully admitted trial evidence"); *Stewart v. Winn*, 967 F.3d 534, 539–40 (6th Cir. 2020) (rejecting petitioner's attempt to rely on the "general rule that

26

the Due Process Clause prohibits 'fundamentally unfair' procedures—without a specific Supreme Court holding covering the type of due-process error he asserts"); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("[The Supreme Court] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").[7]

Additionally, like the petitioner in *Andrew*, Petitioner faces a "roadblock" under *Estelle*, 502 U.S. 62. *Andrew*, 62 F.4th at 1315.

> There, the petitioner, convicted of the second-degree murder of his infant daughter, challenged his conviction on grounds that the district court had violated his due-process rights by admitting irrelevant battered-child-syndrome evidence. *Id.* at 67, 112 S.Ct. 475. The Ninth Circuit granted habeas relief, concluding that the evidence rendered the petitioner's trial arbitrary and fundamentally unfair in violation of due process. *Id.* at 66–67, 112 S.Ct. 475. But the Supreme Court reversed after concluding that the evidence was probative of intent. *Id.* at 69, 112 S.Ct. 475. With that decided, the Court observed that it "need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial." *Id.* at 70, 112 S.Ct. 475. So Estelle found no clearly established federal law that would entitle a petitioner to habeas relief based on the admission of irrelevant evidence. And no post-*Estelle* case has opted to "explore further" that rule. *Id.*

*Id.* (citing *Estelle*, 502 U.S. at 66-67, 70).

---

[7] As referenced above, the Tenth Circuit recently reviewed a claim of gruesome photographs for fundamental fairness and rejected the State's lack of clearly established law argument. *Johnson*, 3 F.4th at 1230. However, the instant case deals with the admission of other crimes evidence and is more akin to the case in in *Andrew* – which also involved the admission of other crimes evidence – so, *Andrew*, not *Johnson*, is controlling here. *See Andrew*, 62 F.4th at 1315.

In sum, Petitioner has failed to identify clearly established federal law governing this claim. *See Andrew*, 62 F.4th at 1316 (counseled petitioner's failure to identify clearly established federal law is dispositive under § 2254(d)(1)).

> ## ii. Even assuming, *arguendo*, there is clearly established law regarding evidentiary claims, Petitioner has not satisfied § 2254(d).

Despite the lack of on-point clearly established Supreme Court law regarding evidence of other crimes and bad acts, the Tenth Circuit has held that habeas relief may be granted with regard to state court evidentiary rulings where due process is implicated and the rulings "rendered the trial so fundamentally unfair that a denial of constitutional rights result[ed]." *Mayes v. Gibson*, 210 F.3d 1284, 1293 (10th Cir. 2000) (citing *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999)).[8] Put differently, the Tenth Circuit has held that the relevant question in habeas proceedings "is not whether th[e] evidence was admissible under state law, but instead whether, considered in light of the entire record, its admission resulted in a fundamentally unfair trial." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002). Specifically in regard to evidence of other crimes and bad acts, the Tenth Circuit has held that "'[it] will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law.'" *Id.* (quoting *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th

---

[8] Respondent respectfully maintains that the absence of clearly established law is dispositive here. However, Respondent recognizes the existence of the Tenth Circuit precedent reviewing state evidentiary claims for fundamental fairness.

Cir. 1998)).

Importantly, though, the Supreme Court has noted that the "Due Process Clause has limited operation," and the Supreme Court has further "defined the category of infractions that violate 'fundamental fairness' *very narrowly*." *Dowling v. United States*, 493 U.S. 342, 352 (1990) (emphasis added). In *Dowling*, the Supreme Court held that the admission of acquitted conduct as other crimes evidence at the defendant's trial did not violate fundamental fairness. *See id.* at 352-54. In fact, the Supreme Court noted that this evidence of other crimes was even potentially valuable as circumstantial evidence—rather than violative of some constitutional right. *Id.* at 353 ("Henry's testimony [regarding the acquitted conduct] was at least circumstantially valuable in proving petitioner's guilt.").[9] Notably, although the Tenth Circuit has reviewed state evidentiary rulings for fundamental fairness, it has also cautioned that "'[b]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements,' when engaged in such an endeavor a federal court must 'tread gingerly' and exercise 'considerable self-restraint.'" *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (quoting *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990) (en banc)). Further, in considering fundamental fairness, a federal court must always consider the entire proceedings, including the strength of the evidence against a petitioner. *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002).

---

[9] Again, *Dowling* did not actually find constitutional error, so it does not clearly establish that the admission of other crimes evidence can violate due process. In fact, just a year later, the Supreme Court noted in *Estelle* that "we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." *Estelle*, 502 U.S. at 75.

In Oklahoma, evidence of additional acts of child molestation is admissible under § 2414, which provides: "In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant." OKLA. STAT. tit. 12 § 2414(A) (2011). Pursuant to the statute:

> For the purposes of this rule, "child" means a person below the age of sixteen (16), and "offense of child molestation" means a crime under federal law or the laws of this state that involve:
>
> 1. Any conduct proscribed by Sections 1111 through 1125 of Title 21 of the Oklahoma Statutes, that was committed in relation to a child;
>
> 2. Contact between any part of the defendant's body or an object and the genitals or anus of a child;
>
> 3. Contact between the genitals or anus of the defendant and any part of the body of a child;
>
> 4. Deriving sexual pleasure or gratification from the infliction of death, bodily injury, emotional distress, or physical pain on a child; or
>
> 5. An attempt or conspiracy to engage in conduct described in paragraphs 1 through 4 of this subsection.

OKLA. STAT. tit. 12 § 2414(D) (2011). And when the State seeks to offer evidence under § 2414, "the attorney for the state shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least fifteen (15) days before the scheduled date of trial." OKLA. STAT. tit. 12

§ 2414(B) (2011). Finally, "the propensity evidence must be established by clear and convincing evidence." *Horn v. State*, 204 P.3d 777, 786 (Okla. Crim. App. 2009).

Here, particularly given that Petitioner is counseled, this Court, with respect, must confine its consideration of his due process claim to the particular § 2254(d)(1) and/or (d)(2) arguments raised by Petitioner. *See Meek v. Martin*, __ F.4th __, 2023 WL 4714719 *41 (10th Cir. 2023) (stating that, in a counseled petition, the court will confine its analysis to the arguments raised by petitioner and cannot make arguments for a petitioner); *Grant*, 727 F.3d at 1018-19 (same). Considering each such argument marshaled by Petitioner, none demonstrates that no fairminded jurist could agree with the OCCA's denial of relief on this claim.

First, Petitioner argues that the OCCA rested its decision on an unreasonable determination of fact because it "concede[d] the lack of notice [of the other crimes evidence], yet inexplicably concludes there was no 'unfair surprise.'" (Doc. 5 at 27). This particular argument, although cast in terms of § 2254(d)(2), is purely a matter of state law and is not cognizable on habeas review. *See United States v. Kendall*, 766 F.2d 1426, 1441 n.6 (10th Cir. 1985) (the requirement of a so-called *Burks* notice is a state rule which the Tenth Circuit declined to adopt); *Hernandez v. Addison*, 2006 WL 2489349, at *16 (W.D. Okla. Aug. 28, 2006) (unpublished) ("To the extent Petitioner complains that he did not receive a *Burks* notice regarding this evidence, he is obviously raising an error of state law." (citing *Kendall,* 766 F.2d at 1441 n. 6)). In any event, there is nothing contradictory about the OCCA's finding. The OCCA simply found that, although Petitioner did not receive a separate, written § 2414 notice of the other crimes evidence, he did not suffer

actual surprise. (Exhibit 1 at 3). Indeed, that DMS alleged Petitioner abused her during the Morocco trips was in the record from the very first arrest affidavit, and the State's Witness and Exhibit List indicated that the State expected DMS to testify consistently with the documents and reports provided to defense counsel in discovery. (Exhibit 8 at 3-5, 61-64). At no point during DMS's testimony did trial counsel object to her testifying regarding the Morocco trip, nor did he declare that he did not have notice and required a continuance.[10] The OCCA quite reasonably determined that Petitioner was not unfairly surprised by the testimony despite the lack of a formal written notice of other crimes evidence. *See Hernandez*, 2006 WL 2489349, at *16 (Petitioner's challenge to the lack of *Burks* notice failed because it sounded in state law, and in addition, the purpose of the "notice is to ensure that the defendant is not surprised by the admission of other crimes evidence," but "[h]ere, the [OCCA] specifically found that the purposes of the *Burks* notice had been satisfied as evidenced by the discovery materials and Petitioner's motion in limine.").

Second, Petitioner contends the OCCA's determination that DMS's other crimes testimony was corroborated by other evidence was unreasonable under § 2254(d)(2) because the "OCCA fails to identify what 'other evidence' corroborated DMS's allegations." (Doc. 5 at 28). This argument should be rejected by this Court because the relevant question is not whether the OCCA correctly found the evidence admissible under OKLA. STAT. tit. 12, § 2414 (2011), but, rather, whether the determination by the OCCA

---

[10] Before the OCCA, Petitioner readily acknowledged that "documents produced for trial counsel by the state/prosecution prior to trial and contained in trial counsel's file contained all of the essential allegations that DMS, the prosecution's key witness, testified to at trial." (Exhibit 6, Rule 3.11 Application, at 4).

that Petitioner's trial was not rendered fundamentally unfair was contrary to clearly established law or based on an unreasonable determination of the facts. *See Meek*, __ F. 4th __, 2023 WL 4714719 *2. Regardless, the OCCA is not required to expressly name the corroborating evidence it identified. The Supreme Court has acknowledged that federal courts have no power to impose opinion writing standards on state courts. *See Johnson*, 568 U.S. at 300. Rather, *Petitioner* has the burden by clear and convincing evidence to show the OCCA's finding of corroborating evidence was incorrect. *See* 28 U.S.C. § 2254(e)(1).

In any event, there was evidence that corroborated DMS's claims. Ms. Sims testified that on one occasion, Petitioner held her down and ejaculated onto her stomach. (Exhibit 7; Tr. II 140). Ms. Sims stated that she had never discussed this event with DMS because she was too ashamed. (Exhibit 7, Tr. II 142). This was extremely similar to an incident that happened to DMS. During the first trip to Morocco, DMS stated that she was unable to fight Petitioner off because he was larger than her, and that she was too scared to fight Petitioner off after Petitioner raped her, he pulled his penis out of her vagina, ejaculated onto her stomach, and then wiped off his semen with her nightgown. (Exhibit 7, Tr. I 187-188). Importantly, it is uncontested that Petitioner took DMS to have the hymenoplasty performed as Petitioner admitted that he took DMS to have a hymenoplasty in Morocco but claimed that DMS wanted the surgery so that she would appear as a virgin for the Moroccan boy that he claimed she wanted to marry. (Exhibit 7, Tr. II 187-189).

