# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PAUL LEWIS SIMS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    Case No. CIV-23-533-D |
| | ) |
| DAVID BUSS, Warden, | ) |
| | ) |
| Respondent. | ) |

## REPORT AND RECOMMENDATION

Petitioner Paul Lewis Sims ("Petitioner")[1] seeks a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1) ("Petition"). Chief United States District Judge Timothy D. DeGiusti referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C). (Doc. 3). Respondent filed a response, (Doc. 14), along with portions of the record, including jury trial transcript (Tr. Vols. I-III), and the state trial court record (R.). (Docs. 14, 16).[2] For the reasons set forth below, the undersigned recommends Petitioner's application for habeas corpus relief be **DENIED.**

---

[1] Throughout the record, Petitioner is referred to alternately by his legal name Paul Lewis Sims and his Moroccan name, Ibrahim Elkani.

[2] Citations to the parties' filings and attached exhibits will refer to this Court's CM/ECF pagination. Citations to the state court record will refer to the original pagination. Except for capitalization, all quotations are verbatim unless otherwise noted.

## I.    Background

Petitioner was convicted after a jury trial of five counts of child sexual abuse in violation of OKLA. STAT. tit. 21, § 843.5(E), and sentenced to life imprisonment on each count, to run consecutively.  Canadian County District Court, Case No. CF-2019-188;[3] (*see also* Doc. 1, at 1; Doc. 14, at Ex. 2).  The victim, DMS, is Petitioner's stepdaughter.  (R. at 3-5).  She alleged sexual abuse and rape from around May 2016 to around December 2018, when she was between fourteen and seventeen years old.  (*Id.* at 3; Tr. Vol. I, at 178). Petitioner is from Rabat, Morocco, and he took DMS by herself on two long trips to the country — one in the summer of 2016 and one in the summer of 2017 — during which they stayed at his family home.  (Tr. Vol. I, at 177-80; 209).  DMS testified at trial that Petitioner repeatedly raped her during the first trip whenever they were alone together, including while Petitioner's family members were sleeping in the home.  (*Id.* at 185-88). They returned from Morocco in September 2016, around DMS's fifteenth birthday, at which point she testified Petitioner threatened that if she reported the sexual abuse to police or her mother, Tammy Sims, their family — including her three siblings — "wouldn't have any money and [they] would all suffer and [their] family would be destroyed."  (*Id.* at 195).

Petitioner continued to abuse DMS while in Yukon, Oklahoma, throughout 2016 and the first part of 2017.  DMS testified that at night Petitioner regularly entered the bedroom she shared with her younger sister in the Yukon house, and he would rape her

---

[3]    https://www.oscn.net/dockets/GetCaseInformation.aspx?db=canadian&number=CF-2019-188&cmid=412672 (*Docket Sheet*) (last visited June 16, 2025).

digitally, anally, and vaginally. (*Id*. at 198-99; 202). DMS testified that she would pretend to be asleep so that she could roll away from him and so that she did not have to talk to Petitioner about it the next day. (*Id*.) DMS described specifically for the jury where and how Petitioner touched her body. (*Id*.) The prosecutor periodically verified with DMS, "are you still talking about when you're 15 and happening in Yukon? Is that correct?. . . At the address on Dawn Avenue; correct?" (*Id*. at 203). DMS testified that Petitioner raped her in her bedroom in Yukon, remembering specifically one occasion in which she had gone to the bedroom to get her earrings and that Petitioner

> hugged me from the front so I couldn't move my arms, even though I tried to punch him. He got me on the ground, and I managed to try wiggling away, but he held me there and put his weight on me. . . . He pushed my panties to the side after I refused to masturbate for him and he put his private part in mine.

(*Id*. at 200-201). DMS testified that she was abused while she was homeschooled by Petitioner in the Yukon house, including an incident in the living room:

> I was sitting down, studying for English, not watching a video, and he came in there. And I was sitting at an angle, so he easily got me on my stomach and pulled down my pants. At this time I was wearing pants, but they were stretchy around the waist so they were easy to get down, and he penetrated my butt with his penis – private part.

(*Id*. at 206). Counsel asked DMS, "You've mentioned several things that happened when you were 15 in Yukon. Have you mentioned everything that happened?" (*Id*. at 208). DMS responded, "No. It happened so many times, the same repeated things. He would touch my butt, my private areas, he would penetrate my private area with his finger and his private part on several occasions, so many that I can't remember." (*Id*.)

3

Petitioner took DMS on the second trip to Morocco during the summer of 2017.  (*Id.* at 209; *see also* Tr. Vol. II, at 32).  There, Petitioner received a call from Ms. Sims, who told him that Yukon police officers had been at the house to investigate an allegation that Petitioner was raping DMS.  (Tr. Vol. I, at 211).  Petitioner started "flipping out" and forced DMS to call the investigating officer and deny the allegations.  (*Id.* at 211-15).  Petitioner then took DMS to a doctor who performed two surgeries to "make her a virgin again," as described in the Information.  (R. at 4).  DMS was not able to see the operations, but she was aware they were being performed on her vagina.  (*Id.* at 5).

DMS testified at trial that Petitioner told her she was "a virgin again and that [Petitioner] couldn't touch" her.  (Tr. Vol. I, at 217; *see also id.* at 213-14 ("He said I had to protect him.  And then we went into town and he saw this doctor that was supposed to create cherries.")).  In the days after the surgery, she experienced serious cramping and pain, then vaginal bleeding.  (R. at 5).  Petitioner took her back to the doctor, who performed the surgery again, this time leading to an infection from the stitches.  (Tr. Vol. I, at 219).  Petitioner and DMS returned to the doctor once more, this time for medication to treat the infection.  (*Id.* at 220).

Upon their return from the second Morocco trip in August 2017, DMS met with Yukon police and denied that Petitioner had hurt her in any way.  (*Id*. at 220-21).  She eventually reported the abuse to Ms. Sims in October 2018 and again in December 2018.  (*Id*. at 223-26; R. at 4).  Ms. Sims insisted at trial that DMS was lying about Petitioner's abuse.  (Tr. Vol. I, at 225-26).

In March 2019, DMS ran away from home because Petitioner, who traveled regularly, was set to return home, and she was afraid to be around him. (R. at 4). At that time, DMS reported to the Yukon Police Department that she had previously lied to Department of Human Services officials and the Yukon Police Department about being sexually abused by Petitioner. (*Id.*) She soon after underwent a forensic interview at CART House,[4] a child advocacy center. (*Id.*) During the interview, DMS alleged Petitioner sexually abused, raped, and physically abused her beginning on the first Morocco trip and continuing in Yukon, Oklahoma. (*Id.*) As described in the Information, DMS detailed "multiple occasions . . . where [Petitioner] force[d] his penis into her vagina, forced his fingers into her vagina and forced his fingers into her anal cavity, and forced [DMS] to look at and touch his exposed penis." (*Id.*) She alleged the abuse continued regularly until a Department of Human Services investigation was opened in 2017, when she lied, denying the abuse on Petitioner's instruction. (*Id.*)

At the CART House interview, DMS also alleged Petitioner abused her by kicking and stomping on her throughout 2017. (*Id.*) She stated that she told her mother, Tammy Sims, about Petitioner's rape and physical abuse in December 2018. (*Id.*) Ms. Sims told Yukon police that she was unsure what to do about the allegations because DMS had previously denied any abuse to Department of Human Services. (*Id.*) Ms. Sims also said she was afraid of Petitioner and described instances of spousal rape. (*Id.*) Ms. Sims

---

[4] "CART" stands for Child Abuse Response Team.

obtained a protective order for herself and her children and against Petitioner while he was out of town. (*Id.*)

After the forensic interview, DMS underwent a physical examination at CART House, during which she told the nurse that she had twice undergone surgery to "get her virginity back." (Tr. Vol. II, at 61-62). A doctor who later reviewed video documentation of the examination along with another doctor's report and the CART House intake interview, testified at trial that scar tissue and a "hymenal notch" were present that could have been caused by the hymenoplasty in Morocco. (*Id.* at 84-87).

Petitioner, testifying in his own defense, denied ever sexually abusing DMS. (*Id.* at 174; 191). He said DMS had a history of false accusations against him and Ms. Sims. (*Id.* at 161-62). He testified to the Muslim custom that men and women sleep separately and denied ever sharing a private room with DMS. (*Id.* at 164). DMS testified that she got engaged to a Moroccan boy during the first trip, and the two planned on getting married when DMS turned eighteen so that he could use the marriage to come to the United States. (*Id.* at 8-9). Petitioner said the hymenoplasty was intended to make DMS eligible for marriage and that she had advocated for the procedure. (*Id.* at 187-89).