Third, Petitioner argues that the OCCA's finding that "the evidence of events occurring in Morocco [was] not . . . so prejudicial to outweigh its probative value . . . was

33

objectively unreasonable." (Doc. 5 at 30). However, the OCCA's determination was reasonable and fairminded jurists could agree with the OCCA's analysis. The OCCA stated that

> Appellant also argues the evidence of other sex crimes failed to meet the balancing requirements of section 2403. We disagree. Appellant flatly denied sexually abusing the complainant. Strict, convincing proof of her shocking allegations was entirely necessary to obtain convictions on these charges. The victim's descriptions of abuse were clear and convincing, highly probative of disputed facts, corroborated by other evidence, and no less prejudicial testimony was available.
>
> The crimes of Appellant in Morocco were very similar to those committed in Oklahoma against the same victim. This evidence therefore did not distract the jury from the principal issues on trial, but rather tended to show Appellant's sexual propensity, consciousness of guilt, his identity as an abuser, and his plan to escape detection.

(Exhibit 1 at 5).

Here, giving the evidence its maximum reasonable probative value, the evidence of prior and subsequent acts was clearly proved through the testimony of DMS, the victim, the evidence was extremely probative in explaining how the sexual abuse that became the subject of Petitioner's Oklahoma charges began and why DMS did not initially report it, Petitioner strongly disputed all the accusations made by DMS, and there was no less prejudicial alternative evidence. *Horn*, 204 P.3d at 786.

Similarly, giving the evidence its minimum reasonable prejudicial effect, the abuse DMS recounted in Morocco would not contribute to an improperly based jury verdict. DMS detailed horrific and nearly constant abuse that she suffered at Petitioner's hands over

a period of nine months from September 2016 to June 2017, essentially any time they were alone together. (Exhibit 7, Tr. I 198-208). From its opening statement, the prosecution made clear: "[n]ow, ladies and gentlemen, we're in the Canadian County Courthouse. The criminal acts that we're prosecuting here are what happened in Canadian County. Okay? But Morocco is part of the story because it's the beginning and part of the middle too." (Exhibit 7, Tr. I 167-168).

Petitioner has not shown that any fairminded jurist, reviewing all the evidence, would reach a different conclusion than the OCCA in weighing the evidence's probative and prejudicial value (even assuming that such a weighing is within a federal habeas court's purview). *Andrew*, 62 F.4th at 1317.

Next, Petitioner complains that the evidence of Petitioner's abusive behavior in Morocco was not proven by clear and convincing evidence. (Doc. 5 at 28; Exhibit 3 at 15-16). Petitioner complains "[n]o witnesses, physical evidence, forensic evidence, exhibits, or other witnesses were presented to establish DMS's allegations actually occurred." (Doc. 5 at 28; Exhibit 3 at 16). This assertion is utterly without merit because Petitioner fails to acknowledge that DMS's testimony *is evidence.* Oklahoma law allows for *conviction,* where the burden of proof required is beyond a reasonable doubt, of rape and similar sex crimes based on the uncorroborated testimony of a single witness in all but the most extreme cases—where "the testimony is so insubstantial and incredible as to be unworthy of belief." *Gilmore v. State,* 855 P.2d 143, 145 (Okla. Crim. App. 1993). Petitioner makes no argument that DMS's testimony was so internally inconsistent that a rational juror could not believe she was describing true events or that it failed to establish the elements of a sex

crime, nor can he. DMS described in graphic detail how Petitioner, first digitally then with his penis, raped her during their first trip to Morocco in 2016, and testified that this also occurred during the 2017 trip Morocco. (Exhibit 7, Tr. I 184-88, 210-211).

Further, as stated above, there was additional evidence to corroborate her claims. Petitioner himself admitted that he took DMS to have the hymenoplasties performed. The evidence presented was sufficient to meet the standard of beyond a reasonable doubt, let alone a clear and convincing standard.

A fairminded jurist could also agree that there was no chance that DMS's Morocco abuse testimony would "distract from the central issues of the trial." *Horn*, 204 P.3d at 786. The OCCA has found § 2414 evidence properly admitted where "[t]he particulars of the prior crime showed a visible connection with the instant charges, and demonstrated a common scheme to take sexual advantage of very young girls that were placed in [the appellant's] trust and care." *James v. State,* 204 P.3d 793, 798 (Okla. Crim. App. 2009). Here, beyond just a visible connection or common scheme, the evidence of Petitioner's conduct in Morocco was *central* to DMS's story, which could not have been otherwise told.[11] And it could not distract because unlike instances where propensity testimony comes from a witness other than the victim in the case, DMS was the victim in all the charged crimes, and the abuse she suffered in Morocco did not vary at all from the abuse she testified occurred in Oklahoma for which Petitioner was charged. Indeed, despite

---

[11] In fact, as the State argued on direct appeal, the Morocco evidence was truly *res gestae* evidence. (Exhibit 4 at 12-15). However, the OCCA did not decide that issue and instead appeared to assume that the evidence was properly analyzed under OKLA. STAT. tit. 12 § 2414 (2011). (Exhibit 1 at 4-5).

complaining of the page count of the Oklahoma testimony, Petitioner makes no assertion anywhere in his brief that DMS's testimony concerning his behavior in Oklahoma, if believed, would not establish that he committed each of the elements charged in his Oklahoma crimes.

Petitioner's only argument is to characterize DMS's testimony as "paint[ing] an image of an American girl being taken to a foreign country to be repeatedly abused by [Petitioner], a Muslim man of Moroccan descent," and to, without citation, assert that his jury could not have performed their duty diligently and according to their instructions. (Doc. 5 at 22; Exhibit 3 at 17-18). *See Meek*, __ F.4th __, 2023 WL 4714719 *3 (stating that counsel's incredulity is not enough to show that the OCCA's determination was unreasonable). In fact, the jurors were specifically instructed to "not let sympathy, sentiment or prejudice enter [their] deliberations." (Exhibit 8 at 136). There is no evidence that the jury deviated from its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.") (citing *Richardson v. Marsh*, 481 U.S. 200, 21 (1987)). And Petitioner cites to none.[12] To be inadmissible under § 2403, evidence must not simply be slightly more prejudicial than probative, it must be *substantially* more prejudicial than probative. OKLA. STAT. tit. 12 § 2403 (2011). Petitioner

---

[12] Petitioner notes in passing that the jurors were not provided with instructions specifically indicating that they could not consider the Morocco testimony as evidence of guilt for the defendant's Oklahoma crimes. (Doc. 5 at 30 n. 4; Exhibit 3 at 18 n. 3). As Petitioner complains about the lack of a limiting instruction in Ground Two, Respondent will address that matter fully below. (*see* Ground Two, *infra*.).

has not made that showing—he certainly has not shown that no fairminded jurist could agree with the OCCA that his trial was not rendered fundamentally unfair.

Finally, to the extent that Petitioner asks this Court to second-guess the OCCA's application of § 2414 and its own state law precedent, this Court must defer to the OCCA's determinations of state law. *See Meek*, __ F.4th __, 2023 WL 4714719 *35; *Grant*, 886 F.3d at 903. The only question is whether all fairminded jurists would disagree with the OCCA's conclusion that Petitioner's trial was not rendered fundamentally unfair, and Petitioner has not met that daunting standard for all the reasons listed above.

**C.     Conclusion.**

As shown above, even assuming Ground One is exhausted as a federal claim, the OCCA's rejection of Petitioner's claim regarding the admission of the conduct that occurred in Morocco was neither contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the state court record. *See* U.S.C. § 2254(d). Therefore, this Court should deny habeas relief on Ground One.

## GROUND TWO

**PEITIONER'S CLAIM THAT THE TRIAL COURT ERRONEOUSLY FAILED TO GIVE A LIMITING INSTRUCTION REGARDING THE EVIDENCE OF MISCONDUCT COMITTED IN MOROCCO WAS NOT EXHAUSTED AS A FEDERAL CLAIM. EVEN ASSUMING, *ARGUENDO*, THAT THE CLAIM WAS PROPERLY EXHAUSTED, IT FAILS FOR LACK OF CLEARLY ESTABLISHED LAW. ALTERNATIVELY, THE OCCA'S REJECTION OF THIS CLAIM WAS NEITHER CONTRARY TO, NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN UNREASONABLE DETERMINATION OF THE APPLICABLE FACTS.**

In his second ground for relief, Petitioner challenges, as he did on direct appeal, the failure to instruct the jury as to how they may consider the evidence concerning sexual assaults of DMS in Morocco. (Doc. 5 at 32-37; Exhibit 3 at 19-20). As shown below, Petitioner's claim was not fairly presented to the OCCA as a federal claim, and thus, any federal claim now advanced before this Court is unexhausted and anticipatorily barred. Regardless, even if this Court finds Petitioner's federal claim was exhausted properly before the OCCA, this claim fails for lack of clearly established law from the Supreme Court. Alternatively, the OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was the OCCA's decision based on an unreasonable determination of fact. Petitioner's second ground for habeas relief must be rejected accordingly.

A.     **Background.**

Before this Court, Petitioner argues that failure to instruct the jury as to how they may consider the evidence concerning the conduct of Petitioner in Morocco deprived him of his federal due process rights. (Doc. 5 at 32-37). But this constitutional claim was never fairly presented to the OCCA and is barred from consideration by this Court. Alternatively, assuming this Court determines this claim was fairly presented to the OCCA, then it must also presume that the OCCA adjudicated the claim on the merits.