Following Petitioner's conviction and sentencing, he appealed to the Oklahoma Court of Criminal Appeals ("OCCA"), which affirmed. (Doc. 14, at Exs. 1, 3). He now petitions for habeas corpus relief.

## II.    Petitioner's Claims

Petitioner raises four grounds for relief.  In Ground One, Petitioner claims the state district court violated his constitutional rights to due process and a fair trial by admitting evidence of sexual abuse that Petitioner allegedly committed in Morocco.  (Doc. 1, at 6; Doc. 5, at 21-32).  In Ground Two, Petitioner claims the state district court violated his constitutional rights to due process and a fair trial by failing to correctly instruct the jury as to the limited purpose for which it could consider the Morocco evidence.  (Doc. 1, at 8; Doc. 5, at 32-37).  In Ground Three, Petitioner claims he was denied his Sixth Amendment right to effective assistance of trial counsel.  (Doc. 1, at 9; Doc. 5, at 37-64).  In Ground Four, Petitioner claims the cumulative effect of the alleged errors deprived him of his constitutional rights.  (Doc. 1, at 11; Doc. 5, at 64-66).

## III.    Standard of Review

"The standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA') guide [this Court's] review of 28 U.S.C. § 2254 applications."  *Wellmon v. Colo. Dep't of Corr.*, 952 F.3d 1242, 1245 (10th Cir. 2020).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011). A petitioner is entitled to federal habeas relief only if that merits-based adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "It is the petitioner's burden to make this showing and it is a burden intentionally designed to be difficult to meet." *Owens v. Trammell*, 792 F.3d 1234, 1242 (10th Cir. 2015) (internal quotation marks omitted). This standard "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted).

This Court "first determine[s] whether the petitioner's claim is based on clearly established federal law." *Hanson v. Sherrod*, 797 F.3d 810, 824 (10th Cir. 2015). "Only Supreme Court law announced by the time of the state-court decision on the merits qualifies as clearly established law." *Wellmon*, 952 F.3d at 1245. If clearly established federal law exists, this Court then considers whether the state court decision was contrary to or an unreasonable application of that clearly established federal law. *See Owens*, 792 F.3d at 1242. A state court's decision is contrary to clearly established federal law if it "comes to a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Court has . . . on materially indistinguishable facts." *Wellmon*, 952 F.3d at 1245. Notably, "[i]t is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be diametrically different and mutually opposed to the Supreme Court decision itself." *Owens*, 792 F.3d at 1242 (internal quotation marks omitted).

"[T]he state court's decision is an unreasonable application of Supreme Court Law"
if it "identifies the correct governing legal principle . . . but unreasonably applies that
principle to the facts of the prisoner's case." *Wellmon*, 952 F.3d at 1245 (internal quotation
marks omitted). On this point, "the relevant inquiry is not whether the state court's
application of federal law was *incorrect*, but whether it was objectively unreasonable."
*Owens*, 792 F.3d at 1242 (internal quotation marks omitted). So, to qualify for habeas
relief on this prong, the petitioner must show "there was no reasonable basis for the state
court's determination." *Id.* at 1243 (internal quotation marks omitted). "In other words, so
long as fairminded jurists could disagree on the correctness of the state court's decision,
habeas relief is unavailable." *Id.* (internal quotation marks omitted); *see also Harrington*,
562 U.S. at 103 ("As a condition for obtaining [federal habeas relief], a state prisoner must
show that the state court's ruling on the claim being presented in federal court was so
lacking in justification that there was an error well understood and comprehended in
existing law beyond any possibility for fairminded disagreement.").

This Court "must accept a state-court [factual] finding unless it was based on 'an
unreasonable determination of the facts in light of the evidence presented in the State court
proceeding.'" *Davis v. Ayala*, 576 U.S. 257, 271 (2015) (quoting 28 U.S.C. § 2254(d)(2)).
This Court presumes the factual determination to be correct; a petitioner can only rebut this
presumption with clear and convincing evidence. *See id.*; *see also* 28 U.S.C. § 2254(e)(1).

IV.    **Analysis**

A.    **Ground One: Petitioner Is Not Entitled to Relief on His Evidentiary Claim.**

Petitioner claims his procedural due process rights were violated and his trial rendered fundamentally unfair by the admission of evidence of alleged sexual abuse that occurred in Morocco, which he argues formed the "centerpiece" of the State's case against him.  (Doc. 5, at 21-22).  The undersigned recommends the Court deny habeas relief on this ground because Petitioner did not exhaust his claim in state court and it would be procedurally barred if he raised it now after being granted leave to exhaust.  Even if exhausted and not procedurally barred, Petitioner's claim nevertheless fails on the merits.

1.    **Relevant Procedural History**

Before trial, the State notified Petitioner of its intent to introduce evidence of other bad acts or crimes.  (R., 43-44).  That notice explained the State's intent to "call endorsed witnesses and offer exhibits consistent with the discovery provided to establish [Petitioner] has a history of this type of behavior and, on prior occasions, has engaged in this and other types of relevant behavior as follows: [Petitioner] raped, verbally, and physically abused [sic] T.S. on numerous occasions," with "[m]ore specifics [] detailed in the written discovery which was provided to the defense," and argued that "[s]uch evidence of [Petitioner's] commission of other offenses of child molestation and sexual assault offenses are admissible as probative propensity evidence under Okla. Stat. tit. 12 §§ 2414 and 2413."  (*Id.*)  Petitioner did not object.  (Doc. 14, at Ex. 1, at 2).

During trial, the State elicited testimony from DMS about Petitioner's alleged abuse in Morocco.  (Tr. Vol. I, at 190-94; 209-10).  Testifying in his own defense, Petitioner denied the abuse but described DMS's vaginal operation in Morocco.  (Tr. Vol. II, at 187-90).  The State later emphasized the Morocco evidence in closing argument:

> [Fifteen] years old, thousands of miles from home, with a doctor that doesn't speak English, who you can't communicate with, with your arms tied one by one, your legs tied one by one. [Fifteen] years old, not able to talk to your mother about it, told not to talk to her.  [Fifteen] years old, and the numbing wears off and you feel the stitches and you scream in pain.
>
> That's [DMS's] story.  And you have a choice.  It's that or [Petitioner's] story.

(Tr. Vol. III, at 6).    However, the State also emphasized to the jury that the abuse they were to consider was the abuse performed in Yukon, Oklahoma.  Counsel stated:

> Lewd Acts with a Child Under 16.  We're talking specifically – right – Canadian County, Yukon.  We're talking about she gets back from Morocco Trip Number 1 on her 15th birthday.  She leaves for Morocco the second time before she turns 16.  In June of 2017 is when they left.  So that's the time period we're talking about.
>
> . . . She describes in detail what he did to her breast, what he did to her vaginal area, what he did to her buttocks, in different room in the house at different time, but all while she's 15 in Yukon, Oklahoma.

(*Id.* at 8).    The jury was also given an instruction that read:

> The Defendant is charged in Counts 1 through 5 of the Information with Child Sexual Abuse by sexually abusing [DMS], his step-daughter, when she was under the age of eighteen (18) during a period of time between September 1, 2016, and June 11, 2017, in Canadian County, Oklahoma.  To these charges the Defendant has entered pleas of not guilty.

(R., at 122).

After conviction, Petitioner challenged the trial court's admission of the Morocco evidence on direct appeal, arguing the State failed to provide the pre-trial notice required by state evidentiary rules, that the alleged sexual assault in Morocco was not supported by clear and convincing evidence, and that the probative value of the Morocco evidence was outweighed by its prejudicial effect. (Doc. 14, at Ex. 3, at 18-26). The OCCA rejected Petitioner's claim, relying exclusively on state law. (*Id.* at Ex. 1, at 1-5).

### 2. Petitioner Did Not Exhaust Ground One in State Court, and It Would Be Procedurally Barred If He Raised It Now.

#### a. Petitioner Failed to Exhaust Available State Remedies.

"[A] state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court." *Davila v. Davis*, 582 U.S. 521, 527 (2017). "The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a postconviction attack." *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994). "Exhaustion requires that the claim be 'fairly presented' to the state court, which 'means that the petitioner has raised the 'substance' of the federal claim in state court.'" *Fairchild v. Workman*, 579 F.3d 1134, 1151 (10th Cir. 2009) (quoting *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006)); *see also* 28 U.S.C. § 2254(b)(1)(A). This means "a federal habeas petitioner [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *see also Williams v. Trammell*, 782 F.3d 1184, 1210 (10th Cir. 2015) ("'Fair presentation' . . . requires that the petitioner raise in state court the 'substance' of

his federal claims. This includes not only the constitutional guarantee at issue, but also the underlying facts that entitle a petitioner to relief.") (internal citation omitted).  So "the crucial inquiry" is whether the petitioner has put the state courts on notice of his federal claim by presenting them with its "substance."  *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012).  Although "[a] petitioner need not invoke 'talismanic language' or cite 'book and verse on the federal constitution,'" *id.* (quoting *Nichols v. Sullivan*, 867 F.2d 1250, 1252 (10th Cir. 1989)), "it is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made," *Anderson*, 459 U.S. at 6, 103 S.Ct. 276 (internal citation omitted).