In challenging the failure by the trial court to give, *sua sponte*, limiting instructions regarding the Morocco evidence, Petitioner presents a claim based both on state and federal law. (Doc. 5 at 32-37; Exhibit 3 at 19-20). As to Supreme Court law, he specifically invokes *Estelle*, 502 U.S. at 62, and *Henderson v. Kibbe*, 431 U.S. 145 (1977). (Doc. 5 at 35, 36). However, while Petitioner challenged the failure to instruct regarding this same evidence on direct appeal, his claim has fundamentally changed. (*Compare* Doc. 5 at 32-37, *with* Exhibit 3 at 19-20). Specifically, before the OCCA, Petitioner raised this claim entirely based on OCCA case law, save for a fleeting reference to the failure to provide limiting instructions regarding the conduct that occurred in Morocco violating his "rights to Due Process and a fair trial as guaranteed by … the Sixth and Fourteenth Amendments to the United States Constitution." (Doc. 5 at 32; Exhibit 3 at 19). The substance of Petitioner's argument – i.e., everything save for this singular sentence – consisted entirely of state law, without a single citation to a Supreme Court (including *Estelle* or *Henderson*) or other federal case or mention of "due process." (Doc. 5 at 32-37; Exhibit 3 at 19-20). A side-by-side comparison of Petitioner's briefing now and on direct appeal demonstrates clearly that

he did not fairly present to the OCCA the claim presently pressed. *Grant*, 886 F.3d at 899

("The juxtaposition between [petitioner's brief to the OCCA] and [petitioner's] habeas

petition strongly underscores the deficiencies of the former as an ostensible presentation of

a procedural due process competency claim. The direct-appeal brief did not offer a *fair*

presentation of such a claim.") (emphasis in original).

The OCCA rejected Petitioner's limiting instruction claim as follows:

> In Proposition Two, Appellant argues the trial court's omission of limiting instructions on the evidence of other crimes caused reversible error. He speculates that the absence of limiting instructions could have allowed the jury to convict him of crimes committed in Morocco rather than Oklahoma. The failure to *sua sponte* administer limiting instructions on other crimes evidence is not reversible unless it rises to the level of plain error. *Jones v. State,* 1989 OK CR 7, ¶ 8, 772 P.2d 922, 925.

> We have repeatedly declined to find such instructional omissions reversible error. *Holt v. State,* 1989 OK CR 21, ¶ 8, 774 P.2d 476,478; *Hainey v. State,* 1987 OK CR 120, ¶ 20, 740 P.2d 146, 151. The underlying evidence was properly admitted. Its prejudicial impact was considerable, but absent any indication that it was misused, there is no plain or obvious error. Proposition Two is denied.

(Exhibit 1 at 6).

**B.     Preliminary Statement Regarding Fair Presentation and Merits Adjudication.**

As stated in Ground One, *supra*, a habeas petitioner who challenges an omitted jury

instruction in state court is not automatically entitled to then claim in habeas proceedings

that his due process right to a fair trial was violated by the admitted evidence because state

courts must be alerted to the fact that a petitioner is asserting a claim under the United

States Constitution. *Tyler v. Nelson*, 163 F.3d 122, 1227 (10th Cir. 1999).

41

Moreover, if a petitioner does wish to exhaust a federal due process claim, the claim must be "fairly presented to the state court, which means that the petitioner has raised the substance of the federal claim in state court." *Grant*, 886 F.3d at 890 (quotation marks omitted). To fairly present a federal due process challenge, "it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." *Gray*, 518 U.S. at 163. Nor is it sufficient to bookend a state-law claim with conclusory references to the Constitution. *Wilder*, 274 F.3d at 260 (holding that "fleeting reference[s] to the federal constitution" and "vague references to such expansive concepts as due process and fair trial" fail to fairly present, and therefore exhaust, a federal claim in state court). *See Duncan*, 513 U.S. at 364-366; *Zuniga*, 618 F. App'x at 411; *Cole*, 349 F. App'x at 331; *see also Rivera*, 556 U.S. at 158, 160. Put more generally, "[t]o satisfy exhaustion, . . . the habeas petition's focus—as well as the alleged error that it identifies—cannot depart significantly from what the petitioner had presented to the state court." *Grant*, 886 F.3d at 891; *cf. Duncan*, 513 U.S. at 366 ("[M]ere similarity of claims is insufficient to exhaust.").

Here, Petitioner did not fairly present his federal due process claim to the OCCA. The substance of his proposition pertained entirely to showing that the failure to give a limiting instruction regarding the Morocco evidence was plain error under Oklahoma law, with a brief reference to "due process" in the heading and introductory paragraph. (Exhibit 3 at 19). Pursuant to the above-cited case law, Petitioner did not fairly apprise the OCCA that he was raising a federal claim or give that court a fair opportunity to pass upon same; as such, the federal claim he now presents is unexhausted.

Not only is Petitioner's claim unexhausted, but it is subject to an anticipatory bar. Petitioner would face an independent and adequate state procedural bar if he were to return to state court and assert Ground One, as a *federal* claim, in a subsequent application for post-conviction relief. Specifically, if Petitioner were to present the claim in an application for post-conviction relief and appeal to the OCCA, the OCCA would bar the claim as waived because Petitioner could have raised it on direct appeal. *See* OKLA. STAT. tit. 22, § 1086 (2021). The Tenth Circuit has held § 1086 to be independent and adequate. *Smith*, 550 F.3d at 1274.

Further, as stated above, a federal court may not grant relief on a claim defaulted in state court based on an independent and adequate rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

For the same reasons discussed in Ground One, *supra*, Petitioner has not acknowledged his default or shown cause and prejudice or a fundamental miscarriage of justice. *Murray*, 477 U.S. at 488; *Frady*, 456 U.S. at 168. To summarize, at trial, Petitioner denied all allegations against him by DMS and attempted to explain away his conduct in Morocco as customary. (Exhibit 7, Tr. II 181-191). Further, Petitioner asserts that if a limiting instruction regarding the conduct in Morocco was given, the jury would not have improperly considered the conduct in Morocco as substantive evidence of his guilt regarding the incidents that occurred in Yukon. (Doc. 5 at 36-37). There is no evidence the jury improperly considered the incidents that occurred in Morocco as substantive evidence

of Petitioner's guilt regarding the Yukon crimes; nor is Petitioner's claim a claim of actual, factual innocence, but rather a claim of legal innocence. Petitioner does not acknowledge that the federal constitutional version of his claim is unexhausted, and, further, fails to show cause and prejudice or a fundamental miscarriage of justice to overcome his default.

Alternatively, if this Court finds that Petitioner fairly presented his federal due process claim to the OCCA, then this Court must *presume* that the OCCA adjudicated that claim on the merits. *See Johnson*, 568 U.S. at 298-301 (where a state court opinion expressly addresses some of a Petitioner's claims but "rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits"). Indeed, as stated in Ground One, *supra*, *Johnson* explained why a federal court may not separately discuss a federal claim when, as here, a Petitioner raises the claim in cursory fashion within a state-law-focused claim. *Id.* at 299.

Here, too, assuming the OCCA viewed Petitioner as sufficiently raising a federal due process claim, the OCCA unsurprisingly decided such a claim was nonetheless unworthy of discussion given Petitioner's cursory argument, consisting of only a passing reference to the claim. (Exhibit 3 at 19-20). Assuming Petitioner's constitutional claim was fairly presented, the OCCA adjudicated same on the merits. Further, as noted in Ground One, the Tenth Circuit has held that when the OCCA reviews a claim under its plain error standard, it effectively applies the same test that federal courts apply to assess an alleged due process violation. *See Thornburg*, 422 F.3d at 1124-25.

**C.**     **Petitioner's claim fails for lack of clearly established law.**

As noted above, this is a counseled Petition and Petitioner had the burden to cite specific Supreme Court cases he believes the OCCA ran afoul of. *Andrew*, 62 F.4th at 1316. In the instant Petition, Petitioner cites *Estelle*, 502 U.S. at 62 and *Henderson*, 431 U.S. at 145.[13]

As to *Estelle*, the Supreme Court, in the context of an instruction on the consideration of prior abuse evidence in a child abuse murder case, said that the fact that an "instruction was allegedly incorrect under state law is not a basis for habeas relief"; rather, "[t]he only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 71-72. However, here, in contrast, Petitioner complains of an omitted instruction, not an erroneous one. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. The additional issue with Petitioner's reliance on *Estelle* is that there the Court ultimately found that the "jury instruction" did *not* "so infuse[] the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 75 (quotation marks omitted). So it is unclear, and Petitioner does not explain, how the OCCA's opinion could be an unreasonable application of *Estelle*.

As to *Henderson*, the Supreme Court considered "whether the New York State trial judge's failure to instruct the jury on the issue of causation was constitutional error

---

[13] Petitioner also cites to *Brecht*, but for a different point regarding prejudice, and, critically, does not claim it offers clearly established law on instructional errors violating due process. (Doc. 5 at 31).

requiring a Federal District Court to grant habeas corpus relief." *Henderson*, 431 U.S. at 147. The Supreme Court answered that question in the negative, *id.*, so once again it is unclear how the OCCA's decision ran afoul of *Henderson*. Furthermore, *Henderson* involved a missing instruction on an *element* of the crime, which is not the issue in Petitioner's case.

Neither *Estelle* nor *Henderson* provides on-point clearly established federal law applicable to this claim. *See House*, 527 F.3d at 1024.

**D.     Even assuming *arguendo* that Petitioner properly presented his federal claim to the OCCA, and it is supported by clearly established law, the OCCA reasonably determined that the trial court's failure to include instructions on other crimes evidence did not render Petitioner's trial fundamentally unfair.**

Petitioner argues, as he did on direct appeal to the OCCA, that the trial court committed plain error by failing to issue what he deemed were the appropriate limiting instructions relevant to other crimes or sexual propensity evidence regarding the conduct that occurred in Morocco. (Doc. 5 at 37-42; Exhibit 3 at 20-21). The OCCA held that because the underlying evidence was properly admitted, absent any indication that the evidence was misused by the jury, there was no plain error. (Exhibit 1 at 6). As will be shown, because the OCCA's determination was not contrary to or an unreasonable application of clearly established law, nor was it an unreasonable determination of the facts in this case, Petitioner is not entitled to habeas relief.

Although Respondent submits that no clearly established law supports this claim, Respondent recognizes that the Tenth Circuit has held it will review an omitted jury instruction to determine whether the omitted instruction "rendered the trial so

fundamentally unfair as to cause a denial of a fair trial." *Maes v. Thomas*, 46 F.3d 979, 985 (10th Cir. 1995). *See also Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997) ("As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'" (citation omitted)). The fact that "[an] instruction [is] allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72. "Moreover, where the claim is premised on the failure to give a certain instruction, as opposed to a challenge to a given instruction, [p]etitioner's burden is even heavier, because '[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'" *Hernandez*, 2006 WL 2489349 *17 (quoting *Henderson*, 431 U.S. at 155).