Petitioner did not provide the OCCA a fair opportunity to review the constitutional claim before this Court.  Rather, Petitioner made only one fleeting reference to his constitutional rights in his direct appeal, summarizing at the end of his introduction that "[t]he erroneous admission of evidence as to what transpired in Morocco served to violate Mr. Sims [sic] rights to Due Process and a fair trial as guaranteed by Article II, Sections 7 and 20 of the Oklahoma Constitution and the Sixth and Fourteenth Amendments to the United States Constitution."  (Doc. 14, at Ex. 3, at 19).  But to have properly exhausted his due process argument, Petitioner needed to do more than introduce his state evidentiary argument with a cursory mention of due process and a fair trial.  *See Hill v. Farris*, No. CIV-21-335-C, 2022 WL 16954832, at *11 (W.D. Okla. Oct. 7, 2022) (finding that "Petitioner did not raise the substance of his federal claims . . . to the OCCA in a manner sufficient to put the court[ ] on notice of the federal constitutional claim" when

"Petitioner's argument to the OCCA did not reference federal law and explicitly sought a new trial under state law."), *adopted*, 2022 WL 16951674 (W.D. Okla. Nov. 15, 2022).

Before the OCCA, Petitioner relied exclusively on Oklahoma case law and rules of evidence to argue the state district court plainly erred in allowing the Morocco evidence. (Doc. 14, at Ex. 3, at 18-26). This evidentiary argument is insufficient to exhaust his due process claim because "errors of state law do not automatically become violations of due process." *Rivera v. Illinois*, 556 U.S. 148, 160 (2009). Such evidentiary questions "are cognizable on habeas only if the alleged error was 'so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" *Revilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002) (alteration in original) (quoting *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000)). Petitioner's argument before the OCCA lacked any reference to federal case law or explanation about how this alleged evidentiary error "fatally infected the trial." *Revilla*, 283 F.3d at 1212; *see also Cole v. Zavaras*, 349 Fed. App'x 328, 331 (10th Cir. 2009) (finding petitioner failed to exhaust his federal claim: "In some instances, [petitioner] states in a conclusory fashion that the alleged error violated his federal constitutional rights, but he cites no federal case law to support those claims and does little to connect the claim with the rights he alleged were violated.").

### b. Ground One Would Be Procedurally Barred in State Court and Thus Is Subject To an Anticipatory Procedural Bar in This Court.

If a claim is unexhausted, a federal court generally dismisses it without prejudice "so that the petitioner can pursue available state-court remedies." *Grant v. Royal*, 886 F.3d

874, 892 (10th Cir. 2018) (internal quotation marks omitted). But "dismissal without prejudice for failure to exhaust state remedies is not appropriate if the state court would now find the claims procedurally barred on independent and adequate state procedural grounds." *Id.* (internal quotation marks omitted). "[I]n appropriate circumstances the court can apply an 'anticipatory procedural bar' to functionally transform unexhausted claims into exhausted ones, thus obviating the need to dismiss a mixed petition." *Fontenot v. Crow*, 4 F.4th 982, 1019 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2777 (2022).

These are the circumstances here. Petitioner could have raised the constitutional dimension of his evidentiary claim on direct appeal but, as explained above, he did not. Oklahoma law requires that any claims for post-conviction relief be raised first on direct appeal, or they are deemed waived. *Mann v. State*, 856 P.2d 992, 992 (Okla. Crim. App. 1993); OKLA. STAT. tit. 22, § 1086. So, if Petitioner would now attempt to return to state court to raise his constitutional claim about the Morocco evidence on post-conviction relief, the state court would find it to be procedurally barred. The Tenth Circuit has held that the "procedural rule barring post-conviction relief for claims petitioner could have raised on direct appeal constitutes an independent and adequate ground." *Sherrill v. Hargett*, 184 F.3d 1172, 1175 (10th Cir. 1999). Accordingly, the undersigned finds it appropriate to apply an anticipatory procedural bar in this Court. *See Lott v. Trammell*, 705 F.3d 1167, 1193 (10th Cir. 2013) (holding that argument that petitioner's trial was rendered fundamentally unfair was subject to an anticipatory procedural bar when it was not raised on direct appeal to the OCCA); *see also Grant*, 886 F.3d at 901-02 (applying the

anticipatory procedural bar to a procedural due process claim and noting that "under Oklahoma's Uniform Post-Conviction Procedure Act, only claims which were not and could not have been raised on direct appeal will be considered in post-conviction proceedings") (internal quotation marks and alterations omitted).

**c.    Petitioner Does Not Demonstrate Cause and Prejudice or a Fundamental Miscarriage of Justice Sufficient to Overcome the Procedural Bar.**

A petitioner may overcome procedural default if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012). Petitioner has not alleged — and a review of his pleadings reveals he has not shown — cause for his failure to present his unexhausted constitutional claim to the state court. Because Petitioner has not shown cause for his procedural default, the undersigned need not address whether he suffered actual prejudice. *Simpson v. Carpenter*, 912 F.3d 542, 571 (10th Cir. 2018) (A petitioner "must establish both cause and prejudice to overcome the state procedural bar.").[5] Likewise, Petitioner does not assert

---

[5] Petitioner argues that trial counsel provided ineffective assistance, which could in some circumstances amount to cause for his procedural default. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State."); *see also Coleman v. Thompson*, 501 U.S. 722, 754 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012). However, Petitioner does not argue counsel's errors amounted to cause for his failure to raise the constitutional aspect of his evidentiary claim on direct appeal. Furthermore, the OCCA reasonably determined that counsel did not provide ineffective assistance under the Sixth Amendment. *See infra.*

16

a fundamental miscarriage of justice, and a review of his pleadings reveals he does not present any new evidence of his innocence as is required to prove a miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536-37 (2006) (holding that a petitioner "asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  Petitioner cannot overcome the anticipatory procedural bar, so the Court should deny habeas relief on Ground One.

### 3.    Alternatively, Petitioner's Claim Should Be Denied on the Merits.

Even if Petitioner's isolated reference to due process and a fair trial were sufficient to exhaust his claim before the OCCA, the undersigned would recommend denying Ground One on the merits.  "When a state court admits evidence that is 'so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.'"  *Ochoa v. Workman*, 669 F.3d 1130, 1144 (10th Cir. 2012) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).  So the relevant inquiry is "whether, considered in light of the entire record, [the contested evidence's] admission resulted in a fundamentally unfair trial."  *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002), *abrogated on other grounds by Johnson v. Williams*, 568 U.S. 289 (2013).  "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements . . . [the] federal court must tread gingerly and exercise considerable self-

restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks omitted).

The OCCA reviewed Petitioner's claim for plain error. (Doc. 14, at Ex. 1, at 2). "Oklahoma's plain-error test is rooted in due process." *Thornburg v. Mullin*, 422 F.3d 1113, 1124 (10th Cir. 2005). There is "no practical distinction between the [the OCCA's] formulation[ ] of plain error . . . and the federal-due process test." *Id.* Moreover, the OCCA's ruling on Petitioner's evidentiary claim is sufficient to trigger AEDPA deference even without any express due process analysis. *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). So, the Court "must defer to [the OCCA's] ruling unless it unreasonably applied that test." *Thornburg*, 422 F.3d at 1124 (internal quotations and alterations omitted).

The OCCA found that the Morocco evidence was properly admitted because, procedurally, Petitioner suffered no unfair surprise and because the evidence was not unduly prejudicial:

> In Proposition One, [Petitioner] argues the trial court erred in the admission of evidence of other crimes, wrongs, bad acts, and evidence of sexual propensity. He argues the State failed to give the pre-trial notice required by statute and case law; that the acts were not proven by clear and convincing evidence; and that the probative value of these acts was substantially outweighed by the danger of unfair prejudice and other countervailing factors.

> Trial counsel did not object to the evidence on any of the grounds raised on appeal, waiving all but plain error. [Petitioner] must now show plain or

obvious error affected the outcome. This Court will only correct plain error when it seriously affects the fairness, integrity or public reputation of the proceedings, or otherwise causes a miscarriage of justice. The purpose of pre-trial notice of other crimes evidence is to prevent unfair surprise and ensure the defense is heard before the evidence is admitted. These procedures do not relieve defense counsel of the need to object, and "there is no need for the court to make a determination of admissibility unless the defendant raises an objection."