Petitioner argues, summarily, that the "omission of an appropriate limiting instruction acted as denial of Due Process and rendered the trial fundamentally unfair" because, he claims, the jury was "left without any guidance as to the limited purpose for which it could consider the evidence of other crimes and/or sexual abuse occurring in Morocco. (Doc. 5 at 41). He does not make, and has therefore forfeited, any argument that the OCCA's decision was contrary to Supreme Court law and instead argues merely that the OCCA unreasonably applied its own plain error standard and precedent to the instant case. *See Eizember v. Trammell*, 803 F.3d 1129, 1140 (10th Cir. 2015) (holding that petitioner forfeited the contention that the state court's decision was contrary to clearly established law where he argued only that "reasonableness of [the proper standard's] application of that standard… was unreasonable given the facts"). Further, Petitioner's only

evidence "that the jury may have improperly relied on other crimes evidence" is the jury's first question during its deliberations. (Doc. 5 at 41-42). The jury's question read: "May we have a copy of the information?" and the trial court denied that request. (Exhibit 8 at 153). Petitioner then claims "[t]he record is silent as to why this request was made; however, ostensibly one or more jurors could have been curious whether the allegations of abuse occurring in Morocco were included within the charged offenses." (Doc. 5 at 41-42).

Petitioner advanced this same argument on direct appeal (Exhibit 3 at 23), and the OCCA reasonably rejected it. The jury's second question reveals exactly the purpose of the first question. The second question reads: "Is there a typ(o) (scrivener's error) in Instruction 9, Count 5, 1st element? The instruction appears to be identical to Instruction 8, Count 4." (Exhibit 8 at 154). The jury correctly remembered that the information had charged Count 4 and 5 differently,[14] and noted that the initial Instruction 9, governing Count 5, appeared identical to Instruction 8, which governed Count 4. (Exhibit 8 at 128-29). Thus, the trial court responded to the jury's question by issuing an Amended Instruction 9, which correctly set forth the elements as charged (Exhibit 8 at 130, 154). This is proof instead that the jury closely adhered to the information, which charged Petitioner as having committed the crimes for which he was on trial while he was in Canadian County, Oklahoma, between September 1, 2016, to June 11, 2017 (Exhibit 8 at 109-10). Petitioner has not shown that all fairminded jurists would agree that the lack of a

---

[14] Count 4 charged sexual abuse by digital rape of DMS's vagina, while Count 5 charged sexual abuse by digital rape of DMS's anus. (Exhibit 8 at 110).

limiting instruction affected the outcome of the trial. *Patton v. Mullin*, 425 F.3d 788, 807 (10th Cir. 2005).

Petitioner also claims the OCCA's decision was unreasonable because it had "previously held the trial court must issue contemporaneous and final limiting instructions when other crimes evidence is admitted" and had "cautioned likewise with respect to sexual abuse propensity." (Doc. 5 at 34-35 (collecting OCCA cases)). However, as stated by the Tenth Circuit, Respondent is "at a loss to understand how any purported inconsistency in the OCCA's *own (state law) precedent* produced by the OCCA's ruling … is germane to [an] inquiry under AEDPA—where the unalloyed legal concern is clearly established *federal* law." *Grant*, 886 F.3d at 947 n.25.

Petitioner further claims the OCCA unreasonably "found no 'plain or obvious error' in Mr. Sims's case, despite acknowledging that the 'prejudicial impact was considerable.'" (Doc. 5 at 35). However, there is a clear difference between evidence being prejudicial – evidence presented at trial that Petitioner sexually abused DMS is undoubtedly prejudicial – and the evidence being outcome determinative, as would be necessary to show plain error. *See United States v. Mendoza-Salgado*, 964 F.2d 993, 1007 (10th Cir. 1992) (stating that the introduction of cocaine and a large number of weapons into evidence in a conspiracy and drug distribution case creates some risk of undue prejudice, however, "evidence is not unfairly prejudicial simply because it is damaging to an opponent's case," the inquiry is whether the evidence has an "undue tendency to suggest on an improper basis, commonly, though not necessarily, an emotional one") (quoting *United States v. Martinez*, 938 F.2d 1078, 1082 (10th Cir. 1991)).

Petitioner also argues that "Mr. Sims's jury was never informed of the limited purpose for which it could consider DMS's testimony about alleged abuse occurring in Morocco." (Doc. 5 at 36). However, as discussed in Ground One, it was clear from the State's opening statement that "[t]he criminal acts that we're prosecuting here are what happened in Canadian County," not the events that occurred in Morocco. (Exhibit 7, Tr. I 167-68).

Petitioner presents no other discernable arguments sounding in 28 U.S.C. §§ 2254(d)(1) or 2254(d)(2). *See Nguyen*, 131 F.3d at 1357 ("A § 2254 petitioner has a heavy burden in attempting to set aside a state conviction base on an erroneous jury instruction."); *Hernandez*, 2006 WL 2489349 *17 ("Moreover, where the claim is premised on the failure to give a certain instruction, as opposed to a challenge to a given instruction, [p]etitioner's burden is even heavier, because '[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'") (quoting *Henderson*, 431 U.S. at 155).

## D.   Conclusion.

As shown above, Ground Two was not exhausted as a federal claim and is procedurally barred. Alternatively, even assuming the existence of clearly established law, the OCCA's rejection of Petitioner's claim regarding the failure to give, *sua sponte*, a limiting instruction regarding the conduct that occurred in Morocco was neither contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the state court record. *See* 28 U.S.C. § 2254(d). Therefore, this Court should deny habeas relief on Ground Two.

**GROUND THREE**

**THE OCCA'S DETERMINATION THAT PETITIONER ENJOYED EFFECTIVE ASSISTANCE OF COUNSEL WAS NOT CONTRARY TO CLEARLY ESTABLISHED LAW, NOR WAS IT AN UNREASONABLE APPLICATION OF FEDERAL LAW OR BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.**

In his third ground for relief, Petitioner claims he received ineffective assistance of trial counsel. (Doc. 5 at 37-64). Because a fairminded jurist could agree with the OCCA's rejection of this ground for relief, habeas relief must be denied.

**A.  Background.**

On direct appeal, Petitioner claimed that trial counsel was deficient by failing to adequately communicate with Petitioner prior to trial, failing to "mount a reasonable investigation into the State's allegations, and otherwise failed to utilize available evidence to counter those allegations." (Exhibit 3 at 24). Further, Petitioner claimed trial counsel was ineffective for failing to object to the admission of other crimes evidence and failing to request a limiting instruction. (Exhibit 3 at 25-29).

The OCCA denied relief holding:

> In Proposition Three, Appellant argues that trial counsel was ineffective. He specifically claims that trial counsel's [failure] to object to the evidence of other crimes, request a limiting instruction on that evidence, consult with the Appellant and prepare him for trial, and utilize available evidence in his defense, was unreasonably deficient performance. He has filed in connection with this claim a motion to supplement the record on appeal and a request for evidentiary hearing under Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S., Ch. 18, App. (2022). We review this claim under the familiar bipartite standard of *Strickland v. Washington,* 466 U.S. 668 (1984), requiring Appellant to show

that counsel performed deficiently, and that Appellant's defense was prejudiced by it. *Id.,* 466 U.S. at 687. To obtain an evidentiary hearing and supplement the record on appeal with additional evidence of ineffective counsel, Appellant must present clear and convincing evidence of a strong possibility that trial counsel was ineffective for failing to utilize available evidence. Rule 3.11(B)(3)(b).

This burden is less onerous than *Strickland's* (sic) required showing of deficient performance and prejudice. *Simpson v. State,* 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06. The grant of an evidentiary hearing is *not* a finding that defense counsel actually was ineffective, but rather of a strong possibility that warrants a further opportunity to support the claim. Conversely, the *denial* of an evidentiary hearing to supplement the record under Rule 3.1 l(B) necessarily embraces a finding that Appellant has not shown a violation of Sixth Amendment under *Strickland. Simpson, id.*

We have carefully considered Appellant's record-based challenges to counsel's representation, as well as his request for an evidentiary hearing to develop additional facts supporting his claims. The Court finds that he has not shown clear and convincing evidence of a strong possibility that trial counsel was ineffective. He does not show that counsel's presumptively reasonable strategic decisions about how to conduct the defense involved errors so serious as to deserve the name deficient performance. Nor has he shown that counsel's representation was so deficient that, but for unprofessional errors, there is a reasonable probability of a different outcome. Proposition Three, and the related request for an evidentiary hearing, are denied.

(Exhibit 3 at 6-8).

**B.     Standard of Review.**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the

standard a petitioner must meet to raise a successful ineffective assistance of counsel claim.

A petitioner seeking relief based on ineffective assistance of counsel must prove counsel's

performance was deficient and that his defense was prejudiced by that performance. *Strickland*, 466 U.S. at 687. This standard was designed to be difficult to meet, even on *de novo* review. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). But

> [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations and quotation marks omitted).

## C.   Record Based Claims.

Petitioner's first set of claims are based in the trial record, namely that trial counsel was ineffective for failing to object to DMS's Morocco allegations when they were first presented at trial, and for failing to request a limiting instruction in his proposed jury instructions.

A fairminded jurist could agree that it was reasonable that trial counsel chose not to object to DMS's Morocco allegations and did not request a limiting instruction. The record indicates that all parties, including the trial court, believed that the evidence was admissible as *res gestae*. *See United States v. Lee-Clark*, 258 F. App'x 208, 214 (10th Cir. 2007) (unpublished) (reiterating that "[e]vidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof of the offense charged in

the indictment" and that other crimes evidence is admissible when it is "so linked together in point of time and circumstances with the crime charged that it is part of the *res gestae* of the crime charged.") (citations omitted). Indeed, the State did not file a formal, written, § 2414 notice and no one, including the trial court, ever flagged the need for a limiting instruction. On habeas review, the question is not whether the evidence was in fact not admissible as *res gestae* under Oklahoma law—it is instead whether all fairminded jurists would agree that no reasonable attorney would have *believed* the evidence was admissible as *res gestae*. As the Tenth Circuit has stated, regarding *Strickland*,

> even though counsel's strategy was ill-informed and thus does not qualify for the virtually unchallengeable presumption of reasonableness, a court reviewing the record before it might still conclude that counsel performed in an objectively reasonable manner. And, conversely, it is also possible on rare occasions to conclude that counsel's fully-informed strategic choices were unreasonable if "the choice was so patently unreasonable that no competent attorney would have made it."

*Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002) (citation omitted).

Petitioner has not met that standard. For example, the State's attorney on direct appeal also thought the evidence was *res gestae*. (Exhibit 4 at 12-15, 29-30 (arguing that the evidence did not need to meet the formal requirements of § 2414 because it was *res gestae*)). To be sure, the OCCA did not expressly agree or disagree with the State regarding the claim that the Morocco allegations were *res gestae*, and instead analyzed the evidence according to § 2414, perhaps suggesting the court did not believe the evidence was proper *res gestae*; but, regardless, counsel's actions are judged from the time they are performed and not with the benefit of hindsight. (Exhibit 1 at 4-6).