Indeed, under this Court's case law, a defendant who complains of a lack of pre-trial notice "must do more than simply object; he must withdraw his announcement of ready for trial and request a continuance." Because there is no evidence of unfair surprise, the absence of a more formal pre-trial notice concerning this evidence does not require relief.

Evidence of other crimes, wrongs, or bad acts is not admissible to prove action in conformity therewith on a particular occasion, but "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." To be admissible under section 2404(B), general other crimes evidence must be: (1) probative of a disputed issue; (2) visibly connected to the charged crime; (3) necessary to support the State's burden of proof; (4) clear and convincing; and (5) of sufficient probative value to outweigh its prejudice to the defendant.

In cases involving sexual assault or child molestation, evidence of a defendant's other sexual assaults or sexual molestation is relevant and admissible for "any proper purpose," if it is established by clear and convincing evidence and satisfies the general relevancy balancing requirements of 12 O.S. 2011, section 2403.

[Petitioner] argues that the other bad acts, sexual assaults, and child molestation in Morocco were not proved by clear and convincing evidence. We find the complaining witness's testimony of other bad acts, as well as specific acts of rape and molestation in Morocco, was clear and convincing, as it was corroborated both by physical evidence and other testimony indicating [Petitioner's] propensity to commit sexual abuse. This argument is without merit.

[Petitioner] also argues the evidence of other sex crimes failed to meet the balancing requirements of section 2403. We disagree. [Petitioner] flatly denied sexually abusing the complainant. Strict, convincing proof of her

shocking allegations was entirely necessary to obtain convictions on these charges. The victim's descriptions of abuse were clear and convincing, highly probative of disputed facts, corroborated by other evidence, and no less prejudicial testimony was available.

The crimes of [Petitioner] in Morocco were very similar to those committed in Oklahoma against the same victim. This evidence therefore did not distract the jury from the principal issues on trial, but rather tended to show [Petitioner's] sexual propensity, consciousness of guilt, his identity as an abuser, and his plan to escape detection. Because this evidence was admissible under sections 2403, 2404, 2413, and 2414, the trial court committed no plain or obvious error. Proposition One is denied.

(Doc. 14, at Ex. 1, at 2-6) (internal citations omitted). The undersigned finds that the OCCA's plain error analysis of this evidentiary issue constitutes a reasonable determination that, in light of the entire record, the Morocco evidence did not deprive Petitioner of due process or a fundamentally fair trial.

Petitioner first argues the OCCA made an unreasonable factual determination that introduction of the Morocco evidence did not constitute unfair surprise. (Doc. 5, at 27) ("The state court concedes the lack of notice, yet inexplicably concludes there was no 'unfair surprise.' Such analysis appears a non-sequitur and is based upon an unreasonable determination of fact."). Petitioner's argument is essentially that the State's "*Burks* notice" of intent to introduce evidence of other bad acts, which is required by Oklahoma law, was deficient. (Doc. 5, at 25-26); *see Burks v. State*, 594 P.2d 771 (Okla. Cr. App. 1979). To the extent Petitioner argues that a deficient *Burks* notice entitles him to relief, he raises a state-law error that is not cognizable on habeas review. *See Hernandez v. Addison*, 2006 WL 2489349, at *16 (W.D. Okla. Aug. 28, 2006) ("To the extent Petitioner complains that he did not receive a *Burks* notice regarding this evidence, he is obviously raising an error

of state law.") (citing *United States v. Kendall,* 766 F.2d 1426, 1441 n. 6 (10th Cir. 1985)).

Construed as a due process argument that the lack of *Burks* notice deprived him of a

fundamentally fair trial, Petitioner's claim still fails. The OCCA found that, "[b]ecause

there is no evidence of unfair surprise, the absence of a more formal pre-trial notice

concerning this evidence does not require relief." (Doc. 14, at Ex. 1, at 3). The undersigned

finds no unreasonable determination of fact by the OCCA. In its notice of intent to

introduce evidence of other bad acts, the State indicated it would elicit evidence of rape

and verbal and physical abuse against T.S. – Tammy Sims, DMS's mother – with more

details provided in written discovery. (R. at 43-44). However, the notice also referred to

Petitioner's "commission of other offenses of *child* molestation." (*Id*.) (emphasis added).

Moreover, the affidavit in support of Petitioner's arrest details DMS's descriptions of abuse

in Morocco and the hymenoplasty operation, (R., at 4-5), and the State's Witness and

Exhibit List includes DMS and the doctor who reviewed her physical exam and intake

interview records, both of whom were to testify to reports included in discovery, (R., at 61-

62). Thus, the OCCA's holding that any lack of specificity in the *Burks* notice did not

result in unfair surprise was a reasonable factual determination and did not render

Petitioner's trial fundamentally unfair.

Petitioner next argues the OCCA unreasonably found DMS's testimony about the

Morocco abuse was proven by clear and convincing evidence, as required by Oklahoma

law, because the court identified no evidence corroborating DMS's allegations of abuse in

Morocco. (Doc. 5, at 28-29); *see also Brewer v. State*, 2019 OK CR 23, ¶ 5, 450 P.3d 969,

971 (Okla. Crim. App. 2019) ("To be admissible, challenged propensity evidence 'must be established by clear and convincing evidence.'") (quoting *Horn v. State*, 204 P.3d 777, 786 (Okla. Crim. App. 2009)).  The OCCA held that DMS's "testimony of other bad acts, as well as specific acts of rape and molestation in Morocco, was clear and convincing, as it was corroborated both by physical evidence and other testimony indicating [Petitioner's] propensity to commit sexual abuse."  (Doc. 14, at Ex. 1, at 5).  "Under Tenth Circuit precedent, [Petitioner] may only obtain habeas relief for an improper state evidentiary ruling 'if the alleged error was so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" *Bullock v. Carver*, 297 F.3d 1036, 1055 (10th Cir. 2002) (alteration in original) (quoting *Revilla v. Gibson,* 283 F.3d 1203, 1212 (10th Cir. 2002)).  Petitioner points to no clearly established federal law to support his argument that a lack of corroborating evidence would render his trial fundamentally unfair.  Moreover, to the extent Petitioner argues the OCCA's decision was based on an unreasonable factual determination that DMS's testimony was corroborated by other evidence, his argument also fails.  Although Petitioner is correct that the OCCA did not specifically identify the corroborating evidence, the jury heard relevant testimony tending to support DMS's account.  The jury heard from the doctor who reviewed DMS's physical examination reports that the scarring he observed was consistent with hymenoplasty. (Tr. Vol. II, at 87-91).  The jury also heard from Ms. Sims, who testified about her previous description of Petitioner's abusive sexual tendencies, which echoed DMS's own allegations.  (*Id*. at 116-143).  Although Ms. Sims denied previous statements

about Petitioner's sexual abuse and control tactics, it was up to the jury to decide whether her testimony was believable. The undersigned disagrees that the record is devoid of corroborating evidence of the Morocco abuse or that the OCCA's decision was based on an unreasonable determination that DMS's testimony was supported.

Finally, Petitioner argues that the OCCA unreasonably determined that the Morocco evidence was more probative than prejudicial and asserts that the admission of the evidence was so prejudicial as to render the trial fundamentally unfair. (Doc. 5, at 30). Again, the undersigned disagrees and finds the OCCA's balancing of the probative nature of the evidence entirely reasonable. The OCCA explained:

> [Petitioner] flatly denied sexually abusing [DMS]. . . . Strict, convincing proof of her shocking allegations was entirely necessary to obtain convictions on these charges. The victim's descriptions of abuse were clear and convincing, highly probative of disputed facts, corroborated by other evidence, and no less prejudicial testimony was available.

> The crimes of [Petitioner] in Morocco were very similar to those committed in Oklahoma against the same victim. This evidence therefore did not distract the jury from the principal issues on trial, but rather tended to show [Petitioner's] sexual propensity, consciousness of guilt, his identity as an abuser, and his plan to escape detection.

(Doc. 14, at Ex. 1, at 5).

DMS testified at length and with articulate detail about the abuse occurring specifically in Yukon, Oklahoma, the crimes with which Petitioner was charged. In light of the entire record, including the State's closing argument and the jury instruction directing the jury to the Yukon evidence, the admission of the Morocco evidence did not render Petitioner's trial fundamentally unfair. Petitioner's Ground One fails on its merits,

as he has not shown the OCCA's decision was based on an unreasonable application of clearly established federal law or an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d).

> **B.      Ground Two: Petitioner Is Not Entitled to Relief on His Jury Instruction Claim.**

Petitioner claims the state district court violated his rights to due process and a fair trial by not *sua sponte* instructing the jury that it could only consider the Morocco evidence for a limited purpose and not as proof of guilt for the charged offenses. (Doc. 5, at 32-37). The undersigned recommends the Court deny habeas relief on this ground because Petitioner did not exhaust his constitutional claim in state court and it would be procedurally barred if he raised it now after being granted leave to exhaust. Even if exhausted and not procedurally barred, Petitioner's claim nevertheless fails on the merits.