Here, an attorney could have reasonably believed the Morocco allegations were *res gestae*. DMS's testimony regarding Petitioner's Morocco abuse concerned the same perpetrator, the same victim, and the nature of the crimes are substantially similar.[15] The testimony Petitioner complains of – namely that he began sexually abusing DMS during their 2016 trip to Morocco and that this conduct continued during their 2017 trip – is quintessential *res gestae* evidence as it gives the crimes that occurred in Yukon context and make up a continuing pattern of abuse. Without this context, DMS's description of Petitioner's behavior in Yukon seems to come out of nowhere. It would appear to the jury that in an instant, Petitioner went from a loving father figure to raping her in her anus and vagina with both his erect penis and his fingers numerous times. Nor can DMS's behavior, including her reluctance to report Petitioner's abuse, be understood without placing her actions within the context of the environment in which the abuse began, and the grooming behaviors Petitioner exhibited – specifically, it was clear from the testimony that Petitioner started the abuse in a foreign country where DMS could not speak the language or call a trusted friend or family member for help. This information was fundamental to understanding what happened and why it happened. *See Newman v. State*, 466 P.3d 574, 582 (Okla. Crim. App. 2020) ("Evidence is considered *res gestae* when: a) it is so closely

---

[15] Contrary to Petitioner's argument, that "there is no evidence in the record to support that defense counsel engaged in any decision making whatsoever as to evidence of misconduct occurring in Morocco and the admission of the same at trial without a limiting instruction," it must be presumed, even with a silent record, that counsel performed competently. (Doc. 5 at 32). *See Burt v. Titlow*, 571 U.S. 12, 22 (2013). Moreover, this Court must determine what arguments supported, or could have supported, the OCCA's decision and ask whether a fairminded jurist could agree, not assume error. *See Richter*, 562 U.S. at 101.

connected to the charged offense as to form part of the entire transaction; b) it is necessary to give the jury a complete understanding of the crime; or c) when it is central to the chain of events.") (quoting *Eizember v. State*, 164 P.3d 208, 230 (Okla. Crim. App. 2007)); *McElmurry v. State*, 60 P.3d 4, 22 (Okla. Crim. App. 2002) ("*Res gestae* are those things, events, and circumstances incidental to and surrounding a larger event that help explain it."). A fairminded jurist could agree with the OCCA that trial counsel was not ineffective in failing to object to the Morocco evidence or request a limiting instruction.

### D.   Extra-Record Claims

Petitioner's next set of claims rely on information that was attached to a Motion to Supplement the Record on Appeal under Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2021). (Doc. 5 at 40-64; Exhibit 3 at 29-49; Exhibit 7, Rule 3.11 Application at ¶¶ 12-13).

As an initial matter, the Tenth Circuit has held that when the OCCA resolves a claim of ineffective assistance pursuant to its Rule 3.11, that resolution is an adjudication on the merits subject to the heightened AEDPA standards set out in 28 U.S.C. § 2254(d)(1). *Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013); *Glossip v. Trammell*, 530 F. App'x 708, 736 (10th Cir. 2013) (unpublished).

Here, Petitioner is complaining that his trial counsel: (1) failed to investigate, obtain, and utilize evidence to refute allegations of sexual abuse and other crimes; and (2) failed to utilize evidence contained in the discovery produced by the State. (Doc. 5 at 40-64; Exhibit 3 at 29-49).

**1. Failure to consult and communicate with Petitioner prior to trial.**

First, Petitioner claims, based almost entirely on an affidavit written during his appeal, that trial counsel did not adequately communicate with him during trial and ask basic questions which he claims would have led him to provide trial counsel with information which would have been useful at trial. (Doc. 5 at 47-49; Exhibit 3 at 30-32). He claims that counsel visited him in jail only once, for twenty to thirty minutes, that counsel did not inform him that DMS had alleged sexual abuse occurred in Morocco, never asked him if there were witnesses which could help him disprove the allegations, did not have a pre-trial discussion with him about his decision to testify or prepare him to testify in his own defense, and did not ask him "questions about his personal anatomy." (Doc. 5 at 48-49; Exhibit 3 at 31-32; Exhibit 7, Rule 3.11 Application at ¶¶ 12-13). A fairminded jurist could agree with the OCCA that Petitioner did not establish ineffective assistance.

Petitioner's claim, in his affidavit, that counsel never asked him if he had witnesses who might help prove his innocence, and his implication that he thus never informed trial counsel of the names or contact information of his Morocco family members (Exhibit 6, Rule 3.11 Application, Exhibit 1 at ¶ 14), is directly contradicted by his own direct examination testimony, in which he specifically notes to his attorney (the questioner), while listing his relatives' names when asked about the sleeping arrangements in Morocco, "I gave you all the names." (Exhibit 7, Tr. II 163). *See Turner v. Roberts*, 234 F. App'x 867, 872 (10th Cir. 2007) (unpublished) (stating that it was reasonable for the state court to reject a petitioner's ineffective assistance of counsel claim where the alleged errors were either contradicted by the record or concerned strategic and tactical decisions of counsel).

Next, Petitioner claims that trial counsel left him unprepared for his own testimony and implies that trial counsel should have advised him against it. (Doc. 5 at 49-50). After the State rested, the trial court asked defense counsel if he had previously discussed with Petitioner his right to testify, and trial counsel indicated that he had, and that he previously expected to call only one witness, a person who was not Petitioner, although he acknowledged the possibility that he would still call Petitioner himself. (Exhibit 7, Tr. II 93-94). After Ms. Sims' testimony, the court took a recess, Petitioner and trial counsel discussed his decision about whether to testify, and Petitioner determined that he would testify. (Exhibit 7, Tr. II 154-56). The district court made a detailed record of Petitioner's decision, including asking him whether he understood it would subject him to cross examination by the prosecution, and whether he had discussed his decision with his counsel, to which he answered affirmatively to both. (Exhibit 7, Tr. II 154-55). The district court also inquired of trial counsel whether he had "sufficient opportunity to thoroughly discuss this case and the decision whether to testify with the defendant?" to which trial counsel answered affirmatively and Petitioner made no objection (Exhibit 7, Tr. II 155-56). And notably, although Petitioner complains in his affidavit that he had not been advised "[b]efore that day during the jury trial," Petitioner makes no argument that trial counsel did not then fully advise him, nor does he point to any question asked of him for which he was unprepared. (Exhibit 6, Rule 3.11 Application). The OCCA reasonably rejected this claim. *See Turner*, 234 F. App'x at 871.

Next, Petitioner's claims that "[i]t is understood that unique characteristics of [his] anatomy [that] are unknown to DMS, and questioning DMS about these characteristics

could have revealed DMS's allegations were untrue" are wholly unsupported, even by Petitioner's affidavit. (Doc. 5 at 49; Exhibit 3 at 32). Other than claiming that he "could have provided [defense counsel] with information about [his] personal anatomy," Petitioner provides absolutely no details concerning what that information is and points to nothing in DMS's testimony indicating a lack of knowledge. (Exhibit 6, Rule 3.11 Application). The OCCA reasonably rejected this claim that was unsupported and conclusory. *See Dixon v. Calbone*, 204 F. App'x 770, 774-75 (10th Cir. 2008) (unpublished) (holding that petitioner's unsupported and conclusory assertion that his counsel was ineffective for failing to challenge the prosecution's presentation of allegedly perjured testimony was insufficient to support claim of ineffective assistance of counsel because he failed to present the specific evidence he believed was the result of perjury beyond his facial claim).

Finally, Petitioner argues that counsel's failure to communicate with him constitutes the complete denial of counsel such that prejudice should be presumed under *United States v. Cronic*, 466 U.S. 648 (1984), and that the OCCA failed to address his *Cronic* argument such that review should be *de novo*. (Doc. 5 at 50-51; Exhibit 3 at 34). This argument is without merit. For starters, to the extent Petitioner's allegations actually constituted a complete denial of counsel under *Cronic*, it must be presumed the OCCA appropriately considered and applied *Cronic*. *See Woodfork v. Visciotti*, 537 U.S. 19, 24 (2002) (state court decisions must be given the benefit of the doubt); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state courts do not need to cite to or even be aware of Supreme Court decisions so long as their decisions do not violate them).

In any event, to the extent that the OCCA concluded the circumstances alleged by Petitioner did not amount to a total deprivation of counsel, a fairminded jurist could agree. In *Cronic*, the Supreme Court described certain situations under which prejudice becomes presumed. *Chronic*, 466 U.S. at 658-59. Among those is a total breakdown in communications such that Petitioner cannot participate in his own defense and counsel no longer functions as counsel guaranteed by the Sixth Amendment. *Id.* This is not one of those situations. Although Petitioner asserts that counsel met him only once in prison, and the meeting was relatively short, he does not actually allege that he was unable to adequately communicate with counsel or that he was not consulted about crucial decisions. Indeed, Petitioner's trial testimony clearly indicates that they spoke and discussed strategy before he testified, and that he informed his counsel of his family members. (Exhibit 7, Tr. II 157-80). Petitioner made no objections whatsoever to his ability to communicate with counsel during trial despite numerous opportunities to do so. This is not a situation under which prejudice should be presumed under *Cronic. See Harding v. Bear*, 2018 WL 7253351 *4 (W.D. Okla. 2018) (unpublished) (stating that petitioner's argument that his counsel's performance was rendered ineffective "merely because of limited communication" between petitioner and his attorney did not render counsel constitutionally ineffective).

Nor is Petitioner's claim aided by *United States v. Soto Hernandez*, 849 F.2d 1325 (10th Cir. 1988). (Doc. 5 at 50-51; Exhibit 3 at 34). For starters, Supreme Court, not circuit, precedent is the appropriate measuring stick under the AEDPA. *Grant*, 886 F.3d at 890. Regardless, *Soto Hernandez* actually aids Respondent's position. In *Soto Hernandez*, the

appellant claimed that he did not trust his counsel and reasonably believed that, due to a conflict of interest, he could not be fully open with his counsel. *Soto Hernandez*, 849 F.2d at 1327-28. The Tenth Circuit rejected that argument, holding that a breakdown in communication with counsel under *Cronic* required a showing of "irreconcilable conflict" such that attempts at communication were futile. *Id.* The Tenth Circuit relied on *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) for its conclusion. In particular, the Tenth Circuit noted that, in *Brown*, the court found a breakdown in communication where Petitioner "was forced into trial with the assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, *in any manner whatsoever*, communicate." *Soto Hernandez*, 849 F.2d at 1328 (quoting *Brown*, 424 F.2d at 1169 (emphasis in original)). While Petitioner provides an affidavit from Lori Hanson, appellate counsel's legal assistant, claiming that Ms. Hanson has seen an email indicating that trial counsel visited Petitioner in jail once (*see* Exhibit 7, Rule 3.11 Application), he curiously does not provide the email itself, he certainly provides no copy of his phone records from the jail indicating any attempts by him to call or communicate with his defense counsel, let alone does he provide evidence that defense counsel refused to answer or communicate back with him. Petitioner here has not demonstrated that counsel refused his attempts to communicate with him at all, let alone the sort of wholesale refusal to communicate which occurred in *Brown* or that the Tenth Circuit expressed weariness of in *Soto Hernandez*.