> **1.      Petitioner Did Not Exhaust Ground Two in State Court, and It Would Be Procedurally Barred If He Raised It Now.**

As discussed above, Petitioner "must exhaust available state remedies before presenting his claim to a federal habeas court," *Davila*, 582 U.S. at 527, which means giving state courts "a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim," *Anderson*, 459 U.S. at 6. If a claim is unexhausted, dismissal without prejudice "is not appropriate if the state court would now find the claims procedurally barred on independent and adequate state procedural grounds." *Grant*, 886 F.3d at 892 (internal quotation marks omitted). In such circumstances, this Court may "apply an 'anticipatory procedural bar' to functionally transform unexhausted claims into

exhausted ones, thus obviating the need to dismiss a mixed petition." *Fontenot*, 4 F.4th at 1019.  However, Petitioner may overcome procedural default if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Petitioner did not provide the OCCA a fair opportunity to review the constitutional jury instruction claim now before this Court.  As in Ground One, Petitioner made only one fleeting reference to his constitutional rights in his direct appeal, summarizing at the end of his introduction that "[t]he trial court's failure to give an appropriate limiting instruction deprived [Petitioner] of his rights to Due Process and a fair trial in violation of Article II, Sections 7 and 20 of the Oklahoma Constitution and the Sixth and Fourteenth Amendments of the United States Constitution."  (Doc. 14, at Ex. 3, at 26-27).  Petitioner also relied exclusively on the Oklahoma Uniform Jury Instructions and state case law to argue that the state trial court was obligated to provide a limiting instruction.  (*Id.* at 29-31).  In the Petition now before this Court, Petitioner argues the lack of jury instruction denied him due process of law and a fair trial, an agrument which "depart[s] significantly from what the petitioner had presented to the state court." *Grant*, 886 F.3d at 891.  "[E]rrors of state law do not automatically become violations of due process." *Rivera*, 556 U.S. at 160.  And Petitioner did not provide the OCCA a fair opportunity to rule on his constitutional claim, which would have required "rais[ing] . . . the 'substance' of his federal claims." *Williams*, 782 F.3d at 1210.  Petitioner's conclusory mention of his federal rights to due process and

a fair trial — without citation to "federal case law to support those claims" and with "little to connect the claim with the rights he alleged were violated" — was insufficient to exhaust his constitutional argument. *Cole*, 349 Fed. App'x at 331.

Having failed to exhaust, Petitioner may be allowed to "pursue available state-court remedies." *Grant*, 886 F.3d at 892. But in these circumstances, the Court should "apply an 'anticipatory procedural bar.'" *Fontenot*, 4 F.4th at 1019. Under Oklahoma law, any claims for post-conviction relief not first raised on direct appeal are deemed waived. *Mann*, 856 P.2d at 992. So, Petitioner would now be procedurally barred from raising his constitutional claim about the jury instruction. This procedural rule "constitutes an independent and adequate ground," *Sherrill*, 184 F.3d at 1175, so the undersigned finds it appropriate to apply anticipatory procedural bar in this Court, *see Lott*, 705 F.3d at 1193.

Petitioner may overcome this anticipatory procedural default by demonstrating either cause and prejudice or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner has not alleged — and has not shown — cause for his failure to exhaust his constitutional claims, so the undersigned need not address whether he suffered actual prejudice. *Simpson*, 912 F.3d at 571 (A petitioner "must establish both cause and prejudice to overcome the state procedural bar."); *see also supra* n.5. Likewise, Petitioner does not assert a fundamental miscarriage of justice, and he does not present any new evidence of his innocence. *See House v. Bell*, 547 U.S. at 536-37 (A petitioner "asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable

26

doubt.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  Because Petitioner has not

exhausted his federal constitutional claim and cannot overcome the anticipatory procedural

bar, the Court should deny habeas relief on Ground Two.

> ### 2.    Alternatively, Petitioner's Jury Instruction Claim Should Be Denied on the Merits.

Even if Petitioner's references to due process and a fair trial had been sufficient to

exhaust his constitutional jury instruction claim before the OCCA, the undersigned would

recommend denying habeas relief on the merits.  "A state conviction may only be set aside

in a habeas proceeding on the basis of erroneous jury instructions when the errors had the

effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial."

*Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) (upholding denial of habeas relief

where petitioner challenged state trial court's failure to give certain jury instruction).  And

"where the claim is premised on the failure to give a certain instruction, as opposed to a

challenge to a given instruction, Petitioner's burden is even heavier, because '[a]n

omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement

of the law.'"  *Hernandez*, 2006 WL 2489349, at *17 (alteration in original) (quoting

*Henderson v. Kibbe,* 431 U.S. 145, 155 (1977)).

The OCCA reviewed Petitioner's claim for plain error.  (Doc. 14, at Ex. 1, at 6).

"Oklahoma's plain-error test is rooted in due process," *Thornburg*, 422 F.3d at 1124, and

the OCCA's ruling on Petitioner's jury instruction claim is sufficient to trigger AEDPA

deference even without any express due process analysis. *See Harrington*, 562 U.S. at 99

("When a federal claim has been presented to a state court and the state court has denied

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  So, the Court "must defer to [the OCCA's] ruling unless it unreasonably applied that test." *Thornburg*, 422 F.3d at 1124 (internal quotations and alterations omitted).

The OCCA held that the lack of jury instruction was not plain error because there was no indication the jury misused the Morocco testimony:

> In Proposition Two, [Petitioner] argues the trial court's omission of limiting instructions on the evidence of other crimes caused reversible error.  He speculates that the absence of limiting instructions could have allowed the jury to convict him of crimes committed in Morocco rather than Oklahoma. The failure to *sua sponte* administer limiting instructions on other crimes evidence is not reversible unless it rises to the level of plain error.

> We have repeatedly declined to find such instructional omissions reversible error.  The underlying evidence was properly admitted.  Its prejudicial impact was considerable, but absent any indication that it was misused, there is no plain or obvious error.  Proposition Two is denied.

(Doc. 14, at Ex. 1, at 6) (internal citations omitted).

Petitioner first argues that "the omission of an appropriate limiting instruction acted as a denial of Due Process and rendered the trial fundamentally unfair" because the jury "was left without any guidance as to the limited purpose for which it could consider the evidence of other crimes and/or sexual abuse occurring in Morocco," which is "especially problematic considering that the abuse alleged to have occurred in Morocco was of the same type as the charged offenses."  (Doc. 5, at 35-36).  The OCCA's decision was based on the absence of "any indication" the Morocco evidence "was misused."  (Doc. 14, at Ex. 1, at 6).  Respondent asserts, and the undersigned agrees, that Petitioner has not pointed to

clearly established federal law contrary to the OCCA's decision. (Doc. 14, at 45-46). A state court's decision is contrary to clearly established federal law if it "comes to a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Court has . . . on materially indistinguishable facts." *Wellmon*, 952 F.3d at 1245.

Petitioner points to Tenth Circuit and Supreme Court case law "acknowledg[ing] the significance of an appropriate limiting instruction when considering claims of improper admission of prior bad acts/ prior sexual abuse evidence." (Doc. 5, at 36) (citing *James v. Martin*, 567 Fed. App'x 594, 597 (10th Cir. 2014), then citing *Estelle*, 502 U.S. at 75). However, *Estelle* did not hold that the lack of a limiting instruction as to prior bad acts evidence would have entitled the petitioner to habeas relief. In that case, the Supreme Court held that the contested instruction did not improperly invite the jury to convict based on propensity evidence because the jury "likely" understood the instruction as worded and also "the trial court guarded against possible misuse of the instruction by" providing a limiting instruction. 502 U.S. at 75. In other words, *Estelle* held that a limiting instruction guarded against possible misuse of prior bad acts evidence as propensity evidence. It did not hold the inverse, as Petitioner suggests – that a lack of limiting instruction means the jury likely misused prior acts evidence. Assuming *Estelle* constitutes clearly established

federal law, the OCCA's decision is not contrary to the Supreme Court's ruling in that case.[6]

Petitioner likewise does not carry his burden under AEDPA in his argument that the OCCA unreasonably found no plain or obvious error "despite its emphasis in prior cases on the importance of a limiting instruction where other crimes and sexual abuse propensity evidence is admitted." (Doc. 5, at 34-35) (quoting *Bramlett v. State*, 422 P.3d 788, 795 (Okla. Crim. App. 2018), then citing *Horn v. State*, 204 P.3d 777, 787 n.4 (Okla. Crim. App. 2009)). Petitioner's citation to the OCCA's own case law is irrelevant to whether the court's decision was contrary to clearly established federal law. *Grant*, 886 F.3d at 948 n.25 ("[W]e are at a loss to understand how any purported inconsistency in the OCCA's *own (state law) precedent* produced by the OCCA's ruling in [petitioner's] case is germane to our inquiry under AEDPA — where the unalloyed legal concern is clearly established *federal* law.").