And as to Petitioner's citation to American Bar Association Guidelines (Doc. 5 at 49; Exhibit 3 at 33) this cannot control the *Strickland* analysis, let alone drive a finding of

per se deficiency or prejudice. The Supreme Court has clearly held "'[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are only guides,' and imposing 'specific guidelines' on counsel is 'not appropriate.'" *Roe v. Flores-Ortega,* 528 U.S. 470, 479 (2000) (quoting *Strickland,* 466 U.S. at 688). *Strickland* itself "reject[s] mechanistic rules governing what counsel must do." *Roe*, 528 U.S. at 479. "[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* Petitioner's affidavit does not demonstrate that counsel behaved unreasonably or that Petitioner could not reasonably participate in his own defense.

### 2. Failure to investigate, obtain, and utilize evidence to refute DMS's allegations of other crimes/sexual abuse occurring in Morocco.

Next, Petitioner claims that trial counsel was constitutionally ineffective for failing to investigate and utilize evidence from Morocco to impeach DMS's credibility. (Doc. 5 at 52-59 Exhibit 3 at 34-35). To this end, he attaches affidavits from three of his siblings living in Morocco, initially given in Arabic, and apparently translated into English, (Exhibit 6, Rule 3.11 Application, Exhibits 4-6), and a friend who approached trial counsel, offering photographs of DMS and Petitioner's family from the Morocco trips and Petitioner's passport, which trial counsel allegedly declined. (Exhibit 6, Rule 3.11 Application, Exhibit 7).

In analyzing whether trial counsel's performance was deficient, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from the best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

First, we always start the analysis that an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct *might* have been part of a sound trial strategy. Second, where it is shown that a particular decision was, *in fact,* an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.' However, it is important to remember that these presumptions are simply tools that assist us in analyzing *Strickland*'s deficient performance prong and they do not, in and of themselves, answer the ultimate question, which is whether counsel performed in an objectively reasonable manner. So, for example, even though counsel's strategy [may have been] ill-informed and thus does not qualify for the virtually unchallengeable presumption of reasonableness, a court reviewing the record before it might still conclude that counsel performed in an objectively reasonable manner. And, conversely, it is also possible on rare occasions to conclude that counsel's fully-informed strategic choices were unreasonable if 'the choice was so patently unreasonable that no competent attorney would have made it.'

*Bullock*, 237 F.3d at 1046 (citations omitted). Petitioner has not rebutted this presumption.

### a. Failure to interview and/or obtain the testimony of witnesses in Morocco.

As noted above, Petitioner's trial testimony reveals trial counsel did consult with Petitioner and was aware of the identities of Petitioner's Morocco-based relatives prior to trial. (Exhibit 7, Tr. II 163). Moreover, the affidavit of Seddik Halabi, Petitioner's longtime friend, indicates that he offered photographs of DMS in Morocco and Petitioner's passport to trial counsel and that trial counsel declined to take or utilize them. (Exhibit 6, Rule 3.11 Application). This indicates that (1) trial counsel was fully aware of the availability of both lines of inquiry and (2) made a conscious decision not to proceed in that direction. The

question, then, is whether that conscious decision was so unreasonable it is not entitled to deference and, if it was, did it prejudice Petitioner. *Richter*, 562 U.S. at 105.

From the outset, it is worth noting that no exhibit which Petitioner references in this portion of his argument could have any bearing on the facts ultimately at issue in the trial, Petitioner's Oklahoma crimes. At best, this testimony could have been used to impeach DMS's testimony about events which occurred in Morocco and could only have been presented to encourage the jury not to believe DMS's testimony about what occurred in Oklahoma.

Although neither the record, nor the exhibits attached to Petitioner's Rule 3.11 Motion, contain an explicit statement of why trial counsel declined to further pursue impeachment of DMS's Morocco testimony through potential testimony of Petitioner's family members or presentation of photographs from the trips, counsel's actions through the course of the trial demonstrate his overall strategy. Throughout his questioning during cross examination, trial counsel focused almost exclusively on Petitioner's Oklahoma crimes and DMS's and Petitioner's behavior while in Oklahoma. (Exhibit 7, Tr. II 4-50). Similarly, the primary witness Petitioner called was his wife, Ms. Sims, who testified directly to what she claimed she witnessed during the relevant time period in Oklahoma, and specifically to rebut DMS's allegations that Petitioner had been raping and abusing DMS essentially right under Ms. Sims' nose. (Exhibit 7, Tr. II 97-115).

The record indicates, in fact, prior to Ms. Sims' testimony, the defense had not been planning to call Petitioner as a witness at all. (Exhibit 7, Tr. II 93-94). This changed only after Ms. Sims' testimony was thoroughly impeached by the State with the allegations she

had made, and then retracted, regarding Petitioner's abuse towards her. (Exhibit 7, Tr. II 123-43).[16] After Ms. Sims' testimony, Petitioner took the stand and testified to the specifics of the Morocco trips in an attempt to rebut DMS's allegations. (Exhibit 7, Tr. II 157-90).

Moreover, calling Petitioner's family as witnesses would have required a significant shift in trial counsel's strategy, *i.e.*, keeping the focus on events in Oklahoma, and it was not without weaknesses. First, it would have magnified the focus on the events in Morocco, for which Petitioner was not charged. Further, some of the proffered evidence is of limited persuasive value. The affidavits Petitioner attached to his direct appeal includes proposed testimony that DMS witnessed the custom of virgin bride.

> This is a custom of traditional and conservative practice in the region of Morocco where we live where at the end of the wedding festivities, my niece and her new husband would go to a private room and have an intercourse (sex). They would bring out the bride's pants with virgin blood stains showing that the bride has brought honor to her family and herself.

---

[16] Ms. Sims testified directly to what she witnessed regarding DMS's allegations against Petitioner during the relevant time in Canadian County and that she believed that nothing happened, and Petitioner had never hurt DMS nor Ms. Sims. (Exhibit 7, Tr. II 97-115). Ms. Sims testimony was impeached on cross-examination where she acknowledged Petitioner's physical and sexual abuse. Specifically, after initially stating that Petitioner never abused her, Ms. Sims testified on cross-examination that on several occasions during their relationship, Petitioner forced her to do things sexually "that he wanted and [Ms. Sims] didn't" and that she would attempt to fight him off but he fought back and he was stronger than her. (Exhibit 7, Tr. II 138-139). Further Ms. Sims testified that on one occasion Petitioner held her down and ejaculated onto her stomach. (Exhibit 7; Tr. II 140). Additionally, Ms. Sims stated that Petitioner had forced his penis into her mouth "to the point that [she was] choking" and that he would bite her breasts against her will. (Exhibit 7, Tr. II 141). Ms. Sims stated that she had never discussed any of these events with DMS because she was too ashamed. (Exhibit 7, Tr. II 142).

(Exhibit 6, Rule 3.11 Application, Exhibit 1 (grammatical errors in original)). While this testimony could have, theoretically, corroborated Petitioner's testimony concerning his description of the custom, it fails to refute DMS's claim that Petitioner sexually abused her and took her to receive the hymenoplasty in order to cover up the abuse. Either way, Petitioner admitted that he took DMS to receive the hymenoplasty, although he claims DMS wished to have the surgery in order to follow Moroccan custom. (Exhibit 7, Tr. II 187-88). *See Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Parts of the affidavits also conflict with Petitioner's trial testimony. The affidavit of Hannane El Kamli, Petitioner's sister, for example, clearly says that DMS's allegations could not be true because Petitioner and DMS "never slept in the same room." (Exhibit 6, Rule 3.11 Application, Exhibit 1). The affidavit of Khadija El Kamli, Petitioner's other sister, states "DMS always slept in the same room with me, my three young children, A[], S[], and H[]; my sister Hanane [sic], along with my niece Z[]." (Exhibit 6, Rule 3.11 Application, Exhibit 7). Meanwhile, Petitioner explicitly testified that at times he shared a room with just his mother and DMS. (Exhibit 7, Tr. II 167). The affidavit of Said El Kamli, Petitioner's brother, claims that DMS's allegation that Petitioner exposed himself to DMS while they were changing into their swimsuits in the car before going to the beach could not be true because they lived so close to the beach that they changed into their swimsuits at home. (Exhibit 6, Rule 3.11 Application). Petitioner, on the other hand, testified clearly that it could not have happened because they changed into their swimsuits at gender-

segregated bathrooms at the beach. (Exhibit 7, Tr. II 166). A fairminded jurist could agree these affidavits do not demonstrate trial counsel's ineffectiveness. *See Matthews v. Workman,* 577 F.3d 1175, 1191-92 (10th Cir. 2009) (finding counsel not ineffective for declining to call potential alibi witnesses whose testimony was ambiguous and not congruent with Petitioner's proposed timeline).

### b. Failure to obtain and utilize photographs from the Morocco trips to support Petitioner's testimony and challenge the testimony of DMS.

Similarly, counsel's conscious decision not to introduce the photographs of DMS at trial was eminently reasonable. The photographs show DMS posed with various members of Petitioner's family in various settings. (Exhibit 6, Rule 3.11 Application, Attachments 2-5, 8-13). Petitioner claims that these photographs "depict a happy teenager, DMS, enjoying a trip to a foreign country" and had the jury seen those photographs "it would have likely also caused it to question the veracity of DMS's allegations of abuse occurring in Oklahoma." (Doc. 5 at 55-56; Exhibit 3 at 39-40). However, more likely, at least from counsel's perspective, the pictures could have served as a sobering reminder to the jury of the child whose innocence Petitioner spent the next year robbing her of and reinforced to the jury that Petitioner purposely started the abuse when DMS was isolated from all her friends and family in a foreign country where she had no realistic means of disclosure or escape. A fairminded jurist could agree counsel was not unconstitutionally ineffective for declining to take that risk. *See Richter*, 562 U.S. at 108 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense.").