Finally, the same could be said for Petitioner's final argument that the OCCA's finding of no plain error was unreasonable because it also "acknowledg[ed] that the 'prejudicial impact was considerable.'" (Doc. 5, at 35). The relevant constitutional inquiry is not whether evidence was prejudicial, but whether the lack of limiting instruction "render[ed] the trial so fundamentally unfair as to cause a denial of a fair trial." *Maes*, 46

---

[6] As for *James*, that is a lower court case and plainly not clearly established federal law. *Owens*, 792 F.3d at 1242 ("It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be diametrically different and mutually opposed to the Supreme Court decision itself.") (internal quotation marks omitted).

F.3d at 984.  In light of the entire record – DMS's detailed testimony about abuse occurring

specifically in the Yukon house, the State's reminders to the jury that the crimes they were

to consider were the ones committed in Yukon, the jury instruction reminding the jury of

the same – the omission of the limiting instruction (as opposed to some misstatement of

the law) did not violate Petitioner's due process rights.  Thus, Petitioner's Ground Two

fails on its merits, as he has not shown the OCCA's decision was based on an unreasonable

application of clearly established federal law.  *See* 28 U.S.C. § 2254(d).

### C.    Ground Three: Petitioner Is Not Entitled to Relief on His Ineffective Assistance of Counsel Claim Because the OCCA Reasonably Held His Representation Was Consistent with the Sixth Amendment.

Petitioner claims trial counsel provided ineffective assistance during trial by: (1)

failing to object to the admission of the Morocco evidence; and (2) failing to request a

limiting instruction cabining the jury's consideration of the Morocco evidence.  (Doc. 5, at

40-43).  Petitioner claims trial counsel provided ineffective assistance outside trial by: (1)

failing to communicate with him during pre-trial investigation; (2) failing to sufficiently

investigate DMS's allegations; and (3) failing to impeach DMS using available discovery

materials.  (*Id.* at 43-64).  The undersigned recommends the Court deny habeas relief on

this ground.

### 1.    Clearly Established Law

In order to succeed on his claim of ineffective assistance of counsel, Petitioner must

satisfy the standards of *Strickland v. Washington*, 466 U.S. 668 (1984), and show that his

attorney's performance was both deficient and prejudicial.  *Id.* at 687.  An attorney's

performance is deficient when it falls "outside the wide range of professionally competent assistance." *Id.* at 690. "Judicial scrutiny of counsel's performance must be highly deferential. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). The performance is prejudicial where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Thus, prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

On habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable" — not "whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101. The court must therefore use a "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (internal quotation marks omitted).

### 2.     The OCCA's Ruling

The OCCA rejected Petitioner's claim:

In Proposition Three, [Petitioner] argues that trial counsel was ineffective. He specifically claims that trial counsel's omission to object to the evidence of other crimes, request a limiting instruction on that evidence, consult with the [Petitioner] and prepare him for trial, and utilize available evidence in his defense, was unreasonably deficient performance. He has filed in connection with this claim a motion to supplement the record on appeal and a request for

evidentiary hearing under Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S., Ch. 18, App. (2022).

We review this claim under the familiar bipartite standard of *Strickland v. Washington,* 466 U.S. 668 (1984), requiring [Petitioner] to show that counsel performed deficiently, and that [Petitioner's] defense was prejudiced by it. To obtain an evidentiary hearing and supplement the record on appeal with additional evidence of ineffective counsel, [Petitioner] must present clear and convincing evidence of a strong possibility that trial counsel was ineffective for failing to utilize available evidence.

This burden is less onerous than *Strickland's* required showing of deficient performance and prejudice. The grant of an evidentiary hearing is *not* a finding that defense counsel actually was ineffective, but rather of a strong possibility that warrants a further opportunity to support the claim. Conversely, the *denial* of an evidentiary hearing to supplement the record under Rule 3.1 l(B) necessarily embraces a finding that Appellant has not shown a violation of Sixth Amendment under *Strickland.*

We have carefully considered [Petitioner's] record-based challenges to counsel's representation, as well as his request for an evidentiary hearing to develop additional facts supporting his claims. The Court finds that he has not shown clear and convincing evidence of a strong possibility that trial counsel was ineffective. He does not show that counsel's presumptively reasonable strategic decisions about how to conduct the defense involved errors so serious as to deserve the name deficient performance. Nor has he shown that counsel's representation was so deficient that, but for unprofessional errors, there is a reasonable probability of a different outcome. Proposition Three, and the related request for an evidentiary hearing, are denied.

(Doc. 14, at Ex. 1, at 6-8) (internal citations omitted).

### 3.    The OCCA Reasonably Applied *Strickland.*

Petitioner sorts his claims of ineffective assistance into two groups: record-based instances of ineffective assistance and outside-the-trial-record instances of ineffective assistance.

### a.    Record-Based Claims of Ineffective Assistance

Petitioner argues counsel was ineffective in: (1) failing to object to the admission of the Morocco evidence; and (2) failing to request a limiting instruction cabining the jury's consideration of the Morocco evidence. (Doc. 5, at 40-43). He argues that, "[h]ad counsel objected to DMS's testimony concerning her allegations of other crimes/sexual abuse occurring in Morocco, the district court should have not allowed such testimony and/or instructed the jury to disregard same. . . . Without DMS's testimony about how Mr. Sims allegedly abused her in Morocco, there exists a reasonable probability that Mr. Sims would not have been convicted." (Doc. 5, at 41-42).

However, in sexual assault prosecutions, Oklahoma rules allow evidence of other sexual assaults if it meets certain requirements. *See* OKLA. STAT. tit. 12, §§ 2403, 2413-14; *see also Lott v. State*, 98 P.3d 318, 334-35 (Okla. Crim. App. 2004) ("To be admissible, evidence of other crimes must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions."). Thus, it is not at all clear that the trial court would have excluded the Morocco evidence even if counsel had objected. Indeed, the OCCA found that the evidence was properly admitted under Oklahoma law. (Doc. 14, at Ex. 1, at 5, 6).

Even if not admissible as other-crimes evidence, the Morocco testimony could have been admitted by the trial court over defense counsel's objection as *res gestae* of the charged Oklahoma sexual assaults — that is, as evidence of "those things, events, and circumstances incidental to and surrounding a larger event that help explain it." *McElmurry v. State*, 60 P.3d 4, 22 (Okla. Crim. App. 2002); *see also Newman v. State*, 466 P.3d 574, 582 (Okla. Crim. App. 2020) ("Evidence is considered *res gestae* when: 'a) it is so closely connected to the charged offense as to form part of the entire transaction; b) it is necessary to give the jury a complete understanding of the crime; or c) when it is central to the chain of events.'") (quoting *Eizember v. State*, 164 P.3d 208, 230 (Okla. Crim. App. 2007)).  Indeed, DMS's testimony described the abuse as beginning in Morocco, where DMS was away from known family members and could not speak the language, and then continuing in the same ways in Oklahoma.  DMS described the hymenoplasty surgery during the second Morocco trip, which was allegedly part of Petitioner's scheme to cover up the preceding abuse.

Furthermore, Petitioner's trial counsel may have chosen not to object to the admission of the Morocco evidence so that he could elicit testimony about the inconsistencies in DMS's narrative.  For example, defense counsel cross-examined DMS about the statements she made to both police and CART House investigators in August 2017, in which she denied that Petitioner had abused her in Morocco.  (Trial. Vol. II, at 31-34).  Petitioner has not overcome the presumption that defense counsel's failure to object to the admission of the Morocco evidence was sound trial strategy.

Finally, DMS testified extensively and in great detail about abuse that occurred in Oklahoma, which formed the basis for Petitioner's criminal charges. Even without the Morocco evidence, or with the Morocco evidence and a limiting instruction, the jury was likely to convict Petitioner of the crimes charged.