### c. Failure to obtain and utilize Petitioner's United States Passport as a defense exhibit.

Petitioner next complains that counsel was ineffective for failing to utilize his passport at trial. (Doc. 5 at 57-59; Exhibit 3 at 40-41). He asserts that the passport could have been utilized

> (1) to demonstrate that [Petitioner] was a United States citizen, (2) to support [Petitioner's] testimony regarding the length of the trips to Morocco and contradict DMS's testimony regarding those trips, and (3) to impeach DMS's testimony regarding the timing of when a phone call was received from Oklahoma during the second trip to Morocco.

(Doc. 5 at 57; Exhibit 3 at 41). Considering each of these allegations in turn, the OCCA reasonably rejected them.

First, Petitioner's suggestion that the mere fact of counsel reminding the jury that he was an American citizen would have caused them to wholly disregard DMS's harrowing testimony of abuse is unpersuasive. Petitioner's assertions that the jury "was given the impression, albeit incorrect, that he was a foreigner who had been caught abusing an American child" is without citation to anywhere in record. (Doc. 5 at 58; Exhibit 3 at 41). That Petitioner was originally born in Morocco is unquestionably true but cannot have been anywhere close to as prejudicial as the allegations DMS made of abuse in Oklahoma. Moreover, Petitioner's assumptions and insinuations about whether his jury would have been more or less prejudiced against him based on his citizenship status are contrary to *Strickland*'s standard. *See Strickland,* 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the

idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.").

Second, Petitioner's assertion that the passport confirms that the first trip to Morocco lasted only three weeks, from August 11th to September 1st[17] rather than the three months DMS testified to, is unsupported by the pages of his passport that he attaches. The passport pages Petitioner attaches to his Rule 3 .11 Application do not contain any entry or exit dates for the year 2016. (Exhibit 6, Rule 3.11 Application, Exhibit 8, Attachment 1). This, therefore, could not have helped him.

Third, although Petitioner is correct that the June 12, 2017, entry date would have supported his testimony that Ms. Sims called him well into the second trip rather than just a few days info it, as DMS had testified, it is unclear how this would have helped him. (Doc. 5 at 59; Exhibit 3 at 43). After all, Petitioner still admitted at trial that he sought the hymenoplasty for DMS *after* he received notification from Ms. Sims of the Yukon Police Department's investigation into him (Exhibit 7, Tr. II 191).

### d. Failure to investigate and interview DMS's sibling who denied that DMS was abused by Petitioner.

Petitioner next claims counsel was ineffective for failing to interview or utilize evidence from H.S., DMS's younger sibling who was forensically interviewed in 2017 and 2019 and denied that Petitioner had done anything wrong both times. (Doc. 5 59-61;

---

[17] Although Petitioner writes "September 11," Respondent believes this is a typographical error because August 11-September 11 is a full month, not three weeks, and there was no suggestion by either party that the trip extended beyond September 1, 2016. (Doc. 5 at 58; Exhibit 3 at 42).

Exhibit 3 at 43-45; Rule 3.11 Application, Exhibit 9, Attachments E & F). Although this material was fully available to trial counsel, and trial counsel, this Court must presume, made a conscious decision not to use it, Petitioner asserts that counsel should have both utilized the information and conducted a further investigation by interviewing H.S. (Doc. 5 at 59-60; Exhibit 3 at 43-44).

Even though Petitioner now claims that trial counsel should have interviewed H.S., it does not appear that Petitioner believed it was necessary for direct appeal, as on appeal there was no additional evidence indicating or suggesting what H.S.'s testimony would be if interviewed in any attachments. To the extent that the documents available to trial counsel at the time suggest that H.S. denied DMS's allegations about abuse in Oklahoma, it is unclear what effect further questioning would have had. Although Petitioner does not acknowledge it, DMS testified on direct examination that H.S., and indeed all of her other siblings, did not believe her allegations and had mostly stopped talking to her. (Exhibit 7, Tr. I 201-202, 233). H.S., in particular, had apparently messaged DMS telling her to "'go to hell.'" (Exhibit 7, Tr. I 233). Had H.S. testified, she would have been subject to impeachment on cross-examination for bias; this would not have had a reasonable probability of helping Petitioner, and would have been largely cumulative to what DMS already testified to. Indeed, DMS testified that H.S. was asleep whenever Petitioner conducted his nighttime abuse, so H.S.'s testimony would not have been contradictory to DMS's at all. (Exhibit 7, Tr. I 198-99, 201-02). A fairminded jurist could agree with the OCCA's rejection of this claim.

### 3. Failure to utilize available evidence, contained in the State's discovery, to impeach and cross-examine DMS.

Next, Petitioner complains that trial counsel was ineffective for failing to utilize reports from the time she called Yukon Police from Morocco during the second trip, and her interviews with Department of Human Services (DHS) staff and Yukon police upon her return to Oklahoma in 2017. (Doc. 5 at 61-63; Exhibit 3 at 46-47; Rule 3.11 Application, Exhibit 9, Attachments A & B). As with the information about H.S., this was already well before the jury during DMS's testimony, and Petitioner does not exactly explain how the additional provision of these cumulative documents would have probably affected the outcome. He certainly does not show that no fairminded jurist could agree with the OCCA's rejection of this claim.

### a. Failure to cross-examine DMS as to multiple denials made following return from second Morocco trip.

On direct examination, DMS addressed her multiple initial lies concerning Petitioner's behavior. (Exhibit 7, Tr. I 214-15, 220-21). Defense counsel thoroughly cross-examined DMS, forcing her to admit multiple times to lying. (Exhibit 7, Tr. II 31-36). Counsel elicited that she had said Petitioner was a "great parent" and that "nothing had happened." (Exhibit 7, Tr. I 34). Although counsel did not literally attempt to admit the written records of her statements to law enforcement, this clearly indicates he utilized these reports in composing questions. Moreover, given their cumulative nature, it is unclear what, if anything, they could have added. Contrary to Petitioner's assertions, there is no "reasonable probability that [Petitioner] would not have been convicted" had counsel

attempted to introduce the written reports as exhibits. (Doc. 5 at 63; Exhibit 3 at 47). Their content was well within the jury's knowledge and, indeed, was not denied by DMS.

Indeed, counsel's cross-examination essentially addressed DMS's denials as fully as he could. While trial counsel was free to cross-examine DMS on her prior inconsistent statements, he could not admit extrinsic evidence solely for the purpose of addressing truthfulness or untruthfulness. *See* OKLA. STAT. tit. 12, § 608(8) (2011). And even if counsel attempted to admit DMS's prior statements from the reports as extrinsic evidence in pursuance of allegations of bias or prejudice, this would have inevitably run into hearsay issues, because these were not DMS's direct words, but words of DMS as reported by witnesses who did not testify in court, and these reports would not have qualified under any hearsay exception. *See* OKLA. STAT. tit. 12, § 2805 (2011) (allowing hearsay within hearsay if "each part of the combined statements conforms with an exception to the hearsay rule"). And Petitioner makes no argument otherwise.

### b. Failure to cross-examine DMS regarding different allegations of abuse contained in her multiple statements.

Finally, Petitioner claims, based entirely on DMS's initial March 27, 2019, handwritten statement, that her initial allegations did not allege any Oklahoma wrongdoing of the type he was ultimately convicted of, she changed her story at trial, and counsel was ineffective for failing to utilize the handwritten statement during cross-examination. (Doc. 5 at 63-64; Exhibit 3 at 47-49; Rule 3.11 Application, Exhibit 9, Attachment D). This assertion is not borne out in the record, and thus, a fairminded jurist could agree with the OCCA's denial of relief on this claim.

Petitioner points out that in the initial handwritten statement, DMS only alleged that "[e]very night that [Petitioner] was home he would come in and slip his hands into my panties. I pretended I was asleep. Everyday (sic) he was there when I was homeschooled, he would try to rape me every time my mom left the house." (Doc. 5 at 63; Exhibit 3 at 48 (quoting Rule 3.11 Application, Exhibit 9, Attachment D)). He argues that the statement thus "alleged sexual abuse no doubt, but the acts occurring in Yukon were limited to fondling and [Petitioner] 'trying' to rape DMS" and that the jury "needed to hear how DMS's allegations had changed drastically from when she first disclosed abuse." (Doc. 5 at 64; Exhibit 3 at 48).

The record and trial transcript, however, clearly demonstrate that the handwritten statement is merely that, an initial, partial disclosure, and DMS disclosed the magnitude of Petitioner's abuse shortly thereafter, not for the first time at trial. For example, the affidavit for Petitioner's arrest, based in part on DMS's April 4, 2019, forensic interview, conducted only a week after the written statement, indicated constant abuse, including in Oklahoma. (Exhibit 8 at 4). Vicki Boan, who conducted both of DMS's forensic interviews, the first in 2017, where she denied abuse, and the second on April 4, 2017, where she fully disclosed the abuse, testified. (Exhibit 7, Tr. II 69). Ms. Boan testified regarding delayed disclosure. (Exhibit 7, Tr. II 71-77). Although DMS's forensic interview is not within the record, there is no indication whatsoever that there was a material difference between her two hour forensic interview, and what she testified to at trial. And Petitioner makes no claim that he does not have the forensic interview, nor did he attach any portion of it to his Rule 3.11 Application.

In any event, what trial counsel actually cross-examined DMS on was the far more significant inconsistency in her testimony, *i.e.*, that after the second Morocco trip, at the height of Petitioner's abuse and right after she had been forced into two surgeries, she appeared before Ms. Boan and denied that anything was wrong at all, including all allegations of abuse. (Exhibit 7, Tr. II 31-36). The choice to focus on the greater inconsistency rather than focus on the brief initial, if incomplete, disclosure, which hardly painted Petitioner in a good light, is certainly justifiable as sound trial strategy. *Strickland*, 466 U.S. at 690. The OCCA reasonably concluded that Petitioner did not show that the mere provision of a handwritten statement, hastily written the night DMS, after years of abuse, finally disclosed to law enforcement, demonstrated that trial counsel was ineffective.