For the foregoing reasons, it was not unreasonable for the OCCA to determine that trial counsel's failure to object to the Morocco evidence and failure to request a limiting instruction did not constitute deficient performance and did not prejudice Petitioner. That is, the OCCA reasonably determined that there was no reasonable probability that, had counsel objected or urged the limiting instruction, Petitioner would have been acquitted. *See Strickland*, 466 U.S. at 694 (holding that prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). Petitioner has not carried his burden to show that the OCCA's rejection of his record-based claims of ineffective assistance "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

> **b.    Outside-The-Trial-Record Claims of Ineffective Assistance of Counsel.**

Petitioner claims trial counsel was ineffective outside the context of the trial in: (1) failing to communicate with him during pre-trial investigation; (2) failing to sufficiently investigate DMS's allegations; and (3) failing to impeach DMS using available discovery materials. (Doc. 5, at 44). For the reasons set forth below, the undersigned finds that the

36

OCCA reasonably applied the *Strickland* standard in determining that trial counsel was not deficient and that his performance did not prejudice Petitioner.

i.      **Counsel's Failure To Communicate**

Petitioner first claims counsel failed to communicate with him during pre-trial investigation.  (*Id*. at 47-49).  He claims that counsel only met with him at the jail once for 20 or 30 minutes, prior to the Information being formally filed and prior to receiving discovery, and otherwise he only communicated with counsel on the occasions when he was brought to the courthouse for court appearances.  (*Id*. at 48).  He claims that this left him "unable to participate in his defense" because counsel did not inform him that DMS had alleged sexual abuse in Morocco and never asked him if there were witnesses or evidence that could disprove the state's allegations or impeach DMS's testimony.  (*Id*. at 48-49).  Petitioner specifically alleges he was unable to provide counsel with the names of family members in Morocco who could "discredit DMS's allegations" and provide cultural context for DMS's hymenoplasty.  (Doc. 5, at 47-50; 52-55).  However, during his trial testimony, when asked about sleeping arrangements in the Morocco house, Petitioner testified that he had previously given counsel "all the names" of pertinent family members in Morocco.  (Tr. Vol. II, at 163) ("DMS, she was sleeping with ZZ, my niece, my sister Hennen, my sister Hadijah, her two daughters, H and ZZ — I gave you all the names — and the little boy.  His name is A.  He's a baby.  He's still a baby.  And myself, my brother Mohammad, and my brother Saheb, and my mother, we sleep on the other side.").  Moreover, in the Witness List filed prior to trial, defense counsel listed a witness named

Seddic.  (R., at 72).  This testimony and Witness List indicates that Petitioner in fact discussed the Morocco allegations with his counsel and had the opportunity to propose witnesses.  The OCCA was not unreasonable in determining that trial counsel's amount of communication with Petitioner was not tantamount to deficient performance.

Petitioner also argues that counsel inadequately prepared him to testify in his own defense, implying counsel should have advised him against testifying.  (Doc. 5, at 49-50). However, Petitioner decided to testify after discussing that decision with counsel during the recess called after Ms. Sims's testimony.  (Tr. Vol. II, at 154-56).  The trial judge asked Petitioner if he was aware of his right not to testify and whether he had discussed the decision with his attorney; Petitioner answered both in the affirmative.  (*Id.*)  The court also ensured Petitioner was aware that he would be subject to cross-examination.  (*Id.*)  The OCCA reasonably determined counsel did not provide deficient performance by inadequately preparing Petitioner to testify.

Petitioner makes a brief, vague assertion that trial counsel performed deficiently in failing to ask him about "unique characteristics of [his] anatomy [which] are unknown to DMS" and that "questioning DMS about these characteristics could have revealed DMS's allegations were untrue."  (Doc. 5, at 48-49).  It seems debatable to the undersigned as to whether defense counsel had a reasonable professional duty to *anticipate* and *ask* whether his client had "unique anatomy;" it seems more reasonable for Petitioner to *offer* such information to his counsel, which he could have done at any time, including during trial. Petitioner does not allege that he did so and that defense counsel refused to question DMS

on that point.  It was not unreasonable for the OCCA to find that trial counsel was not deficient in this regard.

Alternatively, Petitioner claims counsel's communication lapses amount to a complete failure in communication such that prejudice may be presumed.  (Doc. 5, at 51-52).  "In *United States v. Cronic*, 466 U.S. 648, 658 (1984), the Supreme Court held that in certain circumstances a presumption of ineffectiveness arises making it unnecessary to examine actual performance of counsel."  *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988).  Notably *Cronic* itself did not address communication failures between counsel and client.  However, the Tenth Circuit has recognized that "[a] complete breakdown in communication between an attorney and client may give rise to such a presumption."  *Soto Hernandez*, 849 F.2d at 1328. "[T]o prove a total breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible."  *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002).  The court

> consider[s] four factors when determining whether a complete breakdown in communication rendered a defendant's representation constitutionally ineffective:
>
> > 1) whether the defendant's motion for new counsel was timely; 2) whether the trial court adequately inquired into defendant's reasons for making the motion; 3) whether the defendant-attorney conflict was so great that it led to a total lack of communication precluding an adequate defense; and 4) whether the defendant substantially and unreasonably contributed to the communication breakdown.

*United States v. Holloway*, 939 F.3d 1088, 1097-98 (10th Cir. 2019) (quoting *Lott*, 310 F.3d at 1250; citing *Romero v. Furlong*, 215 F.3d 1107, 1113 (10th Cir. 2000) for four factors). In this case, Petitioner never filed a motion for new trial counsel, which causes the first two factors to be inapplicable or perhaps to weigh against Petitioner; indeed, he never complained about his counsel before the trial court. There is no indication that Petitioner purposefully contributed to the circumstances that led to counsel's relatively few opportunities to converse with Petitioner. Thus, the court must look primarily to the third factor and consider whether the amount of communication alleged by Petitioner "led to a total lack of communication precluding an adequate defense," *see id.*, or whether "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," *Cronic*, 466 U.S. at 659, or that counsel failed to communicate with him about "the essentials of [his] defense," *Soto Hernandez*, 849 F.2d at 1328. Petitioner concedes he did have some visits and opportunities for conversation with his lawyer, even though brief and few in number. The trial court record shows that defense counsel provided Petitioner with an adequate defense and tested the prosecution's case by cross-examining all of the State's witnesses, calling Ms. Sims to testify that she never observed any abuse, conducting the direct examination of Petitioner when he chose to testify, and making a closing argument addressing all of the evidence and pointing out inconsistencies in DMS's testimony. Accordingly, it was not unreasonable for the OCCA to disallow Petitioner a presumption of prejudice under *Cronic*. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that consistency with clearly established federal law "does not require citation of our cases-

40

indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

### ii. Counsel's Failure to Obtain and Utilize Evidence To Refute DMS's Allegations About the Morocco Abuse.

Petitioner alleges that trial counsel was ineffective by failing in various ways to rebut DMS's allegations about the abuse in Morocco. It should be noted that trial counsel cross-examined DMS about her testimony about Morocco, questioned Ms. Sims about her knowledge of the Morocco trips, and led Petitioner through his testimony regarding the Morocco trips. The fact that counsel did not focus even more of the jury's time and attention on the Morocco evidence would have been a reasonable strategic decision, since the Petitioner was on trial for crimes that occurred in Oklahoma. Thus, it was not unreasonable for the OCCA to determine that trial counsel was not deficient for not introducing more evidence about the Morocco trips. However, the undersigned addresses each of Petitioner's contentions in turn.

Petitioner first argues that trial counsel was deficient for failing to interview and/or obtain the testimony of witnesses in Morocco. As discussed above, it is apparent from Petitioner's trial testimony and the defense Witness List that Petitioner communicated to counsel the names of family members and other witnesses that could have observed events in Morocco. It was not unreasonable for trial counsel to decide not to devote trial resources to those witnesses, who were subject to impeachment for bias as family members, and who could not testify as to events relevant to Petitioner's actual criminal charges – the Oklahoma abuse. Thus, it was not unreasonable for the OCCA to view the fact that defense

counsel ultimately chose not to present such witnesses at trial as a "presumptively reasonable strategic decision." (Doc. 14, at 1, at 8). *See Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ("[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney."); *Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir. 1998) ("Generally, the decision whether to call a witness rests within the sound discretion of trial counsel."); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."). Indeed, defense counsel may have reasonably determined that calling such witnesses would have focused even more of the jury's attention on the Morocco evidence and served to confuse the jury or invite prejudice.

Petitioner next alleges counsel failed to obtain photographs from the trips to Morocco, which he argues "depict a happy, carefree teenager, DMS, enjoying trips to a foreign country" and "are not the sort of images one would expect of a person who was being repeatedly sexually abused during those trips." (Doc. 5, at 55-57). The OCCA reasonably determined that counsel's decision not to obtain and present these photographs to the jury was not an error "so serious as to deserve the name deficient performance" nor was it prejudicial. (Doc. 14, at 1, at 8). Stacked against DMS's graphic testimony about the abuse and the surgery in Morocco and the doctor's testimony about observable evidence of her hymenoplasty, a fairminded jurist could agree with the OCCA's determination that it was a reasonable strategic decision to not draw the jury's attention to images of the victim

with the Petitioner in a foreign country, surrounded by only his family members and where she did not speak the language.