Finally, overall Petitioner's complaints about trial counsel's handling of DMS on cross-examination ignore the deference counsel is owed. This Court and the Tenth Circuit have repeatedly rejected claims of ineffective assistance where a petitioner's attorney thoroughly cross-examined a State witness and the petitioner merely points to additional grounds for impeachment or different impeaching evidence that counsel could have used. *See, e.g.*, *Hancock v. State*, 798 F.3d 1002, 1030 (10th Cir. 2015) (stating that trial counsel's failure to use two prior statements to impeach witness did not prejudice defendant, and thus did not amount to ineffective assistance of counsel where counsel impeached witness with her other prior statement); *Easter v. Calbone*, 2006 WL 2270951 *10 (W.D. Okla. Aug. 8, 2006) (unpublished) (holding trial counsel was not ineffective for failing to use medical reports to impeach the testimony of the State's witness). Further, as

referenced above, trial counsel thoroughly cross-examined DMS, obtaining concessions that she had lied multiple times in 2017 when first speaking to officers, and that she did not come forward until she was caught with a love letter from a significant other. (Exhibit 7, Tr. II 34-38). Accordingly, Petitioner has not shown that no fairminded jurist could agree with the OCCA's rejection of this ineffective assistance claim.

### E.   Conclusion.

As shown above, the OCCA's rejection of Petitioner's ineffective assistance claim on direct appeal was neither contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the state court record. *See* 28 U.S.C. § 2254(d). Therefore, this Court should deny habeas relief on Ground Three.

### GROUND FOUR

**THE OCCA'S DETERMINATION THERE WERE NO SIGNIFICANT ERRORS DURING PETITIONER'S TRIAL REQUIRING REVERSAL IMPLICATES NO CLEARLY ESTABLISHED LAW, AND REGARDLESS WAS NOT CONTRARY TO CLEARLY ESTABLISHED LAW, NOR WAS IT LEGALLY OR FACTUALLY UNREASONABLE.**

In his final ground for relief, Petitioner claims the above-alleged errors, when considered in the aggregate, "deprived [him] of his Constitutional rights."[18] (Doc. 5 at 64-66; Exhibit 3 at 49-50). Even assuming this claim is supported by clearly established law, because a fairminded jurist could agree with the OCCA's denial of this claim, Petitioner is

---

[18] Petitioner's fourth ground for relief is so summarily briefed that it is unclear if Petitioner is claiming an effect on his convictions or his sentences or both. (Doc. 5 at 64-66).

not entitled to relief.

## A.  Background.

On direct appeal and reiterated in his Petition, Petitioner claims that the accumulation of errors and irregularities in his case should accumulate into reversible error. (Doc. 5 at 64-66; Exhibit 3 at 49-50). The OCCA denied his claim stating:

> In Proposition Four, Appellant argues cumulative error deprived him of a fair trial. We have found no significant errors on review, and thus find no accumulation of prejudicial effects. *Barnett v. State,* 2011 OK CR 28, ¶ 34, 263 P.3d 959, 969. Proposition Four is denied.

(Exhibit 1 at 8).

## B.  Clearly Established Law.

The Tenth Circuit has, in the past, rejected the argument that the cumulative error analysis is not supported by clearly established federal law. *See Hanson v. Sherrod*, 797 F.3d 810, 852 n. 16 (10th Cir. 2015) ("[W]hen a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process'" (quoting *Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003))).

However, Respondent points to a recent Tenth Circuit decision in which the court stated,

> [a]lthough we are bound by Tenth Circuit precedent on this issue, we note, in passing, that the Supreme Court has never recognized the concept of cumulative error. And, because there is no "clearly established Federal law" on this issue, we question whether a state appellate court's rejection of a cumulative error argument can justify federal habeas relief under the standards outlined in § 2254(d).

76

*Bush v. Carpenter*, 926 F.3d 644, 686, n. 16 (10th Cir. 2019). Respondent thus preserves, for future review, the argument that this claim fails for lack of clearly established Supreme Court law, as *Bush* recognized.

In any event, "[a] cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Smith*, 824 F.3d at 1255 (internal quotation marks omitted). "The cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Id.* (internal quotation marks omitted).

## C. The OCCA's determination there were no significant errors that could accumulate into reversible error was reasonable and not contrary to clearly established law or based on unreasonable findings of fact.

Petitioner has failed to show that he is entitled to relief on his cumulative error claim.[19] As an initial matter, § 2254(d) deference applies to the OCCA's rejection of Petitioner's cumulative error claim because it adjudicated the claim on the merits. Although

---

[19] This Court may consider in its cumulative error analysis only those claims that are not procedurally defaulted. *Ray v. Simmons*, 125 F. App'x 943, 946-47 (10th Cir. Feb. 7, 2005) (unpublished); *See also Cuesta-Rodriguez*, 916 F.3d at 916 (agreeing with State of Oklahoma that court cannot rely on procedurally defaulted claims in considering a cumulative-error claim); *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005) ("Meritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated." (alteration in original) (quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996))). Thus, Grounds One and Two, which were not exhausted as federal claims and are anticipatorily barred, should not be considered as to cumulative error. Furthermore, even if these claims are considered, this Court must confine itself to the arguments raised to the OCCA, *see Sexton*, __ U.S. __, 138 S.Ct. at 2558, and this Court may consider only constitutional errors in its cumulative error analysis, *see Lott*, 705 F.3d at 1223. Before the OCCA, Grounds One and Two were either barely federalized or based entirely on state law.

the OCCA did not cite the U.S. Constitution or any federal cases in deciding this claim, this Court must presume that the OCCA adjudicated the federal aspect of Petitioner's claim on the merits. *See Johnson*, 568 U.S. at 298.

"The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility." *Rivera*, 900 F.2d at 1469. "A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Hooks v. Workman*, 689 F.3d 1148, 1194 (10th Cir. 2012) (quoting *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003)).

Here, although not stated explicitly, in Ground One, the OCCA apparently found error in the lack of pre-trial written notice, *see* OKLA. STAT. tit. 12, § 2414(B) (2011), insofar as it treated the evidence as admissible under OKLA. STAT. tit. 12, § 2414 (2011). (Exhibit 1 at 3); *see McClendon v. State*, 777 P.2d 948, 952 (Okla. Crim. App. 1989); *Diaz v. State*, 728 P.2d 503, 513 (Okla. Crim. App. 1986); *Burks v. State*, 594 P.2d 771, 775 (Okla. Crim. App. 1979). However, the OCCA found that any error did not warrant relief because there was no evidence that the presentation of the Petitioner's conduct in Morocco constituted an "unfair surprise" and therefore no more formal notice was necessary. (Exhibit 1 at 3).

Additionally, although not explicitly stated, by finding that the evidence of Petitioner's conduct in Morocco was admissible under § 2414, which, like other types of other crimes evidence, requires a limiting instruction, the OCCA implicitly found error in

the lack of a limiting instruction, but that any error did not rise to the level of *plain* error (*i.e.*, outcome-determinative error) as there was no "indication that [the evidence] was misused." (Exhibit 1 at 6); *see* OKLA. STAT. tit. 12, § 2404(b) (2011); *Jones v. State*, 772 P.2d 922, 925 (Okla. Crim. App. 1989); *Burks*, 594 P.2d at 775.

However, in disposing of Petitioner's cumulative error claim, the OCCA described these errors as "no[t] significant" and concluded there was no aggregation of prejudice warranting relief. (Exhibit 1 at 8). A fairminded jurist could agree. The error from Ground One had no prejudicial effect at all, as the OCCA found that Petitioner suffered no unfair surprise from the admission of the evidence. (Exhibit 1 at 5-6). Indeed, as Respondent discussed in Ground One, it was apparent that DMS alleged Petitioner abused her during the Morocco trips as this allegation was in the record from the very first arrest affidavit, and the State's Witness and Exhibit List indicated that the State expected DMS to testify consistently with the documents and reports provided to defense counsel in discovery. (Exhibit 8 at 3-5, 61-64). So, Petitioner was on notice that DMS would testify regarding the events in Morocco. As to Ground Two, the OCCA found no evidence the jury misused the evidence, and in fact the record shows the jury carefully considered the Information, which charged Petitioner only with crimes committed in Oklahoma. (Exhibit 1 at 6).

Based on the above, the OCCA reasonably concluded that any errors were, if at all, modestly prejudicial in nature and cast no "grave doubt" on the proceedings. *See Meek*, __ F.4th __, 2023 WL 4714719, *42. *See also Littlejohn v. Royal*, 875 F.3d 548, 570 (10th Cir. 2017) ("From a purely additive or sum-of-the-parts perspective, the three dashes of modest prejudice that we have assumed here ... hardly constitute, in the aggregate, a recipe

for the kind of prejudice that would render [petitioner's] resentencing proceeding fundamentally unfair or cause us to have grave doubts about whether the errors affected the jurors' verdict ...."); *see also Grant*, 886 F.3d at 956 (noting that *Littlejohn*'s "logic applie[d] with even greater force [in that case], where we ... collectively assess[ed] the modest prejudicial effect of only two errors, not three"). Further, as the Tenth Circuit discussed in *Meek*, *Grant*, and *Cargle*, "harmless individual errors may possess 'an inherent synergistic effect,' ... such that the errors may be 'collectively more potent than the sum of their parts.'" *Grant*, 886 F.3d at 956 (first quoting *Cargle*, 317 F.3d at 1221; and then quoting *Littlejohn*, 875 F.3d at 571). Here, however, as in *Grant* and *Meek*, Petitioner "makes no argument that the two errors that we have assumed here possess any particularized synergies" and, "[t]herefore, th[e] synergy principle ... does not avail" him. *Meek*, __ F.4th __, 2023 WL 4714719 *42 (quoting *Grant*, 886 F.3d at 956). Indeed, in Ground Four, Petitioner does not discuss the specifics of what errors he believed occurred or offer any theory as to how they accumulated to deny him a fair trial. He has certainly not shown that no fairminded jurist could agree with the OCCA's denial of relief.

**D.    Conclusion.**

As shown above, the OCCA's rejection of Petitioner's cumulative error claim on direct appeal was neither contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the state court record. *See* 28 U.S.C. § 2254(d). Therefore, this Court should deny habeas relief on Ground Four.

## **CONCLUSION**

Based on the above and foregoing law and reasoning, federal habeas corpus relief is unwarranted. Petitioner's petition for federal habeas corpus relief should therefore be denied in its entirety by the Court.

Respectfully submitted,

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ SAMANTHA K. OARD**
**SAMANTHA K. OARD, OBA #34174**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Fax: (405) 522-4534
Service email: fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

**X**     I hereby certify that on August 24, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and a Notice of Electronic Filing was emailed to the following CM/ECF registrant:

Robert S. Jackson
Counsel for Petitioner
Bob Jackson Law
1300 NW 10th St
Oklahoma City, Oklahoma 73106


s/ SAMANTHA K. OARD