Petitioner next argues counsel was ineffective for failing to use his passport at trial to prove he was United States citizen and to contradict DMS's testimony about the length of the trips to Morocco and about the timing of Ms. Sims's phone call from Oklahoma during the second trip. (Doc. 5, at 57). Counsel's decision to emphasize the broad evolution of DMS's account over time, rather than risk distracting the jury with minor inconsistencies, could reasonably be seen as sound trial strategy.

Petitioner next argues counsel performed deficiently by failing to interview DMS's sibling, who denied during forensic interviews that DMS had been abused, and to use her testimony to contradict DMS's account. (Doc. 5, at 59-61). DMS testified on direct examination, though, that none of her siblings believed her allegations of abuse and had for the most part stopped talking to her. (Tr. Vol. I, at 201-03; 233; *see also* Tr. Vol. II, at 31 (DMS testimony describing text message from her sister: "That she never wants to see me again, that I sent her dad to jail.")). Again, counsel's decision about whether or not to call a witness, especially a minor family member who could be effectively impeached, is a tactical decision entitled to deference. *See supra*.

Finally, Petitioner argues counsel was ineffective in failing to cross-examine DMS about certain inconsistencies in her reports of sexual abuse and about how those reports had changed "drastically" over time. (Doc. 5, at 61-64). However, on cross-examination counsel elicited testimony from DMS about her initial misrepresentations about the

Morocco trip during her first interview at CART House.  (Tr. Vol. II, at 34-35).  DMS admitted that she "lied to them" when she described her trip as pleasant, told them nothing had happened, and told them Petitioner and Ms. Sims were great parents.  (*Id.* at 34). Counsel also questioned DMS about Petitioner's reaction to a love letter and lipstick Petitioner found in her backpack.  (*Id.* at 37-40).  Because DMS had already testified that she only came forward after Petitioner had found these forbidden items, counsel's questioning served to remind the jury of her possible motive for lying about the abuse.  (*See* Tr. Vol. I, at 223-25).  Petitioner further argues that counsel performed deficiently in failing to cross-examine DMS about the handwritten statement she provided local police in 2019, in which she stated that Petitioner raped her in Morocco but that in Oklahoma he put his hands into her panties every night and *tried* to rape her every time her mom left the house. (Doc. 5, at 63-64).  Counsel's decision to focus on DMS's initial inconsistent statements at the CART House and her possible motive for making a false accusation rather than further emphasize the handwritten statement's descriptions of sexual abuse could reasonably be considered sound trial strategy.  The OCCA reasonably determined that counsel was not deficient in failing to follow the line of questioning Petitioner now urges.

### c.    Conclusion

The OCCA reasonably found Petitioner was not provided ineffective assistance of counsel both because counsel's performance was not constitutionally deficient and because the complained-of performance was not prejudicial, given the entire trial record.  Indeed, Petitioner has not met his burden to show that the OCCA's rejection of his *Strickland* claim

"was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.  The court should deny habeas relief on Ground Three.

### D.    Ground Four: Petitioner Is Not Entitled to Relief on His Cumulative Error Claim.

Petitioner claims he was prejudiced by the cumulative effect of his other alleged errors.  The undersigned recommends the Court deny habeas relief on this ground.

### 1.    Clearly Established Law

"[W]hen a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 n. 16 (10th Cir. 2015) (quoting *Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003)).  "In the federal habeas context, a cumulative error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 915 (10th Cir. 2019) (quoting *Cole v. Trammell*, 755 F.3d 1142, 1177 (10th Cir. 2014)).  "The cumulative-error analysis applies where there are two or more actual errors." *Smith v. Duckworth*, 824 F.3d 1233, 1255 (10th Cir. 2016) (quoting *United States v. Franklin–El*, 555 F.3d 1115, 1128 (10th Cir. 2009)).  This Court also considers the impact of any constitutional claims that "have been individually denied for insufficient prejudice." *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003); *see also Grant*, 886 F.3d at 954-55 ("[I]n resolving under the prejudice prong of *Strickland*

[petitioner's] ineffective-assistance claims based on counsel's [two] alleged failure[s] . . . we have effectively assumed that counsel's performance was constitutionally deficient. And thus, we are obliged to assess these two assumed errors in a cumulative-error analysis.").

### 2.    The OCCA's Ruling

The OCCA rejected Petitioner's claim:

> In Proposition Four, [Petitioner] argues cumulative error deprived him of a fair trial. We have found no significant errors on review, and thus find no accumulation of prejudicial effects. Proposition Four is denied.

(Doc. 14, at Ex. 1, at 8) (internal citation omitted).

### 3.    Analysis

The undersigned agrees with Petitioner that in holding the Morocco evidence was admissible under OKLA. STAT. tit. 12, § 2404, the OCCA implicitly found that the lack of limiting instruction was error – even if not plain error – because Oklahoma law requires one whenever evidence of other crimes or other bad acts is introduced. *See Bramlett v. State*, 422 P.3d 788, 795 (Okla. Crim. App. 2018).[7]   The OCCA did not find any other "significant errors." (Doc. 14, at Ex. 1, at 8)   The OCCA found, rather, that Petitioner "[did] not show that counsel's presumptively reasonable strategic decisions about how to

---

[7] As to Ground One, Respondent asserts that the OCCA "apparently found error in the lack of pre-trial written notice" insofar as it treated the Morocco evidence as admissible under OKLA. STAT. tit. 12, § 2414(B). (Doc. 14, at 78) (citing *McClendon v. State*, 777 P.2d 948, 952 (Okla. Crim. App. 1989)).   However, Petitioner's argument before the OCCA appears to have been that the pre-trial notice given was deficient, not entirely omitted, as a *Burks* notice was clearly given and labeled as such. (R. at 43-44).

conduct the defense involved errors so serious as to deserve the name deficient performance." (*Id.*) Thus, it appears that the OCCA viewed certain decisions by trial counsel as harmless, non-deficient-performance errors which, combined with the lack of a limiting instruction, did not amount to cumulative error. The undersigned finds that determination to be reasonable.

Regarding the lack of limiting instruction raised in Ground Two, the record shows that the jury was otherwise advised of the scope of the charges — that is, those crimes occurring in Oklahoma and not Morocco. In its opening statement, the State clarified, "Now, ladies and gentlemen, we're in the Canadian County Courthouse. The criminal acts that we're prosecuting here are what happened in Canadian County. Okay? But Morocco is part of the story because it's the beginning and part of the middle too." (Tr. Vol. I, at 167-68). As discussed above, DMS testified clearly about the Oklahoma abuse, with clarification by counsel for the State that certain acts occurred in the Yukon house. The State reminded the jury in its closing statement that the crimes charged were alleged to have occurred in Oklahoma, and the jury instruction performed the same function. The record does not indicate any misapplication of the Morocco evidence.

This remains so even when considered in light of other evidence the jury did not receive because of counsel's alleged ineffective assistance, as raised in Ground Three. The jury did not hear witnesses or see photographs from the Morocco trips; did not see Petitioner's passport; and did not hear additional testimony from DMS's sibling about her disbelief of DMS's accusations. None of this evidence would have significantly altered

the jury's understanding of DMS's descriptions of abuse occurring in Oklahoma or the doctor's corroborating testimony about her hymenoplasty.  Put differently, any harm from the lack of limiting instructions was not made worse by the omission of those pieces of evidence.  The same could be said for the introduction of the Morocco evidence itself: the lack of limiting instruction did not exacerbate its prejudicial effect such that would warrant relief based on cumulative error.  While "harmless individual errors may possess 'an inherent synergistic effect,' such that the errors may be 'collectively more potent than the sum of their parts,'" any such synergies were hampered by the State's clarifications about the scope of the charges, which performed much the same function.  *Grant*, 886 F.3d at 956 (internal citation omitted) (first quoting *Cargle*, 317 F.3d at 1207, then quoting *Littlejohn v. Royal*, 875 F.3d 548, 571 (10th Cir. 2017).  The undersigned recommends the Court deny habeas relief based on cumulative error.

## V.    Recommended Ruling and Notice of Right to Object.

For the reasons discussed above, the undersigned recommends the Petition for habeas relief (Doc. 1) be **DENIED.**  The undersigned further recommends the Court **DENY** Petitioner's request for an evidentiary hearing because "the state-court record 'precludes habeas relief' under the limitations of § 2254(d)."  *Cullen v. Pinholster*, 563 U.S. 170, 183, 131 S. Ct. 1388, 1399, 179 L. Ed. 2d 557 (2011) (quoting *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007)).

**The Court advises the parties of their right to object to this Report and Recommendation by August 11, 2025,** under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P.

72(b)(2).  The Court further advises the parties that failure to make timely objection to this report and recommendation waives their right to appellate review of both factual and legal issues contained herein.  *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues and terminates the referral to the undersigned Magistrate Judge in the captioned matter.

**ENTERED** this 28th day of July, 2025.


AMANDA L. MAXFIELD
UNITED STATES MAGISTRATE JUDGE